UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| V. | : | Civil Action No.: |
| | : | |
| JAMES DZURENDA, individually; | : | |
| SCOTT SEMPLE, individually; | : | |
| CONNECTICUT DEPARTMENT OF CHILDREN | : | |
| AND FAMILIES; JOETTE KATZ, | : | |
| COMMISSIONER, CONNECTICUT | : | |
| DEPARTMENT OF CHILDREN AND | : | |
| FAMILIES, individually and in her official | : | |
| capacity; WILLIAM ROSENBECK, | : | |
| SUPERINTENDENT, CONNECTICUT | : | |
| JUVENILE TRAINING SCHOOL, individually | : | |
| and in his official capacity; and THE STATE OF | : | |
| CONNECTICUT, | : | |
| Defendants. | : | November 23, 2016 |

## COMPLAINT

Plaintiff Jane Doe ("Plaintiff" or "Jane") alleges against Defendants James Dzurenda,

former Commissioner of the Department of Correction ("DOC"); Scott Semple, Commissioner

of the Department of Correction; the Connecticut Department of Children and Families ("DCF");

Joette Katz, the Commissioner of the Department of Children and Families; William Rosenbeck,

Superintendent of the Connecticut Juvenile Training School ("CJTS"); and the State of

Connecticut (collectively "Defendants") the following claims arising under the Eighth and

Fourteenth Amendments to the U.S. Constitution, the Juvenile Justice and Delinquency

Prevention Act ("JJDPA"), the Prison Rape Elimination Act ("PREA"), the Americans with

Disabilities Act ("ADA"), and the Rehabilitation Act of 1973:

1

## NATURE OF THIS ACTION

1.      Jane is a transgender woman who has been traumatized by a history of neglect and severe sexual and physical abuse.    She spent nearly all of the year 2014 in solitary confinement, with no interaction with peers.    When Jane was sixteen years old, although she was never charged with or convicted of a crime in adult court, she was imprisoned in isolation for almost three months at York Correctional Institution ("York CI" or "York"), Connecticut's high-security women's prison run by DOC.    She spent a further more than seven months in total isolation from peers at CJTS, DCF's high-security facility for juvenile delinquent boys.

2.      On January 31, 2014, following an incident at a residential placement out of state, DCF placed Jane in isolation at CJTS.    On February 4, 2014, DCF sought state court authorization to transfer Jane to Manson Youth Institution ("MYI"), a DOC prison for male offenders.    Jane was ultimately transferred to DOC custody, and DOC determined her placement at York CI.    After arriving at York on April 8, 2014, Jane was under constant watch by correctional officers trained only to guard adult inmates.    She was held alone in isolation—without interaction with other minors and without access to the age-appropriate mental health, educational, and rehabilitative services that she requires based on her history of severe trauma.    On June 24, 2014, DCF exercised its authority to remove Jane from York CI and placed her at the Pueblo Unit, a locked facility for girls adjacent to CJTS.    On July 12, 2014, DCF returned Jane to CJTS, where she was held in total isolation from peers until approximately December 23, 2014.

## JURISDICTION AND VENUE

3.      This Court has subject matter and supplemental jurisdiction over Plaintiff's claims and causes of action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2

4.      Venue is proper in the District of Connecticut because all of the events or omissions giving rise to Jane's claims occurred at or within various locations within the State of Connecticut.   28 U.S.C. § 1391(b)(2).

## THE PARTIES

5.      Plaintiff Jane Doe, a nineteen-year-old woman, resides in the State of Connecticut.

6.      Defendant James Dzurenda served as Commissioner of DOC from approximately April 1, 2013, to August 31, 2014.   He was the prison official chiefly responsible for Jane's health and safety while she was incarcerated by DOC and was the official chiefly responsible for determining the conditions under which she was being held while in DOC custody.   He is sued individually.

7.      Defendant Scott Semple has served as Commissioner of DOC since approximately August 31, 2014.   Previously, he served as Deputy Commissioner and was responsible for making determinations regarding the conditions under which Jane was being held at York CI.   He is sued individually.

8.      Defendant DCF is an agency operated by the State of Connecticut and has control over all children committed to its care by Connecticut's Superior Court for Juvenile Matters. DCF has control over the operation of CJTS and the Pueblo Unit.

9.      Defendant Joette Katz served as Commissioner for DCF at all times relevant to this complaint.   She is the person ultimately responsible for Jane's health and safety while Jane is in the care and custody of DCF and the person ultimately responsible for Jane's incarceration at an adult prison and conditions of solitary confinement at CJTS.   She is sued individually and in her official capacity.

3

10.     Defendant William Rosenbeck served as the Superintendent of CJTS and the Pueblo Unit at all times relevant to this complaint.    He is the person who was directly responsible for Jane's conditions of confinement while she was at CJTS.    He is sued individually and in his official capacity.

11.     Each of the above defendants acted as an agent or agency of Defendant State of Connecticut.

## FACTUAL BACKGROUND

12.     Jane was involved with DCF beginning when she was five years old.    At all times relevant to this complaint, she was dually committed to DCF as the result of both child protection and juvenile delinquency proceedings.    DCF was the court-appointed guardian with legal obligations to take actions that serve Jane's best interests.    Conn. Gen. Stat. §§ 46b-121, 46b-129.

### A History of Neglect, Abuse, and Trauma

13.     Beginning in early childhood and persisting throughout her life, Jane has experienced a persistent series of serious traumas, including sexual abuse, physical abuse, verbal abuse, and emotional trauma.    Some of these harms occurred while in DCF residential placements.

14.     Jane suffers from multiple mental impairments, namely Gender Dysphoria, Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

15.     At all times relevant to this action, DCF was aware of Jane's history of trauma and impairments.

### Transgender Status and Gender Dysphoria

16.     Jane is a transgender woman who suffers from Gender Dysphoria.

4

17.    A transgender person is someone whose gender identity—that is, a person's internal sense of being male or female—does not align with his or her assigned sex at birth. Typically, people born with the physical characteristics of males psychologically identify as men, and those with the physical characteristics of females psychologically identify as women. However, for a transgender person, body and gender identity do not match.

18.    A growing body of medical research suggests that this incongruence is caused by genetics and/or in utero exposure to hormones during the development of the brain, such that the anatomic physical body and the brain develop in different gender paths.

19.    While no clear scientific consensus exists regarding the specific origins of Gender Dysphoria (i.e., whether it can be traced to neurological, genetic, or hormonal sources), current research increasingly indicates that Gender Dysphoria has physiological or biological roots.

20.    For many transgender people, this incongruence between gender identity and assigned sex does not interfere with their lives.   For some transgender people, however, the incongruence results in dysphoria—i.e., a feeling of stress and discomfort with one's assigned sex.   Such dysphoria, if clinically significant and persistent, is a serious medical condition and has been regarded as such for well over fifty years.

21.    Gender Dysphoria is listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5) as a mental impairment that is characterized by a marked incongruence between one's experienced/expressed gender and assigned gender at birth. Gender Dysphoria involves a persistent physical and emotional discomfort with one's biological sex.   Left untreated, Gender Dysphoria can result in debilitating depression and anxiety, and can also lead to consideration of or attempted suicide, self-castration, or self-mutilation.

22.    The accepted course of medical treatment to alleviate the symptoms of Gender

Dysphoria often involves allowing the individual to live as his or her chosen gender through one or more of the following treatments: changes in gender expression and role; dressing, grooming, and otherwise outwardly presenting in a manner consistent with one's gender identity; hormone therapy; psychotherapy; and, in some cases, surgery to change primary and/or secondary sex characteristics.

23.     Jane has been diagnosed with Gender Dysphoria.    As part of her medically-supervised treatment, she changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire, growing long hair, and taking feminizing hormones, which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women.

24.     Jane's Gender Dysphoria is so severe that she has experienced debilitating depression and anxiety.

25.     Before the incidents described in this complaint, DCF recognized that Jane is a transgender woman with Gender Dysphoria and placed her in facilities with other girls.    Indeed, DCF had provided Jane with hormone therapy for the previous several years to support her physical transition.

26.     At all times relevant to this action, DCF was aware of Jane's Gender Dysphoria.

27.     At all times relevant to this action, DCF was aware of Jane's history of Gender Dysphoria.

28.     At all times relevant to this action, DCF perceived Jane as having Gender Dysphoria.

29.     Jane's Gender Dysphoria is a mental impairment that substantially limits one or

more major life activities.

30.     Jane is substantially limited in her ability to care for herself because she requires regular, ongoing, and life-long medical treatment, including ongoing psychotherapy and periodic hormone treatment.   She is also substantially limited in other major life activities, such as eating, sleeping, learning, concentrating, thinking, communicating, and interacting with others because of distress associated with her Gender Dysphoria.

31.     Jane is substantially limited in the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

32.      Jane has a history of Gender Dysphoria, which substantially limits one or more major life activities, including the ability to care for herself, eating sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and which substantially limits neurological function, brain function, endocrine function, and reproductive function.

33.     Jane was subjected to various actions prohibited by the ADA and the Rehabilitation Act because of her Gender Dysphoria.

**Other Mental Impairments**

*Developmental Trauma Disorder*

34.     Jane has been diagnosed with Developmental Trauma Disorder.

35.     Under the DSM-5, Developmental Trauma Disorder is a trauma- and stressor-related disorder that results from exposure to a traumatic or stressful event and causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Depression*

36.    Jane has been diagnosed with depression.

37.    Under the DSM-5, depression is characterized by the presence of a depressed mood or loss of interest or pleasure, which causes clinically significant distress or impairment in social, occupational, or other important areas of functioning

*Posttraumatic Stress Disorder*

38.    Jane has been diagnosed with posttraumatic stress disorder (PTSD).

39.    Under the DSM-5, PTSD is a trauma- and stressor-related disorder that results from exposure to actual or threatened death, serious injury, or sexual violence.   PTSD is characterized by the presence of recurrent, involuntary, and intrusive distressing memories related to the traumatic event, which cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Anxiety*

40.    Jane suffers from anxiety.

41.    Under the DSM-5, anxiety is characterized by excessive fear, worry, and other related behavioral disturbances, which cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

42.    At all times relevant to this action, DCF was aware of Jane's Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

43.    At all times relevant to this action, DCF was aware of Jane's history of Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

44.    At all times relevant to this action, DCF perceived Jane as having Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

8

45.      Jane has Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, each of which substantially limits one or more major life activities, including her ability to care for herself, eat, sleep, learn, concentrate, think, communicate, and interact with others, and also substantially limits the operation of major bodily functions, including neurological function and brain function.

46.      Jane has a history of Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, each of which substantially limits one or more major life activities, including the ability to care for herself, eating sleeping, learning, concentrating, thinking, communicating, and interacting with others, and also substantially limits the operation of major bodily functions, including neurological function and brain function.

47.      Jane was subjected to various actions prohibited by the ADA and Rehabilitation Act because of her Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

**Initial Placement at CJTS**

48.      Jane was adjudicated delinquent on November 21, 2013, and committed to the custody of DCF for a period not to exceed eighteen months.

49.      On January 31, 2014, following an incident at a residential placement, DCF placed Jane at CJTS in isolation in a housing unit.   Jane was sixteen years old at the time.   She stayed in this unit until April 8, 2014.

50.      DCF placed Jane in solitary confinement at CJTS for conduct that was a direct result of her disability.

51.      For this stay of more than two months, Jane was not permitted to go outdoors and had no contact with an appropriate peer group.

9

52.     Jane slept in a small locked cell in the housing unit.   The cell had a bed, a desk, and a narrow window looking into the housing unit.

53.     CJTS officers controlled when Jane could enter and exit her cell, and could watch Jane through the window in the door of her cell.

54.     When Jane was permitted to leave her cell, her movement was restricted to the housing unit, which consisted of a large room containing a table, chairs, and a television.

55.     At all times when she was in the housing unit, at least two officers were stationed in the unit and observed Jane.

56.     Jane was confined in the housing unit and was not taken outdoors for recreation or other activities from January 31, 2014 until April 8, 2014.

57.     Some CJTS staff members referred to Jane using a male pronoun and/or used her male given name.

58.     Initially, Jane was the only child in the housing unit.   Later, an injured boy was placed in the unit with her.   Other than interactions with this boy, Jane had no contact with any other child.   With the exception of occasional professional visits, her contact with adults was limited to employees of DCF.

59.     By isolating Jane at CJTS, DCF denied her the ability to participate in and benefit from services and activities provided to other residents at CJTS and the Pueblo Unit, including educational and recreational programming, a "residential milieu," and other specialized programs.

60.     While in isolation at CJTS from January 31, 2014 to April 8, 2014, Jane was confined to her unit for 24 hours a day and did not enjoy the same ability as other residents to spend time in different areas throughout the facility.

61.     While in isolation at CJTS from January 31, 2014 to April 8, 2014, Jane was denied the opportunity to participate in group therapy and to learn from peers in a school setting. She was denied the opportunity to develop healthy attachments to peers and to work on her ability to self-regulate in settings with peers.   DCF provided these opportunities to other children in its care.

62.     While at CJTS, Jane experienced stress, frustration, anxiety, loneliness, isolation, depression, and trauma.

63.     Jane's distress from the conditions of confinement at CJTS was exacerbated by her history of severe abuse and trauma.

64.     While at CJTS, Jane needed individual psychotherapy multiple times a week from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.   DCF did not provide this form of psychotherapy.

65.     On February 4, 2014, DCF moved the Connecticut Superior Court to transfer Jane pursuant to Conn. Gen. Stat. § 17a-12 from DCF custody to MYI, a correctional institution operated by DOC for male prisoners ages 14 to 21 charged with or convicted of offenses in adult court.   DCF was aware of Jane's history of severe trauma and impairments prior to seeking this transfer.   Conn. Gen. Stat. § 17a-12 had been utilized only once in the previous 14 years, for an individual who was not living under the care and custody of DCF's guardianship.   In Jane's case, DCF sought to transfer its own ward—one for whom it had parental obligations—to an adult prison for male offenders.

**Transfer to York CI**

66.     On April 8, 2014, the Superior Court (Kaplan, J.), ordered Jane to be placed in the custody of DOC and transferred to York CI.   The Court's order provided that the DOC

11

Commissioner was responsible for determining whether to assign Jane to either MYI or York CI. In addition, the Court ordered that Jane was "to be held in isolation for no more than 72 hours." On April 8, Jane was transferred from CJTS to York CI.

67.     Even after the Superior Court ordered the transfer of Jane to DOC custody, Commissioner Katz had authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI at any time and place her "in another facility or in the community or to terminate the commitment."

68.     DCF's mandate is to protect and care by providing treatment and services for abused, neglected, and delinquent children.   Here, DCF effectuated the transfer of a child in its care and custody to an adult correctional setting and held her in prolonged solitary confinement in clear violation of its mandate.

69.     DCF initiated the transfer of Jane to DOC custody for conduct that was a direct result of her disability.

70.     York CI is a high-security prison operated by DOC.   It is Connecticut's only correctional facility for women charged with or convicted of crimes in Connecticut's adult criminal courts.

71.     Jane was held at York CI in isolation and segregation from other prisoners from April 8, 2014 until June 24, 2014.

72.     Jane was not being held at York CI as a result of a new criminal charge or an adult court conviction.

73.     At York CI, Jane was required to wear a prison uniform, had an inmate number, ate inmate meals, was under constant watch by correctional officers trained to guard adult inmates convicted of serious crimes rather than juveniles such as Jane, and was subject to strip

12

searches each time she visited with her attorneys.

74.     Given Jane's history of sexual trauma and her status as a transitioning transgender girl, these strip searches caused her great anxiety and distress.

75.     Other than occasional professional visits, Jane had no contact with anyone other than DOC correctional officers and employees from April 8, 2014 until June 24, 2014.   She had no contact with other minors.

76.     From April 8, 2014 until May 13, 2014, Jane was held in isolation in the mental health unit at York CI.   She was initially held in one locked concrete cell within the mental health unit and then moved to another locked concrete cell.

77.     While in the mental health unit, Jane could hear screaming, banging, and crying day and night from adult inmates suffering from mental illness or undergoing drug detoxification.   As a result, Jane found it difficult to sleep.

78.     Jane was held in a prison cell in the mental health unit for approximately 21-22 hours per day.   She was provided one hour of solitary recreation each day, and she received limited education services from a prison teacher in another cell in the mental health unit.

79.     While in her cell, Jane was watched at all times by a correctional officer, including when she took a shower, used the toilet, or tried to rest.

80.     On May 13, 2014, Jane was moved to another housing area on the grounds of York CI.

81.     This housing area was a self-contained unit consisting of three rooms and a bathroom.   Jane felt no sense of privacy in this housing unit.   Jane slept in one of the rooms and was observed by correctional officers through a window cut in the door of the room.   In addition, a window was cut in the bathroom door.   At all times, at least two correctional officers

13

were stationed inside the unit to monitor Jane.    At least one additional correctional officer was stationed outside the unit at all times.    Jane was able to walk outside the unit into a small area of outdoor space.

82.    Jane received limited educational services from prison teachers in the housing unit each weekday, and her treatment plan called for visits once a week from the prison psychologist.    Jane spent approximately 23 hours a day in this housing unit or immediately outside it; she left for one hour a day for recreation in the prison gym, and for occasional professional visits.

83.    While Jane was at York CI, DOC said that she could attend "school" with groups of adult inmates charged or convicted of crimes or attend group meetings with such inmates. DCF also said that Jane could be transported 30 miles away to CJTS during the day to attend school with the boys being held in that locked juvenile facility.    Jane declined to place herself in these environments, where she feared she would be ridiculed, harassed, and physically assaulted.

84.    After arriving at York CI, Jane experienced increasing levels of stress, frustration, anxiety, loneliness, isolation, depression, and trauma.

85.    Jane's distress from the isolation she experienced at York CI was exacerbated by her history of severe abuse and trauma.

86.    After arriving at York CI, Jane was monitored by correctional officers twenty-four hours a day.

87.    At York CI, Jane was fully compliant with DOC rules and had no disciplinary incidents.    Jane did not engage in any violent conduct at York CI and did not make any verbal threats to staff or inmates at York CI.

88.    While at York CI, Jane was denied access to benefits and services provided to

14

other children in DCF custody who have been adjudicated delinquent, including those housed at CJTS or the Pueblo Unit.   Jane was denied access to age-appropriate educational, vocational, and mental health services.   DCF and DOC did not provide Jane with intensive individual psychotherapy from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.   Jane had no opportunity to participate in programs, recreation, and therapy with other children.

89.     Throughout her stay at York CI, Jane's isolation was indefinite.   Until four days before her transfer to the Pueblo Unit, she was not informed when she would leave York CI and where she would go.   She was given no specific guidelines for what she needed to do to be moved out of the prison.   She was given no maximum end date for her incarceration at York CI.

**Transfer to Pueblo**

90.     On June 24, 2014, Commissioner Katz exercised her authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI and place her "in another facility or in the community or to terminate the commitment."   Commissioner Katz placed Jane at the Pueblo Unit, a locked facility for girls adjacent to CJTS that is operated by DCF.

91.     At Pueblo, Jane was positively engaged in individual and group therapy and in school work.

92.     On July 12, 2014, Jane was involved in a fight involving three other girls.   This was the first physical altercation involving Jane since the out-of-state incident in January 2014—Jane had no physical conflicts at CJTS or York CI.

93.     The same day, immediately after the incident, DCF moved Jane to isolation at CJTS.   DCF placed Jane back in solitary confinement at CJTS for conduct that was a direct result of her disability.

15

94.     The decision to move Jane to isolation at CJTS was made within hours of the incident at the Pueblo Unit, without time to review records of the incident, interview staff or youth, or convene a treatment team meeting to consider alternatives to solitary confinement as a crisis or behavior management tool.   All four girls involved in the fight were restrained and all four were described in DCF records as hitting each other and staff.   None of the other girls involved in the incident were removed from the Pueblo Unit at the time and placed in isolation at CJTS.   Multiple residents at the Pueblo Unit had histories or patterns of aggressive, assaultive, and self-injurious conduct, including assaulting staff.

95.      Due to additional delinquency proceedings relating to the events at Pueblo, Jane was thereafter committed to DCF custody until April 2016.

### Return to CJTS

96.     Upon returning to CJTS on July 12, 2014, Jane was placed in solitary confinement in the same unit she was placed in previously and held in isolation.   Other than her unauthorized contact with peers on September 16, 2014, Jane's first interaction with peers came on December 23, 2014.

97.     From July 12, 2014 until December 23, 2014, Jane was observed by CJTS staff at all times, and staff controlled when she could exit and enter her cell.

98.     Jane was required to be in her cell from 8:30 pm to 7:30 am each day.   When she left her cell, she had access to a large empty room containing only a table, chairs, and a television.   Two CJTS staff members sat in this room at all times and watched her.   Other CJTS staff members came to this room to meet with her.

99.     From July 12, 2014 until August 15, 2014, Jane was not permitted to go outdoors for recreation or other activities.   Only after a written request by the Office of the Child

16

Advocate to DCF on August 15, 2014, was Jane permitted to go outdoors for recreation. Subsequently, she usually went out for one hour a day.   However, some days staff did not come to take her outside.   Jane at times declined offers to go outside when the boys were outside because she did not want to be "paraded around in front of the boys."

100.    Other than contact with peers on September 16, 2014, Jane had no contact with peers from July 12, 2014, until approximately December 23, 2014.   Her only human contact, other than occasional professional visits, was with CJTS staff.   Jane declined DCF's invitation to be housed with and interact with the general male population at CJTS—where she reasonably feared she would be harassed, humiliated, and assaulted.

101.    Jane was not permitted to wear her own clothes, make up, or a wig.   She was required to wear the same uniform as the boys.   Prior to October 2014, when she was allowed to use hair extensions, she could not express herself physically as a girl.   It is psychologically damaging and harmful for a transgender female to be placed in a male facility and to be unable to express herself as female.

102.    Over the course of her isolation, Jane experienced increasing levels of stress, frustration, anxiety, loneliness, isolation, depression, and trauma.

103.    Jane's distress from the isolation at CJTS was exacerbated by her history of severe abuse and trauma.

104.    Throughout most of her stay at CJTS, Jane's isolation was indefinite.   Until shortly before December 23, 2014, she was not informed when she would next interact with peers.   She was given no maximum end date for her incarceration at CJTS.

### Treatment Needs and Harms of Isolation

105.    It is widely recognized by experts that placing a child with a history of trauma in

17

prolonged isolation has harmful psychological effects on the child.    Indeed, Jane suffered from stress, depression, anxiety, loneliness, and trauma during the more than ten months she spent in isolation from an appropriate peer group.    Jane was and is receptive to treatment and services that are specific to her needs and take into account her age, transgender status, and history of trauma.

106.    Keeping Jane in isolation at York CI and CJTS indefinitely both severely impeded her ability to receive appropriate treatment and develop social skills and actively caused her great psychological harm, with resulting physical consequences.

107.    The experience of isolation for Jane was deeply stigmatizing.    By isolating Jane from her peers, DCF expressed to this child that she was too dangerous to be around other children, even those with histories of misbehavior and assaultive conduct.    Jane was the only child that DCF isolated alone in a unit for many months at CJTS based on purported dangerousness.    Based on the claim that she was too dangerous for DCF custody, DCF singled Jane out for transfer under Conn. Gen. Stat. § 17a-12—a statute that DCF had utilized only once in the previous 14 years.    In a public fashion, DCF conveyed to this child that she was uniquely damaged and dangerous, and unsuitable for contact with peers.    The experience of being selected for this extreme and harsh treatment deeply damaged the self-esteem and feelings of self-worth for this transgender child, who was already deeply traumatized by physical and sexual abuse.    At the same time that DCF officials isolated and stigmatized Jane, they also denied her the ability to express herself as female through prohibiting her from wearing her own clothes, a wig, or make up—and placing her in a facility for boys.    The combined impact of this treatment caused Jane to experience acute psychological distress and will have lasting impacts on her sense identity and self-worth.

18

108.    Jane requires intensive, trauma-informed treatment, including therapy sessions multiple times per week with a developmentally, psychodynamically, and trauma-oriented clinician.

109.    Jane also needs counseling from a therapist who is expert in providing care to transgender adolescents.

110.    In addition, Jane requires the opportunity to participate in group therapy sessions with a focus on transgender youth.    For more than ten months, DCF did not provide this form of therapy to her.   Jane could not participate in group therapy, develop attachments, or work on her ability to self-regulate because she was held in isolation and had no contact with an age- and gender-appropriate peer group.

111.    This period was extremely difficult for Jane, not only because of the prolonged isolation, but because of the uncertainty about its duration.    Isolation with an indeterminate end date has even more serious harmful consequences than other forms of isolation, particularly for children.   Part of Jane's suffering arose from the fact that during this period DCF did not communicate to her when she was to be moved, where she would be moved, and what she needed to do in order to be moved.   DCF did not provide her with an end date for her incarceration at York or CJTS or a concrete plan for her future placement.

112.    President Obama has banned solitary confinement entirely for juvenile offenders in the federal system.[1]    In 2014, the American Medical Association, "[r]ecognizing the harmful

---

[1]    *See* Barack Obama: *Why We Must Rethink Solitary Confinement*, Washington Post, January 25, 2016; *see also* White House, Office of the Press Secretary, Fact Sheet: Department of Justice Review of Solitary Confinement (Jan. 26, 2016), https://www.whitehouse.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

physical, emotional and psychological impact of solitary confinement," adopted a policy opposing juvenile solitary confinement except in limited, extraordinary circumstances.[2] The American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement for juveniles, noting that "potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety and psychosis."[3] The United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which establish minimum standards for the protection of juveniles in correctional facilities, prohibit the solitary confinement of juveniles.[4] National standards regarding the placement of youth in detention recommend against use of solitary confinement except as temporary response to behavior that threatens immediate harm to a youth or others.[5] The U.S. Attorney General's National Task

---

[2] "AMA Adopts New Policies to Improve Health of Nation at Interim Meeting," November 11, 2014. Available at http://www.ama-assn.org/ama/pub/news/news/2014/2014-11-20-ama-policies-improve-health-of-nation.page. The policy provides that "Our AMA: (1) opposes the use of solitary confinement in juvenile correction facilities except for extraordinary circumstances such as the protection of the juvenile, staff, or other detainees; (2) opposes the use of solitary confinement of juveniles for disciplinary purposes in correctional facilities; and (3) supports that isolation of juveniles for clinical or therapeutic purposes must be conducted under the supervision of a physician. (Res. 3, I-14)." Available at https://www.ama-assn.org/ssl3/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=/resources/html/PolicyFinder/policyfiles/HnE/H-60.922.HTM.

[3] American Academy of Child and Adolescent Psychiatry, Policy Statement, Solitary Confinement of Juvenile Offenders (April 2012), *available at* http://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (attached as Exhibit A).

[4] U.N. Rules for the Protection of Juveniles Deprived of Their Liberty, G.A. Res. 45/113, Annex, U.N. GAOR, 45th Sess., Supp. No. 49A, U.N. Doc. A/45/49/Annex (Dec. 14, 1990).

[5] Juvenile Detention Alternatives Initiative (JDAI), *A Guide to Juvenile Detention Reform: Juvenile Detention Facility Assessment 2014 Update* 177-80 (2014), *available at*

Force on Children Exposed to Violence recently concluded that "nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."   The Task Force accordingly proposed abandoning practices like solitary confinement.[6]

113.   Studies of the impact of solitary confinement on incarcerated adults have revealed an array of detrimental physiological and psychological effects, including: hypersensitivity to stimuli-perceptual distortions and hallucinations, increased anxiety and nervousness, fears of persecution, blunted affect and apathy, talking to oneself, confusing thought processes, sleep disturbances, changes in appetite an weight, withdrawal, depression, and lack of impulse control.[7]   Youth lack the essential coping skills to manage acute and chronic stressors.[8]   As a result, they are less equipped than adults to handle solitary confinement.

114.   Youth exposed to solitary confinement are more likely to commit suicide, attempt

---

http://www.aecf.org/m/resourcedoc/aecf-juveniledetentionfacilityassessment-2014.pdf#page=3. Other standards regarding the placement of youth in detention or juvenile correctional programs recommend against anything but brief use of solitary confinement as a behavior management strategy.   PbS Learning Inst., PbS Goals, *Standards, Outcome Measures, Expected Practices and Processes* 10 (2007), *available at* http://sccounty01.co.santa-cruz.ca.us/prb/media%5CGoalsStandardsOutcome%20Measures.pdf; Am. Corr. Ass'n, *Performance Based Standards Juvenile Corr. Facilities* 5-52 (4th ed. 2009).

[6] Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, *Rep. of the Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, Defending Childhood: Protect, Heal, Trive* 178 (2012), *available at* http://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

[7] Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry, 1450, 1452 (1983); Richard Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8, 15 (1988); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 134 (2003).

[8] Rudolf H Moos, *Life Stressors, Social Resources, and Coping Skills in Youth: Applications to Adolescents with Chronic Disorders*, 30 J. Adolescent Health 22 (2002).

suicide, and engage in other acts of self-harm.[9]

115.    Juveniles who are confined in adult facilities are more likely to be physically or sexually abused and to commit suicide than those in juvenile facilities.[10]

116.    Attempts by facilities' staff to protect youth, generally by placing youth inisolation or administrative segregation, can cause even further damage:

> An individual held in solitary confinement for 23 hours a day typically begins to lose his sense of reality, and becomes paranoid, anxious and despondent, all of which can exacerbate existing mental health conditions. Given that many of the youth being held in adult jails have experienced some serious trauma in their lives or have undiagnosed or untreated mental illness, they are particularly vulnerable.[11]

117.    Experts recognize that segregation and isolation have similar effects even when prisoners have contact with correctional officers.

118.    Youth have a greater need for social stimulation and attachment than adults.

Close peer relationships promote healthy adolescent adjustment, high perceived self-worth, pro-social behavior and decreased risk of emotional and behavioral problems.[12]

---

[9]  Lindsay M. Hayes, Dep't of Justice Office of Juvenile Justice and Delinquency Prevention, Juvenile Suicide in Confinement: A National Survey (2009), *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf; Carly B. Dierkhising et. al, *Victims Behind Bars: A Preliminary Study of Abuse During Juvenile Incarceration and Post-Release Social and Emotional Functioning*, 20 Psychology, Public Policy & Law 181 (2014).

[10]  Emily Ray, Comment, *Waiver, Certification and Transfer of Juveniles to Adult Court: Limiting Juvenile Transfers in Texas*, 13 Scholar 317, 320 (2010).

[11]  Terry F. Hickey & Camilla Roberson, *Pretrial Detention of Youth Prosecuted as Adults*, 44-Dec Md. B.J. 44, 48 (2011).

[12]  Deborah Laible et al., *The Differential Relations of Parent and Peer Attachment to Adolescent Adjustment*, 29 J. Youth & Adolescence 46 (2000), *available at* http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1050&context=psychfacpub.

Youth held in solitary confinement are deprived of social stimulation with peers altogether.

119.    A history of maltreatment, trauma or mental health issues increases the risks associated with solitary confinement.

120.    Solitary confinement of youth negatively impacts healthy development, perpetuates maltreatment and trauma, and contributes to the failed success of juveniles post-release.

121.    Jane feared that if she were placed in contact with an all-male population she would be assaulted, would experience verbal and physical abuse, stress, and anxiety, and would not feel safe.   For women, particularly transgender women in men's facilities, assault is tragically common.   According to the recent National Transgender Discrimination Survey, of the 6,450 transgender respondents who had been incarcerated, 37% reported being harassed by officers or staff, 16% reported physical assault by other inmates or staff, and 15% reported sexual assault by other inmates or staff.[13]   A study of California prisons found that 59% of transgender respondents reported sexual assault, as compared with 4.4% of non-transgender respondents.[14]

### FIRST CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of Due Process under the Fourteenth Amendment to the United States Constitution against Defendants Katz, individually, and Rosenbeck, individually)**

---

[13]  Jamie M. Grant, Ph.D., *et al.*, Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 166-67 (2011), *available at* http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[14]  Valerie Jenness, Ph.D., The California Department of Corrections and Rehabilitation Wardens' Meeting at 34 (April 8, 2009), *available at* http://ucicorrections.seweb.uci.edu/files/2013/06/Transgender-Inmates-in-CAs-Prisons-An-Empirical-Study-of-a-Vulnerable-Population.pdf (last visited Feb. 27, 2014).

122.     Plaintiff incorporates herein Paragraphs 1 through 121 of this Complaint.

123.     The Due Process Clause of the Fourteenth Amendment provides constitutional protections for Jane as an incarcerated juvenile.

124.     Defendants' actions described in this complaint—including but not limited to confining Jane in isolation for extended and indefinite periods, placing her at a facility for boys, causing her to be held at an adult prison, and threatening to transfer her to an adult prison for men—and the policies, procedures, and practices enacted and carried out by the Defendants are not rationally related to a legitimate, non-punitive governmental purpose and are excessive in relation to any purpose that Defendants claim.

125.     Defendants' acts, omissions, policies, and practices substantially depart from accepted professional standards and practices, constitute punishment, and reflect deliberate indifference to the known or obvious consequences to Jane, including actual harm and pervasive risk of harm.

126.     Defendants' excessive confinement of Jane and the inhumane conditions of confinement imposed on her were arbitrary and improper, shock the conscience, offend notions of fairness, and are offensive to human dignity.

127.     Defendants' actions toward Jane denied her the guaranteed rights and protections of due process required by the Fourteenth Amendment to the United States Constitution.

128.     Based on Jane's placement in isolation at CJTS and isolation at York CI, and as a further direct and proximate result of the Defendants' violations of the Fourteenth Amendment, Jane suffered from harm in the form of illegal incarceration in solitary confinement at a male facility, physical pain, shame, humiliation, degradation, and emotional stress, isolation,

24

separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and lack of opportunity to form healthy relationships with adult models.

## SECOND CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of Due Process under the Fourteenth Amendment to the United States Constitution against Defendants Dzurenda, individually, and Semple, individually)**

129.    Plaintiff incorporates herein Paragraphs 1 through 128 of this Complaint.

130.    Defendants' actions described in this complaint—including but not limited to confining Jane in isolation for an extended period at York CI—and the policies, procedures, and practices enacted and carried out by the Defendants are not rationally related to a legitimate, non-punitive governmental purpose and are excessive in relation to any purpose that Defendants claim.

131.    Defendants' acts, omissions, policies, and practices substantially depart from accepted professional judgment standards and practices, constitute punishment, and reflect deliberate indifference to known or obvious consequences to Jane, including actual harm and pervasive risk of harm.

132.    Defendants' excessive confinement of Jane and the inhumane conditions of confinement imposed on her have been arbitrary and improper, shock the conscience, offend notions of fairness, and are offensive to human dignity.

133.    Defendants' actions toward Jane denied her the guaranteed rights and protections of due process required by the Fourteenth Amendment to the United States Constitution.

134.    As a direct and proximate result of the Defendants' violations of the Fourteenth Amendment, Jane suffered harm in the form of physical pain, shame, humiliation, degradation,

and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and a lack of opportunity to form healthy relationships with adult models.

## THIRD CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Eighth Amendment as Applied by the Fourteenth Amendment to the United States Constitution against Defendants Katz, individually, and Rosenbeck, individually)**

135.    Plaintiff incorporates herein Paragraphs 1 through 134 of this Complaint.

136.    At all times relevant to this complaint Defendants were aware of and consciously disregarded the excessive risk to Jane's health and safety posed by conditions of her confinement.

137.    Defendants' acts, omissions, policies and practices constituted cruel and unusual punishment and subjected Jane to actual harm, to pervasive risk of harm, and to other unlawful conditions in violation of the Eighth Amendment to the United States Constitution (as incorporated by the Fourteenth Amendment).

138.    Based on Jane's prolonged placement in isolation at CJTS and isolation at York CI, and as a further direct and proximate result of the Defendants' violations of the Eighth Amendment, Jane has suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and a lack of opportunity to form healthy relationships with adult models.

## FOURTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Eighth Amendment as Applied by the Fourteenth Amendment to the United States Constitution against Defendants Dzurenda, individually, and Semple, individually)**

26

139.    Plaintiff incorporates herein Paragraphs 1 through 138 of this Complaint.

140.    At all times while Plaintiff was incarcerated at York CI, Defendants were aware of and consciously disregarded the excessive risk to Jane's health and safety posed by conditions of her confinement.

141.    Defendants' acts, omissions, policies, and practices constitute cruel and unusual punishment and subjected Jane to actual harm, to pervasive risk of harm, and to other unlawful conditions in violation of the Eighth Amendment to the United States Constitution (as incorporated by the Fourteenth Amendment).

142.    As a further direct and proximate result of the Defendants' violations of the Eighth Amendment, Jane suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and a lack of opportunity to form healthy relationships with adult models.

## FIFTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Juvenile Justice and Delinquency Prevention Act against Defendant Katz, individually)**

143.    Plaintiff incorporates herein Paragraphs 1 through 142 of this Complaint.

144.    The Juvenile Justice and Delinquency Prevention Act ("JJDPA"), 42 U.S.C. § 5601 *et. seq.*, applies to persons, like Jane, who were under the age of eighteen who have been charged with delinquent offenses and to the State of Connecticut and its agencies.

145.    The State of Connecticut has accepted funds under the JJDPA and has agreed to be bound by its terms.

146.    Jane is entitled to relief for violations of the JJDPA under 42 U.S.C. § 1983.

27

147.    The JJDPA expressly prohibits the incarceration of juveniles in adult jails or lockups except under very limited exceptions which are inapplicable in this case.   *See* 42 U.S.C. § 5633(a)(13).

148.    York CI is an adult jail or lockup within the meaning of the JJDPA.

149.    Defendants initiated proceedings resulting in Jane being incarcerated at York CI, a DOC facility containing adult inmates, in contravention of the JJDPA, between April 8, 2014 and June 24, 2014.

150.    At all times between April 8, 2014 and June 24, 2014, Defendants had the legal power to remove Jane from York CI.

151.    Defendants chose not to exercise this authority until approximately June 24, 2014.

152.    As a result of Defendants' violations of the JJDPA with respect to Jane, Jane suffered harm in the form of illegal incarceration, physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to services available in juvenile facilities, and a lack of opportunity to form healthy relationships with adult models.

## SIXTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Juvenile Justice and Delinquency Prevention Act against Defendants Dzurenda, individually, and Semple, individually)**

153.    Plaintiff incorporates herein Paragraphs 1 through 152 of this Complaint.

154.    Between April 8, 2014, and June 24, 2014, Defendants incarcerated Jane in an adult prison containing adult inmates in conditions tantamount to solitary confinement or segregation, in contravention of the JJDPA.

155.    As a result of Defendants' violations of the JJDPA with respect to Jane, Jane

suffered harm in the form of illegal incarceration, physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to services available in juvenile facilities, and a lack of opportunity to form healthy relationships with adult models.

### SEVENTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Prison Rape Elimination Act against Defendants Katz, individually, and Rosenbeck, individually)**

156.    Plaintiff incorporates herein Paragraphs 1 through 155 of this Complaint.

157.    The Prison Rape Elimination Act ("PREA") 42 U.S.C. § 15601 *et. seq*. and 28 C.F.R. 115 *et. seq.*, regulates the treatment and housing of transgender individuals, like Jane.

158.    PREA's regulations in this respect apply in the State of Connecticut.

159.    PREA dictates that "[r]esidents [of juvenile facilities] may be isolated from others only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged.   During any period of isolation, agencies shall not deny residents daily large-muscle exercise and any legally required educational programming or special education services. Residents in isolation shall receive daily visits from a medical or mental health care clinician. Residents shall also have access to other programs and work opportunities to the extent possible."   28 C.F.R. § 115.342(b).

160.    PREA also requires that "[i]f a resident is isolated pursuant to paragraph (b) of this section, the facility shall clearly document: (1) The basis for the facility's concern for the resident's safety; and (2) The reason why no alternative means of separation can be arranged."

28 C.F.R. § 115.342(h).

161.    Additionally, under PREA, "[e]very 30 days, the facility shall afford each resident described in paragraph (h) of this section a review to determine whether there is a continuing need for separation from the general population."    28 C.F.R. § 115.342(i).

162.    Defendants' treatment of Jane persistently violated PREA's requirement that residents in juvenile facilities be isolated "only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged."

163.    Defendants, further, did not afford Jane the procedural right to a review of her isolation every 30 days as required by PREA.

164.    As a result of her illegal incarceration, Jane suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to services available in juvenile facilities, and a lack of opportunity to form healthy relationships with adult models.

## EIGHTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Fourteenth Amendment Due Process Claim through Violations of the Juvenile Justice and Delinquency Prevention Act and the Prison Rape Elimination Act against Defendants Katz, individually, and Dzurenda, individually)**

165.    Plaintiff incorporates herein Paragraphs 1 through 164 of this Complaint.

166.    Jane is entitled to relief under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

167.    JJDPA and PREA create liberty interests protected under the Fourteenth

Amendment Due Process Clause.

168.    Defendants deprived Jane of the liberty interests created by JJDPA without due process.

169.    Defendants deprived Jane of the liberty interests created by PREA without due process.

## NINTH CAUSE OF ACTION

**(Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*, against Defendants DCF, Katz and Rosenbeck in their official capacities, and the State of Connecticut)**

170.    Plaintiff incorporates herein Paragraphs 1 through 169 of this Complaint.

171.    Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

172.    In particular, in providing any aid, benefit, or service, under Title II of the ADA, a public entity "may not ... [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others[.]" 28 C.F.R. § 35.130(b)(1)(i), (ii),

(iii), and (vii).[15]

173.     Additionally, a public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

174.     A public entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary," 28 C.F.R.§ 35.130(b)(8); or (2) "utilize criteria or methods of administration … that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability … or the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)(ii).

175.     A public entity is also prohibited from aiding and perpetuating discrimination against persons with disabilities in the programs, services, or activities it provides. 28 C.F.R. § 35.130(b)(1)(v).

176.     The ADA's "integration mandate" requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."    28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that

---

[15]   In enacting the ADA, Congress, having found that "[i]solat[ion] and segregat[ion]" were pervasive in areas such as education and institutionalization prior to the ADA's implementation, 42 U.S.C. § 12101(a)(2), (3), directed the Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination.   42 U.S.C. § 12134.   Pursuant to this mandate, the DOJ has issued these and other regulations defining the forms of discrimination prohibited by Title II of the ADA.   *See* 28 C.F.R. § 35.101 *et. seq.*

prisoners with disabilities be housed in the most integrated setting appropriate to their needs

under the program access obligation); *see also* Guidance on ADA Regulation on

Nondiscrimination on the Basis of Disability in State and Local Government Services Originally

published July 26, 1991, 28 C.F.R. pt. 35, App. B ("Integration is fundamental to the purposes of

the Americans with Disabilities Act.   Provision of segregated accommodations and services

relegates persons with disabilities to second-class status.").

177.    DCF violated the rights of Jane secured by Title II of the ADA and its

implementing regulations.

178.    DCF is currently and at all times relevant to this action has been a "public entity"

as defined by the ADA, 42 U.S.C. § 12131(1)(B), and provides a "program, service, or activity"

within the meaning of the ADA, including educational and rehabilitative programs and services.

179.    Jane suffers from multiple mental impairments, namely, Gender Dysphoria,

Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

180.    Gender Dysphoria is not excluded under the ADA, 42 U.S.C. § 12211(b)(1),

because it is a gender identity disorder that results from a physical impairment.   In 2015, the

U.S. Department of Justice concluded that, "[i]n light of the evolving scientific evidence

suggesting that gender dysphoria may have a physical basis, along with the remedial nature of

the ADA and the relevant statutory and regulatory provisions directing that the terms 'disability'

and 'physical impairment' be read broadly, the [ADA's exclusion of gender identity disorders

not resulting from a physical impairment] should be construed narrowly such that gender

dysphoria falls outside its scope."[16]

---

[16]  Second Statement of Interest of the United States at 5, *Blatt v. Cabela's Retail, Inc.*, No.

181.   Alternatively, Gender Dysphoria is not excluded under the ADA because it is not a "gender identity disorder" under 42 U.S.C. § 12211(b)(1)—it is a dysphoria.

182.   Because of the date of the actions complained of, the expanded definition of "disability" under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") applies.

183.   Under the ADAAA and DOJ regulations, the definition of disability is to be construed broadly in favor of expansive coverage.   42 U.S.C. § 12102(4)(A); 28 C.F.R. §§ 35.108(a)(2)(i), 35.108(d)(1)(i).   Accordingly, the terms "substantially" and "major" in the definition of disability are to be interpreted consistently with the ADAAA's findings and purposes, which reinstate "the broad scope of protection intended to be afforded by the ADA" and convey Congress's intent "that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."   42 U.S.C. §§ 12102(4)(B), ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ (2)(a)(5), (b)(5).

184.   In determining disability, the ADAAA requires that impairments must be assessed "without regard to the ameliorative effects of mitigating measures," such as medication, therapy, and reasonable accommodations.   42 U.S.C. § 12102(4)(E)(i).

185.   In determining disability, the ADAAA requires that impairments that are "episodic or in remission" must be assessed in their active state.   42 U.S.C. § 12102(4)(D).

186.   In determining disability, a "major life activity" includes "the operation of a major bodily function," including neurological, brain, and reproductive functions.   42 U.S.C. § 12102(2)(B).

5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).

187.    Under the ADAAA and DOJ regulations, "an individual meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities if the individual establishes that he or she has been subjected to an action prohibited under th[e ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."   42 U.S.C. §§ 12102(3)(A); *see also* 28 C.F.R. § 35.108(f)(1); ADA Amendments Act of 2008, Pub. L. No. 110-325, § (2)(b)(3) (reinstating "broad view of the third prong" of the definition of disability). Accordingly, no showing of substantial limitation of a major life activity is required under the regarded-as prong.   28 C.F.R. § 35.108(a)(2)(iii) ("[T]he 'regarded as' prong of the definition of "disability" . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.").

188.    Jane's Gender Dysphoria substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

189.    Jane has a record of Gender Dysphoria, which substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

190.    Jane "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because DCF excluded her from

35

participation in and denied her the benefits of DCF's educational and rehabilitative programs, services, and activities based on Gender Dysphoria, and also subjected her to discrimination based on Gender Dysphoria.

191.    Jane suffers from Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, each of which substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, and interacting with others, and also substantially limits the operation of major bodily functions, including neurological function and brain function.

192.    In particular, according to DOJ, "it should easily be concluded that [major depressive disorder and post-traumatic stress disorder] . . . will, at a minimum, substantially limit . . . brain function."   28 C.F.R. § 35.108(d)(2)(iii)(K) (discussing "[p]redictable assessments" of disability).

193.    Jane has a record of Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, each of which substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, and interacting with others, and also substantially limits the operation of major bodily functions, including neurological function and brain function.

194.    Jane "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because DCF excluded her from participation in and denied her the benefits of DCF's educational and rehabilitative programs, services, and activities based on Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, and also subjected her to discrimination based on Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

195.     Jane is currently and at all times relevant to this action has been a "qualified individual with a disability" within the meaning of Title II of the ADA.

196.     As a child committed to the custody of DCF, Jane was qualified to participate in DCF's programs, services, and activities. DCF provides these services to other children committed to its custody.

197.     DCF has long been aware of the mounting psychological toll that Jane's life course has had on her wellbeing and functioning, as documented both by DCF's own diagnosis of Jane's mental impairments and by reports prepared by other facilities and transmitted to DCF.

198.     When DCF nevertheless locked Jane in solitary confinement, DCF excluded her from participating in and denied her the benefits of DCF's educational and rehabilitative programs, services, and activities by reason of her disabilities, namely, Gender Dysphoria, Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety.

199.     By locking Jane in solitary confinement at CJTS and refusing to remove Jane from solitary confinement at York CI, DCF failed to house Jane in the most integrated setting appropriate to her needs and deprived her of the social, educational, psychological, and rehabilitative benefits of programs administered by DCF for other children. By locking Jane in solitary confinement at CJTS and failing to remove her from solitary confinement at York CI, DCF denied Jane equal opportunity to benefit from DCF's educational and rehabilitative programs and services.   This deprivation caused her to fall further behind in rehabilitation and education than her non-disabled peers.

200.     By isolating Jane at CJTS, DCF denied her the ability to participate and benefit from services and activities provided to other residents at CJTS and the Pueblo Unit.   *Id.* § 35.130(b)(1)(i).

37

201.   To the extent Jane was provided with services and activities at CJTS and York CI, these services and activities were unequal to those provided to other residents at CJTS and the Pueblo Unit, as they were provided to her in isolation.   *Id.* § 35.130(b)(1)(iv).   DCF provided Jane a benefit that is not as effective in affording equal opportunity as the benefits offered to her non-disabled peers.

202.   Jane was denied the opportunity to participate in group therapy and to learn from peers in a school setting.   Jane's recreation time was spent alone.   She was denied the opportunity to develop healthy attachments to peers and to work on her ability to self-regulate in settings with peers.   Jane was confined to her unit for 23-24 hours a day and did not enjoy the same ability as other residents to spend time in different areas throughout the facility.   DCF denied Jane the opportunity to go outside for months.

203.   By subjecting Jane to solitary confinement, DCF utilized a method of administration that had the effect of subjecting Jane to discrimination by reason of her disability. DCF's methods of administration with respect to Jane had the purpose and effect of defeating or substantially impairing accomplishment of the objectives of DCF's educational and rehabilitative programs, services, and activities with respect to Jane.

204.   DCF failed to provide reasonable modification to its policies, procedures, and practices regarding Jane, as it was legally required to do.   28 C.F.R. § 35.130(b)(7).   Prior to placing Jane in isolation at CJTS on January 31, 2014—and transferring her to York CI on April 8, 2014—DCF did not attempt accommodations such as increased mental health counseling.   In addition, following the fight at the Pueblo Unit on July 12, 2014, DCF did not attempt or make reasonable modification at the Pueblo Unit such as increased mental health counseling, increased supervision, or positive behavior interventions and supports. Indeed, DCF decided to transfer

38

Jane back to CJTS immediately following the incident—while allowing the other girls involved in the fight to stay at the Pueblo Unit, despite their similar behaviors and histories.

205.    From January 31, 2014 until October 23, 2014, DCF failed to provide Jane with intensive individual psychotherapy from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.

206.    By virtue of the fact that DCF did not put these or other reasonable modifications in place, Jane was discriminated against because of her disabilities.

207.    By confining Jane at CJTS, a facility for juvenile delinquent boys in which some staff members referred to Jane using a male pronoun and her male given name and staff refused to permit Jane to wear her own clothes, make-up, or a wig, by attempting to confine Jane at MYI, a DOC prison for all-male offenders, and by removing Jane from the Pueblo Unit, a facility for delinquent girls, DCF subjected Jane to discrimination based on Gender Dysphoria.

208.    Instead of complying with the ADA, DCF elected to hold Jane in conditions of confinement that violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution.

209.    DCF subjected Jane to unconscionable conditions of solitary confinement for ten months based on her disability-related behavior, and watched her deteriorate mentally because of her disabilities.

210.    DCF confined Jane in this manner because of her disabilities.

### TENTH CAUSE OF ACTION

**(Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.*, against Defendants DCF, Katz and Rosenbeck in their official capacities, and the State of Connecticut)**

211.    Plaintiff incorporates herein Paragraphs 1 through 210 of this Complaint.

212.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

213.    DCF accepts federal financial assistance and has done so at all times relevant to this complaint. DCF is therefore a "program . . . receiving Federal financial assistance" for purposes of the Rehabilitation Act.

214.    The definition of disability is identical under the ADA and Rehabilitation Act, and the expanded definition of "disability" under the ADAAA applies with equal force to the definition of "disability" under Section 504 of the Rehabilitation Act. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, §7 (conforming Section 504 of Rehabilitation Act's definition of "disability," 29 U.S.C. § 705, to definition of disability "in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102))."

215.    Jane suffers from multiple mental impairments, namely, Gender Dysphoria, Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, each of which substantially limits one or more major life activities and also the operation of major bodily functions, as set forth more fully in Paragraphs 191, 194-95.

216.    Jane has a record of Gender Dysphoria, Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, each of which substantially limits one or more major life activities and also the operation of major bodily functions, as set forth more fully in Paragraphs 193, 197.

217.    Jane "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because DCF excluded her from

40

participation in and denied her the benefits of DCF's educational and rehabilitative programs,

services, and activities based on Gender Dysphoria, Developmental Trauma Disorder,

Depression, Posttraumatic Stress Disorder, and Anxiety, and also subjected her to discrimination

based on these impairments.

218.    Gender Dysphoria is not excluded under the Rehabilitation Act because it is a

gender identity disorder that results from a physical impairment[17] or, alternatively, it is not a

gender identity disorder—it is a dysphoria.

219.    Jane is currently and at all times relevant to this action has been a "qualified

individual with a disability" for purposes of the Rehabilitation Act.

220.    By confining Jane in isolation at CJTS and declining to transfer Jane from York

CI, DCF deprived Jane of the social, educational, and psychological benefits of programs

administered by DCF for other children, in violation of the Section 504 of the Rehabilitation Act.

221.    DCF confined Jane in this manner solely because of her disabilities.

222.    By confining Jane at CJTS, a facility for juvenile delinquent boys in which some

staff members referred to Jane using a male pronoun and her male given name and staff refused

to permit Jane to wear her own clothes, make-up, or a wig, by attempting to confine Jane at MYI,

a DOC prison for all-male offenders, and by removing Jane from the Pueblo Unit, a facility for

---

[17] *See* Second Statement of Interest of the United States at 3–5, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).   After excluding "gender identity disorders not resulting from physical impairments" from the ADA in 1990, Congress passed an identical exclusion to the Rehabilitation Act two years later.   *See* 29 U.S.C. § 705 (excluding "gender identity disorders not resulting from physical impairments"); H.R. REP. NO. 102-973, at 158 (1992) (Conf. Rep.) (discussing amendment to Rehabilitation Act).   Because "the definition of disability is identical under the ADA and Rehabilitation Act," the Second Circuit construes the definition identically under both statutes.   *E.g.,* Roberts v. Royal Atl. Corp., 542 F.3d 363, 370 (2d Cir. 2008) (internal alterations omitted).

delinquent girls, DCF subjected Jane to discrimination based on Gender Dysphoria in violation of Section 504 of the Rehabilitation Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Jane prays for judgment against Defendants on all claims, as follows:

1.     Compensatory and punitive damages against Defendants Dzurenda, Katz, Semple, and Rosenbeck in their individual capacities;

2.     Compensatory damages against the State of Connecticut, DCF, and Katz and Rosenbeck in their official capacities;

3.     Costs of suit, including litigation expenses and reasonable attorneys' fees;

4.     Such other and further relief as the Court deems just, equitable, and proper.

THE PLAINTIFF

By /s/ David N. Rosen
David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com

Sarah French Russell
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Ave.
Hamden, CT 06518
(203) 382-3238
(203) 582-3237
CT26604
sarah.russell@quinnipiac.edu