**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JANE DOE | : | CIVIL ACTION NO. 3:16-CV-1934 (RNC) |
| v. | : | |
| JAMES DZURENDA, ET AL. | : | June 28, 2017 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

Jane Doe seeks damages for the harm she suffered when Defendants[1] kept her in solitary confinement for nearly a year.  Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court should deny the motion.[2]

**INTRODUCTION**

For most of the year 2014, when Jane was sixteen (and then seventeen) years old, she was detained in solitary confinement at high security facilities run by either the Connecticut Department of Children and Families ("DCF") or the Connecticut Department of Correction ("DOC").  Treating Jane, a child with a history of extreme trauma, in this way not only harmed her mental and physical wellbeing, it was also illegal:

By holding Jane in prolonged isolation, Defendants violated the provision of the Juvenile Justice and Delinquency Prevention Act ("JJDPA") prohibiting states from incarcerating children

---

[1]  Defendants are (1) James Dzurenda, former Commissioner of the Department of Correction ("DOC"); (2) Scott Semple, Commissioner of DOC; (3) the Connecticut Department of Children and Families ("DCF"); (4) Joette Katz, Commissioner of DCF; (5) William Rosenbeck, Superintendent of the Connecticut Juvenile Training School ("CJTS"); and (6) the State of Connecticut (collectively "Defendants").

[2] This memorandum is much longer than Plaintiff, and no doubt Defendants and the Court, would wish, but we think the case's factual complexity and the number and range of Defendants' arguments make the length necessary.

1

in any "jail or lockup for adults," and the provisions of the Prison Rape Elimination Act ("PREA") that stringently limit any isolation of children; they violated the anti-discrimination provisions of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehab Act"); and they deprived Jane of her rights under the Eighth and Fourteenth Amendments.

Defendants assert that private plaintiffs cannot sue for violations of the relevant JJPDA and PREA provisions. But Defendants fail to adequately distinguish a closely analogous case, *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015), which held that private plaintiffs may pursue claims under 42 U.S.C. § 1983 for violations of a similarly-structured federal statute (the Food Stamp Act). *Briggs*, and the Supreme Court cases it relies on, show that Jane may sue for violations of the JJDPA and PREA provisions under § 1983.

Defendants next assert that Jane's Title II ADA claim must be dismissed because she does not allege "discriminatory animus or ill will." However, the 2001 Second Circuit case upon which Defendants rely has been abrogated in relevant part by the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006). After *Georgia*, a plaintiff may bring a suit for damages under the ADA where she alleges that the conduct also violated substantive due process or Eighth Amendment rights, as Jane does here. Notably, qualified immunity is not a defense to Jane's ADA and Rehabilitation Act claims, which she brings against the State, DCF, and state officials in their official capacities.

Defendants urge dismissal of Jane's substantive due process and Eighth Amendment claims—using their own version of facts to say that Jane's claims are "without basis in fact." But Jane's complaint thoroughly details the nature of the constitutional violations, and the parties' factual disputes obviously cannot be resolved at this stage of the litigation.

Finally, Defendants claim they are protected by both absolute immunity and qualified immunity. The absolute immunity defense fails because Defendants had wide discretion over Jane's placement and the conditions of her confinement and were not merely "carrying out an order of the court." (Defs' Mem. at 52). The qualified immunity defense fails because Jane alleges violations of clearly established federal statutory and constitutional law—and in any case there are factual issues bearing on these claims that must be developed through discovery.

## CONTENTS

FACTS ........................................................................................................................................... 4

ARGUMENT ............................................................................................................................... 15

    I.    JANE MAY SUE FOR DEFENDANTS' VIOLATION OF THE JJDPA'S PROHIBITIONS ON PLACING JUVENILES IN ADULT FACILITIES. ................ 16

        A.    Defendants Violated the JJDPA by Placing Jane in a "Jail or Lockup for Adults.". 16

        B.    Private Plaintiffs May Enforce the JJDPA's Prohibitions on Placing Juveniles in Adult Facilities. ............................................................................................................ 20

        C.    Jane Has Not Waived Her JJDPA Argument ............................................................ 31

    II.    PREA'S LIMITATIONS ON PLACING JUVENILES IN SOLITARY CONFINEMENT MAY BE ENFORCED UNDER § 1983. ...................................... 38

    III.    JANE STATES VALID CLAIMS UNDER THE ADA AND THE REHABILITATION ACT. ............................................................................................ 43

        A.    Jane Has Adequately Alleged She Has a Disability Under the ADA. ...................... 44

        B.    The ADA's Definition of "Disability" Does Not Exclude Gender Dysphoria. ......... 50

        C.    Jane has Properly Alleged Discrimination under the ADA and Rehab Act ............. 69

        D.    A Plaintiff May Maintain an ADA Suit for Damages Without the Need to Allege that Defendants Acted with Discriminatory Animus or Ill Will Based on Disability. ...................................................................................................................... 74

        E.    Defendants' Argument for Dismissal of the ADA Claim Improperly Relies on Facts Outside the Complaint. ............................................................................................... 80

        F.    Qualified Immunity Does Not Bar Plaintiff's ADA and Rehab Act Claims. ........... 81

    IV.    JANE'S CONSTITUTIONAL CLAIMS SHOULD NOT BE DISMISSED............... 81

V.      DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY.................... 90

VII.    QUALIFIED IMMUNITY DOES NOT BAR RELIEF AND, IN ANY EVENT,
        INVOLVES FACTUAL ISSUES THAT CANNOT BE RESOLVED AT THIS
        STAGE OF THE CASE. ........................................................................... 95

CONCLUSION................................................................................................................. 99

## FACTS

The facts relevant to the motion to dismiss are drawn from the complaint and summarized here for the Court's convenience.[3]

Jane Doe's involvement with DCF began when she was five years old.  (Compl. ¶ 12).  Beginning in early childhood and continuing throughout many years, Jane was subjected to severe neglect, as well as physical, sexual, and emotional abuse.  (*Id.* ¶ 13).  Some of these harms occurred when she was in DCF residential placements.  (*Id.*)  During the time periods relevant to this action, Jane was committed to DCF as the result of both child protection and juvenile delinquency proceedings.  (*Id.* ¶ 12).  As her court-appointed guardian, DCF had legal obligations to take actions that served Jane's best interests.  Conn. Gen. Stat. §§ 46b-121, 46b-129.

As a result of Jane's long history of horrific trauma and abuse, as well as DCF's persistent failure to care for or protect her, Jane suffers from impairments that substantially limit major life activities.  (Compl. ¶ 13-47).  In particular, during the time period covered by the complaint, Jane suffered from Depression, Posttraumatic Stress Disorder, Anxiety, Developmental Trauma Disorder, and Gender Dysphoria.  She is thus an individual with disabilities within the meaning of the Americans with Disabilities Act ("ADA").  (*Id.* ¶ 195).  At

---

[3] Jane relies only on facts that are contained in the complaint, while Defendants acknowledge that the "Factual Background" section of their Memorandum includes many facts outside the complaint (*see* Defs' Mem. at 4 n.3), foreshadowing factual disputes that may be important later but are immaterial now.

all times relevant to this action, DCF was aware of Jane's history of trauma and her impairments. (*Id.* ¶ 15).

Jane is a transgender girl who suffers from Gender Dysphoria. (*Id.* ¶ 16). A transgender person is someone whose gender identity—that is, a person's internal sense of being male or female—does not align with his or her assigned sex at birth. Typically, people born with the physical characteristics of males psychologically identify as men, and those with the physical characteristics of females psychologically identify as women. However, for a transgender person, body and gender identity do not match. (*Id.* ¶ 17). For many transgender people, this incongruence between gender identity and assigned sex does not interfere with their lives. For some transgender people, however, the incongruence results in dysphoria—i.e., a feeling of stress and discomfort with one's assigned sex. Such dysphoria, if clinically significant and persistent, is a serious medical condition. (*Id.* ¶ 20). Left untreated, Gender Dysphoria can result in debilitating depression and anxiety, and can also lead to consideration of or attempted suicide, self-castration, or self-mutilation. (*Id.* ¶ 21).

The accepted course of medical treatment to alleviate the symptoms of Gender Dysphoria often involves allowing the individual to live as his or her chosen gender through one or more of the following treatments: changes in gender expression and role; dressing, grooming, and otherwise outwardly presenting in a manner consistent with one's gender identity; hormone therapy; psychotherapy; and, in some cases, surgery to change primary and/or secondary sex characteristics. (*Id.* ¶ 22).

Jane has been diagnosed with Gender Dysphoria. As part of her medically-supervised treatment, she changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire, growing long hair, and taking feminizing

5

hormones, which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women. (*Id.* ¶ 23). Jane's Gender Dysphoria is so severe that she has experienced debilitating depression and anxiety. (*Id.* ¶ 24). Until the time period covered by this complaint, DCF recognized that Jane is a transgender girl with Gender Dysphoria and placed her in facilities and programs with other girls. (*Id.* ¶ 25). Indeed, DCF helped to provide Jane with hormone therapy to support her physical transition. (*Id*).

The chronology of Jane's incarceration is as follows.

| | |
|---|---|
| **January 31, 2014** | Jane incarcerated at Connecticut Juvenile Training School |
| **April 8, 2014** | Jane transferred to York CI per Connecticut Superior Court order<br>Jane placed in mental health unit at York CI |
| **May 13, 2014** | Jane moved from mental health unit to self-contained unit at York CI |
| **June 24, 2014** | DCF Commissioner removed Jane from York CI and placed her at the Pueblo Unit |
| **July 12, 2014** | Jane removed from the Pueblo Unit and placed back at Connecticut Juvenile Training School |
| **December 23, 2014** | Jane's interactions with peers begins |

We summarize each stage in turn.

**January 31-April 8, 2014: Isolation at Connecticut Juvenile Training School**

On November 21, 2013, the Superior Court for Juvenile Matters committed Jane as a delinquent to the custody of DCF for a period not to exceed eighteen months.[4] (*Id.* ¶ 48). On January 31, 2014, after an incident at a residential facility, DCF placed Jane in isolation for more than two months in a housing unit at the Connecticut Juvenile Training School ("CJTS")— DCF's locked facility for boys. (*Id.* ¶ 49). DCF placed Jane in solitary confinement at CJTS for

---

[4] The commitment was later extended to April 6, 2016. (Compl. ¶ 95).

conduct that was a direct result of her disability.  (*Id.* ¶ 50).  During these months at CJTS, Jane experienced stress, frustration, anxiety, loneliness, isolation, depression, and trauma.  (*Id.* ¶ 62).  Her distress at the conditions of her confinement was exacerbated by her history of severe abuse and trauma.  (*Id.* ¶ 63).

During her detention at CJTS from January 31 to April 8, 2014, Jane was not permitted to leave her housing unit or go outdoors.  (*Id.* ¶¶ 51, 56).  While in the housing unit, Jane slept in a small locked cell.  (*Id.* ¶ 52).  CJTS officers controlled when Jane could enter and exit her cell.  (*Id.* ¶ 53).  When Jane was permitted to leave her cell, her movement was restricted to the housing unit, which consisted of a room containing a table, chairs, and a television.  (*Id.* ¶ 54).  At all times when she was in the unit, at least two officers were stationed in the unit and observed Jane.  (*Id.* ¶ 55).

During this time, Jane had no contact with other children, except for an injured boy who was placed in the housing unit with her for a period of time.  (*Id.* ¶ 58).  With the exception of occasional professional visits, her contact with adults was limited to DCF employees.  (*Id.*).  By isolating Jane at CJTS, DCF denied her the ability to participate in and benefit from services and activities provided to other children in DCF's care, including educational and recreational programming, a residential milieu, and other specialized programs.  (*Id.* ¶ 59).  DCF denied Jane the opportunity to participate in group therapy with an appropriate peer group, learn from peers in a school setting, develop healthy attachments to peers, and work on her ability to self-regulate in settings with peers.  (*Id.* ¶ 61).  DCF also failed to provide Jane with appropriate psychotherapy from a clinician equipped to meet her complex needs as a transgender girl with an extensive trauma history.  (*Id.* ¶ 64).

**April 8, 2014 Transfer**

On February 4, 2014, DCF moved the Connecticut Superior Court to transfer Jane pursuant to Conn. Gen. Stat. § 17a-12 from DCF custody to Manson Youth Institution ("MYI"), a correctional institution operated by DOC for male prisoners ages 14 to 21 charged with or convicted of offenses in adult court.[5]  DCF had used this mechanism to transfer a child from DCF custody to DOC custody only once in the previous 14 years.  (Compl. ¶ 65).  DCF initiated the transfer to DOC custody for conduct that was a direct result of Jane's disability.  (*Id.* ¶ 69).

On April 8, 2014, the Connecticut Superior Court (Kaplan, J.), ordered Jane to be placed in the custody of DOC and transferred to York CI, a high-security adult prison that is Connecticut's only correctional facility for women charged with or convicted of crimes in Connecticut's adult courts.  The Superior Court's order provided:

> She is ordered transferred to Niantic as a transgender female.  *She is to be held in isolation for no more than 72 hours.  She is to be examined, evaluated and classified under the appropriate State and Federal statutes, guidelines, rules and procedures.  Following the classification process, the Commissioner of Correction shall make his own placement determination.*  This transfer shall be reviewed by the court every 6 months to determine whether it should be continued or terminated, unless the Commissioner of DCF has already exercised the powers granted said Commissioner under § 17a-13 by removing [Jane] from the John R. Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution,

---

[5]  The statute in effect at the time provided in relevant part:

> When, in the opinion of the commissioner, or the commissioner's designee, a person fourteen years of age or older is dangerous to himself or herself or others or cannot be safely held at the Connecticut Juvenile Training School, if a male, or at any other facility within the state available to the Commissioner of Children and Families, the commissioner, or the commissioner's designee, may request an immediate hearing before the Superior Court on the docket for juvenile matters where such person was originally committed to determine whether such person shall be transferred to the John R. Manson Youth Institution, Cheshire, if a male, or the Connecticut Correctional Institution, Niantic, if a female.

Conn. Gen. Stat. § 17a-12(a).

Niantic.  The transfer shall terminate upon the expiration of the commitment in this juvenile matter.

Order of April 8, 2014 (emphasis added).[6]  Thus, even after Jane was transferred to DCF custody, DCF's Commissioner had the authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI at any time and place her "in another facility or in the community or to terminate the commitment."[7]  In fact, the Commissioner finally removed Jane from York CI eleven weeks after she was transferred there.  (Compl. ¶ 90).

**April 8-June 24, 2014: Isolation at York CI**

Jane was held at York CI in isolation and segregation from other prisoners from April 8, 2014 until June 24, 2014.  (Compl. ¶ 71).  Other than occasional professional visits, Jane had no contact with anyone other than DOC correctional officers and employees.  She had no social contact with other minors.  (*Id.* ¶ 75).

---

[6] The April 8, 2014 Order is a two-page document and is available as Exhibit 1 to Defendants' Memorandum in Opposition to Motion for Temporary Restraining Order (Doc. 26), filed in the first action (3:14-cv-00469-RNC).  The next month, the Superior Court issued a longer articulation of the order, which is available on Westlaw. *See In re Doe*, No. F04JV32912660A, 2014 WL 2600505, at *11 (Conn. Super. Ct. May 6, 2014).  Although the May 6 Westlaw version includes a section titled "Order" it does not include this sentence from the April 8 order: "Following the classification process, the Commissioner of Correction shall make his own placement determination."

[7] Conn. Gen. Stat. § 17a-13 provided:

Any person committed to the Department of Children and Families who is transferred to the John R. Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution, Niantic, pursuant to section 17a–12, shall be deemed, while so transferred, to be under the jurisdiction of the Department of Correction except that the Commissioner of Children and Families shall retain his powers to remove such person and to place him in another facility or in the community or to terminate the commitment. The jurisdiction of the Department of Correction shall terminate upon the expiration of the commitment as provided in subsection (a) of section 17a–8.

Although Jane was not charged with or convicted of a crime in adult court, at York CI she wore a prison uniform, had an inmate number, ate inmate meals, was subject to strip searches, and was under constant watch by correctional officers trained to guard adult inmates convicted of serious crimes. (*Id.* ¶ 73). The strip searches, which were performed each time she met with her attorneys, caused this transitioning transgender girl with Gender Dysphoria and a history of sexual trauma great anxiety and distress. (*Id.*).

For the first five weeks of her imprisonment at York CI, Jane was detained alone in a locked concrete cell in the mental health unit of the prison. (*Id.* ¶ 76). Day and night, she could hear the screaming, banging, and crying of adult inmates who were mentally disturbed and/or undergoing detoxification from drugs. (*Id.* ¶ 77). While in her cell, she was under constant watch by correctional officers. (*Id.* ¶ 79). Jane was in her cell for approximately 21-22 hours a day—leaving for one hour each day for recreation, which she did alone in the prison gym, and for one or two hours of "school" (which involved sitting with a teacher in another concrete cell). (*Id.* ¶ 78).

On May 13, 2014, DOC moved Jane out of the mental health unit and into another housing area. (*Id.* ¶ 80). This housing area was a self-contained unit consisting of three rooms plus a bathroom. Jane slept in one of the rooms and was observed by correctional officers through a window cut in the door of the room. In addition, a window was cut in the bathroom door. At all times, at least two correctional officers were stationed inside the unit to monitor Jane. At least one additional correctional officer was stationed outside the unit at all times. Jane was able to walk outside the unit into a small area of outdoor space. (*Id.* ¶ 81). Jane spent approximately 23 hours a day in this housing unit or immediately outside it; she left for one hour a day for recreation in the prison gym, and for occasional professional visits. (*Id.* ¶ 82).

While at York CI, Jane was denied access to benefits and services provided to other children in DCF custody.  In particular, she was denied access to age-appropriate educational, vocational, and mental health services.  (*Id.* ¶ 88).  Jane received limited educational services from prison teachers in the housing unit each weekday, and her treatment plan called for visits once a week from the prison psychologist.  DCF and DOC did not provide Jane with the intensive psychotherapy from an appropriate clinician that she required, and Jane had no opportunity to participate in group therapy with other children.  (*Id.*).

While Jane was at York CI, DOC offered that she could attend "school" or meetings with groups of adult inmates charged or convicted of crimes.  DCF also said that Jane could be transported 30 miles away to CJTS during the day to attend school with the boys being held in that locked juvenile facility.  Jane declined to place herself in these environments, where she feared that she would be ridiculed, harassed, and physically assaulted.  (*Id.* ¶ 83).

While at York CI for eleven weeks, Jane experienced high levels of stress, frustration, and anxiety.  (*Id.* ¶ 84).  During her time there, she was fully compliant with DOC rules, much less did she engage in any violent conduct or make verbal threats to staff or inmates.  (*Id.* ¶ 87).  Yet despite the lack of disciplinary incidents at York, Jane's imprisonment there was indefinite.  Until four days before her transfer out of the prison, she was not informed when she would leave or where she would go, and she was never given any clear guidelines for what she needed to do to be moved to a less punitive environment. (*Id.* ¶ 89).  Jane's youth and history of trauma would make any period of incarceration in isolation in an adult prison difficult for her to withstand, and her, anguish was exacerbated by the indefinite nature of her imprisonment.  (*Id.* ¶¶ 89, 111).

**June 24-July 12, 2014: Pueblo Unit**

On June 24, 2014, the Defendant DCF Commissioner exercised her authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI and place her "in another facility or in

11

the community or to terminate the commitment." The DCF Commissioner placed Jane at the Pueblo Unit, a locked facility for girls adjacent to CJTS that is operated by DCF. (*Id.* ¶ 90). At the Pueblo Unit, Jane was positively engaged in individual and group therapy and in school work. (*Id.* ¶ 91).

On July 12, 2014, for the first time since January, Jane was involved in a fight, involving three other girls. (*Id.* ¶ 92). Within hours, DCF decided to move Jane back to isolation at CJTS—the boys' facility. (*Id.* ¶ 93). DCF's decision was made without time to review records of the incident, interview staff or youth, or convene a treatment team meeting to consider alternatives to solitary confinement. (*Id.* ¶ 94). All four of the girls involved in the incident were described as hitting each other and staff, yet none of the others was removed from the Pueblo Unit and placed in isolation at CJTS. (*Id.*). DCF placed Jane back in solitary confinement at CJTS for conduct that was a direct result of her disability. (*Id.* ¶ 93).

**July 12-December 23, 2014: Renewed isolation at CJTS**

On July 12, 2014, DCF placed Jane back in isolation in the same unit at CJTS that had held her in previously. (*Id.* ¶ 96). As before, staff controlled when she could leave her cell. (*Id.* ¶ 97). For the first month back at CJTS, she was not permitted to go outdoors. (*Id.* ¶ 99). Jane's first interaction with peers (other than an unauthorized contact in September) came on December 23, 2014. (*Id.* ¶ 100). Jane declined DCF's offer to place her in general population with the boys at CJTS, because she feared harassment and assault. (*Id.*).

Until October 2014, when she was allowed to use hair extensions, Jane was not permitted to express herself physically as a girl during this stay at CJTS: she was not permitted to wear her own clothes, make up, or a wig. (*Id.* ¶ 101). It is psychologically damaging and harmful for a transgender girl with Gender Dysphoria to be placed in a male facility and to be unable to

express herself as female. (*Id.*) Over the course of her isolation, Jane experienced increasing levels of stress, frustration, anxiety, loneliness, isolation, depression, and trauma. (*Id.* ¶ 102). Throughout most of her stay at CJTS, Jane's isolation was indefinite. Until shortly before December 23, 2014, when contact with an appropriate peer group began, Jane was not informed when she would next interact with peers. (*Id.* ¶ 104).

**Treatment Needs and Harms of Isolation**

Because of her trauma history and disability Jane required intensive, trauma-informed treatment, including psychotherapy sessions multiple times per week with an appropriate clinician. (*Id.* ¶ 108). Jane needed a clinician with experience and expertise in providing therapy to transgender adolescents and victims of trauma. She also needed the opportunity to participate in group therapy sessions with a focus on transgender youth. (*Id.* ¶ 110). But for more than ten months, DCF held Jane in isolation and prevented any contact with an age- and gender-appropriate peer group, even in therapy sessions. For most of her isolation, she was also denied appropriate individual psychotherapy.

Experts recognize that placing a child with a history of trauma in prolonged isolation has harmful psychological effects. (*Id.* ¶¶ 105, 117-20). Indeed, during the more than ten months she spent in isolation from an appropriate peer group, Jane suffered from stress, depression, anxiety, loneliness, and trauma. (*Id.* ¶ 105). Keeping Jane in isolation prevented her from receiving appropriate treatment and developing social skills, and it actively caused her serious psychological harm, with resulting physical consequences. (*Id.* ¶ 106).

The period was particularly difficult for Jane, not only because of the prolonged isolation but because of the uncertainty about its duration. (*Id.* ¶ 111). Isolation with an indeterminate end date has even more serious harmful consequences than other forms of isolation, particularly for children. DCF intensified Jane's suffering by not telling her when she was to be moved,

13

where she would be moved, and what she needed to do in order to be moved.  DCF did not even provide her with an end date for her incarceration at York or CJTS or any concrete plan for her future placement.  (*Id.*).

The experience of isolation was also wounding.  (*Id.* ¶ 107).  By isolating Jane from her peers, DCF told this child that she was too dangerous to be around other children, even those with histories of misbehavior and assaultive conduct.  Jane was the only child that DCF isolated alone in a unit for many months at CJTS based on purported dangerousness.  Based on the claim that she was too dangerous for DCF custody, DCF singled Jane out for transfer to an adult prison under Conn. Gen. Stat. § 17a-12—a statute that DCF had invoked only once in the previous 14 years.  (*Id.*)  DCF publicly conveyed to this child that she was uniquely damaged and dangerous, and unsuitable for contact with peers.  Jane was already traumatized by physical and sexual abuse. The experience of being selected for extreme and harsh treatment by her supposed guardians left this vulnerable child deeply damaged.  (*Id.*)

At the same time that DCF isolated and stigmatized Jane, it also denied her the ability to express herself as female, prohibiting her from wearing her own clothes (or even a female uniform), a wig, or make up, and placing her in a facility for boys where some staff members referred to her as male. This treatment was entirely contrary to generally accepted professional recommendations for the treatment of gender dysphoria.  (*Id.* ¶¶ 22, 207).

This isolation, stigmatization, and denial of gender expression by the public authorities charged with her care caused Jane severe distress and is likely to have a lasting impact on her sense of identity and self-worth.  (*Id.* ¶ 107).

**Procedural History**

On April 9, 2014, the day after Jane was transferred to York CI, a predecessor to this action was filed, alleging violations of Jane's statutory and constitutional rights, and seeking injunctive relief. (Doe v. Corrections et al, 3:14-cv-00469-RNC). On June 24, 2014, the day before a scheduled preliminary injunction hearing, the DCF Commissioner removed Jane from York CI and placed her at the Pueblo Unit. After Jane was released from CJTS, Plaintiff filed a new action on April 6, 2015, seeking only damages (Doe v. Dzurenda et al, 3:15-CV-498 (RNC)), and the next day filed a notice of dismissal of the original action without prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). The Court approved the dismissal the following day. On November 23, 2016, after her commitment to DCF had ended and she turned 18, Jane filed the present action. The same day, Plaintiff filed a motion to dismiss the second lawsuit without prejudice, which the Court granted on March 1.

## ARGUMENT

Defendants argue that (1) private plaintiffs cannot pursue claims for violations of the JJDPA and PREA, (2) Jane does not state a valid claim under the ADA and Rehabilitation Act, (3) Jane's constitutional claims are "without basis in fact," and (4) Defendants are protected by absolute and qualified immunity. All of these arguments are governed by the standard for Rule 12(b)(6) motions, which require the Court "to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief." *Galper v. JP Morgan Chase Bank*, N.A., 802 F.3d 437, 443 (2d Cir. 2015). We address these arguments in turn. None has merit.

15

I.    **JANE MAY SUE FOR DEFENDANTS' VIOLATION OF THE JJDPA'S PROHIBITIONS ON PLACING JUVENILES IN ADULT FACILITIES**

Defendants say (1) that their alleged conduct "arguably" complied with the JJDPA but in fact the plain language of the JJDPA prohibited them from detaining Jane in an adult facility. They assert (2) that children victimized by statutory violations of the JJDPA cannot sue, but their argument is foreclosed by the Second Circuit's recent decision in *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015), where the court held that the statutory time limits for allocating food stamps are privately enforceable under 42 U.S.C. § 1983.  Finally, (3) they say that Jane was required to raise her JJDPA and damages claims at the state court transfer hearing, but that argument not only lacks merit but is premature at this motion to dismiss stage.

A.    **Defendants Violated the JJDPA by Placing Jane in a "Jail or Lockup for Adults."**

The JJPDA expressly prohibits states receiving federal block grants from placing juveniles in any "jail or lockup for adults" except under specific, limited circumstances that are inapplicable in Jane's case.  *See* 42 U.S.C. § 5633(a)(13).[8]  The JJPDA defines "jail or lockup

---

[8]  The JJDPA requires states receiving block grants to submit a plan.  The statute provides in relevant part:

> In accordance with regulations which the Administrator shall prescribe, such plan shall—
> . . . .
>
> (13) provide that no juvenile will be detained or confined in any jail or lockup for adults except— . . . .

42 U.S.C. § 5633(a)(13).  The statute then provides two exceptions, neither of which applies here.

The first exception covers "juveniles who are accused of nonstatus offenses" who are being held for processing or release, awaiting a transfer to a juvenile facility, or are making a court appearance.  Such juveniles may be detained a jail or lockup for adults for no more than 6 hours and only if "such juveniles do not have contact with adult inmates" and there is "in effect in the State a policy that requires individuals who work with both such juveniles and adult inmates in collocated facilities have been trained and certified to work with juveniles." *Id.* § 5633(a)(13)(A).

16

for adults" to mean "a locked facility that is used by a State, unit of local government, or any law enforcement authority to detain or confine adults—(A) pending the filing of a charge of violating a criminal law; (B) awaiting trial on a criminal charge; or (C) convicted of violating a criminal law." 42 U.S.C. § 5603(22). As the complaint alleges, upon DCF's request, Jane was transferred to the custody of DOC. DOC held her at York CI, an adult women's prison, notwithstanding that Jane was then a sixteen-year-old who had not been charged with, much less convicted of, any crime in adult court.[9] Because none of the JJDPA's narrow exceptions allowing the placement of juveniles in adult facilities applied in Jane's case, Defendants violated the statute.

Defendants say: "Arguably, although not transferred to the adult criminal docket and thus avoiding having an adult criminal record, plaintiff's transfer due to her assaultive conduct after a hearing, excepted this unique case from the JJDPA as state law provisions were followed and the

---

The second exception covers juveniles accused of nonstatus offenses "who are awaiting an initial court appearance that will occur within 48 hours after being taken into custody (excluding Saturdays, Sundays, and legal holidays)." This exception is limited to facilities in rural or remote areas (where no alternative exists), or areas where conditions of safety (such as severe weather) exist. These juveniles must not have contact with adults while in the adult facilities, and staff must "have been trained and certified to work with juveniles." *Id.* § 5633(a)(13)(B).

A separate provision of the JJDPA requires that the state plan provide that "juveniles alleged to be or found to be delinquent . . . will not be detained or confined in any institution in which they have contact with adult inmates" and that "there is in effect in the State a policy that requires individuals who work with both such juveniles and such adult inmates, including in collocated facilities, have been trained and certified to work with juveniles." *Id.* § 5633(a)(12).

[9] The JJDPA defines an "adult inmate"—someone who may lawfully be placed in an adult facility—as an individual who "has reached the age of full criminal responsibility under applicable State law" and "has been arrested and is in custody for or awaiting trial on a criminal charge, or is convicted of a criminal offense." 42 U.S.C. § 5603(26). Thus, Jane was not an "adult inmate" when she was at York CI because she was under 18 years old (the age of full criminal responsibility in Connecticut) and not charged with or convicted of a criminal offense.

17

transfer was approved by the state trial court, concluding in part that there was no other alternative placement." (Defs' Mem. at 31). Defendants point to a JJDPA regulation that provides that a state may place or transfer "an alleged or adjudicated delinquent who reaches the State's age of full criminal responsibility to an adult facility when required or authorized by State law." 28 C.F.R. § 31.303(d)(1)(v). However, this provision is inapplicable because Jane had not reached Connecticut's "age of full criminal responsibility"—which is 18 years old.[10] In addition, the regulation states that the JJDPA does not prevent the waiver or transfer of juveniles to adult court for prosecution for felonies (and their detention in adult facilities after such a waiver or transfer). *Id.* However, as Defendants are well aware, Jane was not waived or transferred to adult court for prosecution for a criminal felony violation. Rather, she was simply adjudicated delinquent in juvenile court, and thus entitled to the protections of the JJDPA.[11]

As for the proposed "no alternative placement" exception to the JJDPA (*see* Defs' Mem. at 21, 31), the presence of an alternative placement is relevant only in considering whether states are permitted to hold juveniles in adult jails or lockups for 48 hours after they are first taken into

---

[10] The "Raise the Age" legislation—which raised the age of juvenile court jurisdiction to include 16 and 17 year olds—was fully implemented on July 1, 2012. Public Act 11-157, Secs. 9-11 (Conn. 2011). Thus, the age of full criminal responsibility at the time Jane was held at York CI was 18. Some states have statutory provisions that permit the transfer of adjudicated delinquents to adult facilities when they reach the age of 18. *See, e.g.*, N.J. Stat. Ann. § 52:17B-175(e).

[11] The adult lockup provision of the JJDPA, 42 U.S.C. § 5633(a)(13), was last amended in 2002. See 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 102-273, § 12209, 116 Stat. 1758 (2002). The amendment narrowed and clarified the scope of the exceptions to the requirement that states "provide that no juvenile will be detained or confined in any jail or lockup for adults." The regulation cited by Defendants was promulgated in 1995, pursuant to an earlier version of the JJDPA's adult lockup provision. See Formula Grants, 60 FR 28440-01. Accordingly, there is a substantial question regarding what weight, if any, should be placed on this portion of the regulation. But in any event, even if the regulation is followed, it does not allow Defendants to violate the JJDPA.

custody and are awaiting an initial court appearance.[12]  The court in the case Defendants cite,

*Horn by Parks v. Madison Cnty. Fiscal Court*, 22 F.3d 653 (6th Cir. 1994), considered whether

an alternative placement was available because the court was determining the applicability of the

JJDPA's exception regarding non-status offenders being held in adult facilities awaiting initial

court appearances.[13]  Those were obviously not the circumstances in the instant case—and

Defendants make no claim that either of the two statutory exceptions to the JJDPA apply.  *See* 42

U.S.C. § 5633(13)(A), (B).

---

[12] The JJDPA's command that "no juvenile will be detained or confined in any jail or lockup for adults" does not apply in these circumstances:

> (B) juveniles who are accused of nonstatus offenses, who are awaiting an initial court appearance that will occur within 48 hours after being taken into custody (excluding Saturdays, Sundays, and legal holidays), and who are detained in a jail or lockup--
>> (i) in which--
>>> (I) such juveniles do not have contact with adult inmates; and
>>> (II) there is in effect in the State a policy that requires individuals who work with both such juveniles and adults inmates in collocated facilities have been trained and certified to work with juveniles; and
>> (ii) that--
>>> (I) is located outside a metropolitan statistical area (as defined by the Office of Management and Budget) and *has no existing acceptable alternative placement available;*
>>> (II) is located where conditions of distance to be traveled or the lack of highway, road, or transportation do not allow for court appearances within 48 hours (excluding Saturdays, Sundays, and legal holidays) so that a brief (not to exceed an additional 48 hours) delay is excusable; or
>>> (III) is located where conditions of safety exist (such as severe adverse, life-threatening weather conditions that do not allow for reasonably safe travel), in which case the time for an appearance may be delayed until 24 hours after the time that such conditions allow for reasonable safe travel;

42 U.S.C. § 5633(13)(B) (emphasis added).

[13] The exceptions to the adult lockup provision were phrased differently at the time of *Horn*, and appeared at 42 U.S.C. § 5633(a)(14) rather than § 5633(a)(13).  *See Horn*, 22 F.3d at 657.

**B.** **Private Plaintiffs May Enforce the JJDPA's Prohibitions on Placing Juveniles in Adult Facilities.**

Supreme Court precedent and the Second Circuit's recent decision *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015) foreclose Defendants argument that plaintiffs may not enforce through a private right of action the JJDPA's prohibitions on placing juveniles in adult facilities.

**1.** ***Briggs v. Bremby.***

The plaintiff in *Briggs v. Bremby* brought suit under § 1983 against the Commissioner of the Connecticut Department of Social Services ("DSS") to enforce the Food Stamp Act's time limits for awarding food stamp benefits. The Food Stamp Act provides that states must submit "a plan of operation," and the plan "shall provide" that the state agency will follow certain time limits regarding awards of food stamps. 7 U.S.C. § 2020(d); (e)(3), (9). In considering whether the plaintiff could sue under § 1983 to enforce the Act's provisions, the Second Circuit followed *Blessing v. Freestone*, 520 U.S. 329 (1997). The Court explained:

> In *Blessing v. Freestone*, 520 U.S. 329 (1997), the Supreme Court established a three-part test for determining whether a federal law creates a right that can presumptively be enforced by private suit through § 1983: 1) "Congress must have intended that the provision in question benefit the plaintiff," 2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence," and 3) "the statute must unambiguously impose a binding obligation on the States." *Id.* at 340–41 (internal citations and quotation marks omitted). The Court has further clarified that "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under § 1983, and that nothing short of an "unambiguously conferred right" will support a cause of action under § 1983. *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002). If these requirements are met, then there is a rebuttable presumption that the statutory right can be enforced through § 1983. *Id.* at 341.

*Briggs*, 792 F.3d at 242. The *Briggs* Court concluded that "[t]he two statutory time limits at issue in this case clearly meet the second and third prongs of the *Blessing* test" because "[t]hey establish a right that is neither vague nor amorphous (both provisions require the allotment of food stamps within a definite number of days), and they impose binding obligations on the States

(both provisions use the mandatory 'shall').'" *Id.* at 242.  It also found the first requirement—that

Congress intended the provisions to benefit food stamp applicants—satisfied.  The Court rejected

the defendants' argument that the time limits "were meant only to guide the States in how to

marshal their resources when administrating food stamp programs." *Id.*[14]

Thus, the Second Circuit in *Briggs* concluded that the Food Stamp Act's provisions

"create a rebuttable presumption that the time limits in those sections are privately enforceable

under § 1983." *Id.* at 245.  It concluded that while the Act granted enforcement power to the

Secretary of Agriculture, Congress did not "preclude[ ] recourse to § 1983 either 'expressly,' or

'impliedly, by creating a comprehensive enforcement scheme that is incompatible with

individual enforcement under § 1983,'" *Id.* (quoting *Blessing*, 520 U.S. at 341), primarily

because the Act contains no agency process for addressing individual complaints that could take

the place of private lawsuits.  *Id.* at 245.

### 2.    The JJDPA's Provisions are Enforceable Under § 1983.

Applying *Blessing*'s three-part test to the JJDPA is straightforward, though we will

include substantial detail which may perhaps be helpful to the Court.

Jane's JJDPA claim easily passes the test that "the right assertedly protected by the

statute is not so vague and amorphous that its enforcement would strain judicial competence."  It

---

[14] The *Briggs* court cited *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), which held that plaintiffs could sue under § 1983 to enforce a reimbursement provision of the Medicaid Act.  *Briggs* recognized that *Wilder* "demonstrates that a statute imposing a requirement on a 'State plan' for administering a social welfare program may nevertheless in appropriate circumstances give rise to a right enforceable under § 1983, for instance if it includes a specific mandate intended to give rights to a particular group." *Briggs*, 792 F.3d at 243-44.  The *Briggs* court continued: "while the Food Stamp Act's time limits are written as requirements for a 'State plan of operation,' the Court in *Wilder* concluded that such a formulation can be fully consistent with a legislative intent to confer enforceable rights upon the relevant plaintiffs." *Id.* at 244 (citations omitted); *see also id*. (adding: "Indeed, it is commonplace that laws designed to protect individual rights are formulated as restrictions on government action.").

defines a right that is simple for courts to enforce: apart from very brief detention in clearly defined circumstances, juveniles may not be placed in adult facilities. *See* 42 U.S.C. § 5633(a)(13) and (13)(A), (B).

*Blessing* also requires that "the statute must unambiguously impose a binding obligation on the state." The JJDPA is phrased in mandatory language, stating that the state plan "shall" "provide that no juvenile will be detained or confined in any jail or lockup for adults" except under the limited circumstances described above. In *Briggs*, the Second Circuit found that language stating that a state plan "shall provide" certain procedures imposed binding obligations on states under *Blessing. Briggs*, 792 F.3d at 242. Thus, as in *Briggs*, and as the court concluded in *Horn by Parks*, 22 F.3d at 658, the statute is binding on states.

Finally, under the *Blessing* test, Congress must have intended that the provision in question benefit the plaintiff. As *Briggs* noted, the Supreme Court's decision in *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002), clarifies that "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under § 1983. In finding that the Food Stamp Act's time limits created *rights* for recipients, *Briggs* observed that the provisions were drafted in a way that "focuses on the needs of the individual beneficiaries," and so it is here: By referring to treatment that "no juvenile" should experience, the provisions "contain language that is focused on the interests of the [individual]." *Id.* In addition, the JJDPA provisions "create . . . specific requirement[s] that must be followed," rather than merely referencing "a generalized 'policy or practice.'" *Id.* Finally, as in *Briggs*, the JJDPA requirements are calibrated to protect the rights of juveniles depending on their particular circumstances, distinguishing juveniles accused of status offenses, who have the right not to be detained in adult facilities at all, from juveniles accused of non-status offenses who may be detained in such facilities, but only for very brief

time periods with special conditions of confinement, and only under a very specific set of circumstances.

Indeed, in enacting the restrictions on the placement of juveniles in adult facilities, Congress considered the detrimental effects of adult incarceration on children.[15] The adult lockup provisions were first enacted with the Juvenile Justice Amendments of 1980. The Senate Judiciary Committee held hearings in March 1980 to consider what became the adult lockup provisions. To begin the hearings, Deputy Attorney General Charles Renfrew, a former federal judge, testified that the jailing of children with adults was "a national catastrophe," presented research documenting its harms, and called on Congress to "absolutely prohibit" the incarceration of children in adult facilities. Reauthorization of the Juvenile Justice and Delinquency Prevention Act of 1974: Hearings Before the S. Comm. on the Judiciary, 96th Cong. 26-30 (March 27 and 28, 1980) (Statement of Deputy Attorney General Renfrew).[16] Judge Renfrew's testimony on behalf of the Department of Justice was adopted and endorsed by several witnesses, who presented further research supporting his conclusions. *See, e.g.*, *id.* at 94 (Statement of Judge Carolyn Lathrop) ("Deputy Attorney General Charles Renfrew made one of the most important and, we believe, most enlightened proposals to emerge from the administration."); *id.* at 107 (Testimony of Sally Maxton) ("We would like to strongly support the recommendation that the act mandate that no youth be held in jail with adults"); *id.* at 112 (Prepared Statement of Sally Maxton) ("[T]he Act must be strengthened to mandate that no youth in this country be held in jail with adults."); *id.* at 133 (Statement of Mark A. Thennes)

---

[15] We include in an appendix excerpts from the JJDPA's legislative history.

[16] Judge Renfrew's testimony to Congress highlighted the harms of placing juveniles into isolation at adult facilities, explaining that "juveniles are highly vulnerable to emotional pressure," making "isolation of the type provided in adult facilities" a serious threat to children's long-term mental health. *Id.* at 27.

("The [National Youth Work] Alliance supports the removal of all children from adult jails."); *id.* at 155 (Statement of Barbara T. Sylvester) ("The harms and tragedies that result from the jailing of juveniles are well documented . . . ."); *id.* at 160 (Statement of Pearl West, quoting Department of Justice policy statement) ("[T]he arguments against holding juveniles in jail are pervasive and along scientific lines.").

That May, the House Committee on Education and Labor and the Senate Judiciary Committee issued favorable reports containing the adult lockup provisions within the Juvenile Justice Amendments of 1980. According to the House Report, the adult lockup provisions would "require the removal of juveniles from jails and lock-ups for adults," after states were given five years to comply. *See* Juvenile Justice Amendments of 1980: Report together with Supplemental and Individual Minority Views, H. Comm. on Education and Labor, H. Rpt. 96-946 (May 13, 1980). The House Report takes notice of the Senate hearings and states that "[s]tatistics on inappropriate placements, the evidence of harm, the growing body of constitutional law, and the expressed belief that properly planned and implemented removal of juveniles from all adult jails and lock-ups is economically feasible, promoted the committee amendment." *Id.* at 24-25. During debate on the floor, House members described the harms from incarcerating children with adults and hailed the bill's mandatory requirements for removal of children from adult jails and lockups. *See* Juvenile Justice Amendments of 1980 (floor debate), 126 Cong. Rec. p. H10921 (Nov. 19, 1980) (Statement of Rep. Coleman); *see also id.* at H10922 (Nov. 19, 1980) (Statement of Res. Comm. Corrada) ("Recognizing the detrimental effect of allowing close contact with convicted criminals, this act requires participating States to remove juveniles from adult jails."); *id.* at H10922 (Statement of Rep. Railsback) ("Some young people simply lack the maturity to cope with the adult offender, and as a matter of fact many of them have even

24

committed suicide rather than continue to endure abuse"); *id.* at H10923 (Statement of Rep. Weiss) ("In particular, the requirement that juveniles be removed from adult prisons and lockups is critically important."). President Carter, signing the Juvenile Justice Amendments into law, made a statement applauding the adult lockup provisions, "which will result in the removal of juveniles from adult jails and lockups." *See* Statement on Signing S. 2441 Into Law, 16 Weekly Compilation of Presidential Documents 50 (December 8, 1980), p. 2787-88.

Judge Renfrew's testimony set the tone for what became the JJDPA adult lockup provisions, laying out the "statistics . . ., the evidence of harm, the growing body of constitutional law," and then-emerging consensus that incarceration of children in adult facilities —and the isolation that results—subjects them to physical and mental harm, and violates their rights. The concerns remained present throughout the Senate hearings, House and Senate reports, floor debates, and President Carter's signing statement for the Juvenile Justice Amendments of 1980. Without question, Congress considered the harms to children from incarceration within adult facilities—and then, took action to protect them by giving them the right not to be housed in these facilities except under the narrowest of circumstances.

Accordingly, applying the analysis of *Briggs* and the Supreme Court cases upon which it relies, the JJDPA's restrictions on placing juveniles in adult facilities can be enforced through a private right of action under § 1983. Not surprisingly, multiple courts have held that the JJDPA's restrictions on placing juveniles with adults creates rights that may be enforced through a private lawsuit under § 1983.[17] *See, e.g.*, *Horn by Parks v. Madison Cnty. Fiscal Court*, 22

---

[17] The adult lockup provisions of the JJDPA were first enacted in 1980 and then amended several times. *See* Juvenile Justice Amendments of 1980, Pub. L. No. 96-509, § 11, 94 Stat. 2750; *see also, e.g.,* Juvenile Justice and Delinquency Prevention Act of 1992, Pub. L. No. 102-586, § 2, 106 Stat. 4982 (amending the provision). The most recent amended language, enacted

F.3d 653, 658 (6th Cir. 1994) ("Having thus determined that the Act [JJDPA] creates a federally secured right and that Congress has not foreclosed private enforcement, we hold that appellant was and is entitled to seek relief through a private cause of action under 42 U.S.C. § 1983. Although we are aware of no circuit court decisions on this issue, our conclusion is consistent with the majority of district court decisions on point."); *Grenier By & Through Grenier on Behalf of Grenier v. Kennebec Cnty., Me.*, 748 F. Supp. 908, 915-18 (D. Me. 1990) ("Congress intended sections 5633(a)(12) and (13) to create enforceable rights for juvenile detainees" and thus "Grenier may use section 1983 to seek relief from the alleged injuries he has suffered as a result of the alleged infringement of his rights under the Juvenile Justice Act"); *Hendrickson v. Griggs*, 672 F. Supp. 1126, 1135 (N.D. Iowa 1987) (rejecting defendants' argument that JJDPA's adult lockup provisions are simply a "nudge in a preferred direction," and holding that those provisions create enforceable rights).[18]

---

in 2002, makes the requirements of the statute even clearer. *See* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 102-273, § 12209, 116 Stat. 1758 (2002).

[18] Various other courts have also concluded that JJDPA provisions are enforceable under § 1983. *See James v. Jones*, 148 F.R.D. 196, 199-200 (W.D. Ky. 1993); *Doe v. Borough of Clifton Heights*, 719 F. Supp. 382, 384 (E.D. Pa. 1989), *aff'd without opinion*, 902 F.2d 1559 (3d Cir. 1990), *cert. denied* 498 U.S. 941 (1990); *Hendrickson v. Griggs*, 672 F. Supp. 1126, 1133–37 (N.D. Iowa 1987); *Kentucky Ass'n for Retarded Citizens v. Conn*, 510 F. Supp. 1233, 1246–50 (W.D. Ky. 1980) (recognizing the right sub silentio), *aff'd* 674 F.2d 582 (6th Cir. 1982); *Doe v. Knauf*, No. 91–187, 1992 WL 672296 (E.D. Ky. Aug. 24, 1992); *James v. Wilkinson*, No. 89–139, 1991 WL 626750 (W.D. Ky. May 20, 1991).

The district courts are not quite unanimous in holding that provisions of the JJDPA can be enforced under § 1983; Defendants have found two cases. (*See* Defs' Mem. at 15, citing *Doe v. McFaul*, 599 F. Supp. 1421 (D.C. Ohio 1984) and *Cruz v. Collazo*, 84 F.R.D. 307 (D. P.R. 1979)). However, both cases are outdated. *Cruz* involved a different provision of the JJDPA— and in fact was decided before the adult lockup provisions were even enacted. *Doe* declared the adult lockup provision in effect at the time unenforceable through § 1983 but did not engage in any analysis of the issue. Ten years later, the Sixth Circuit observed that "the *Doe v. McFaul* ruling can no longer be viewed as reliable" because the case was "decided prior to the Supreme Court's instructive decisions in *Wright*, *Wilder* and *Suter*." *Horn by Parks v. Madison Cnty. Fiscal Court*, 22 F.3d at 659.

### 3.    Defendants' Arguments Fail.

Defendants argue vigorously but unsuccessfully that plaintiffs cannot sue under § 1983 for violations of the adult lockup provision of the JJDPA.

Defendants appear to acknowledge that the *Blessing* test applies in determining whether Jane can sue for a violation of the JJDPA under § 1983, but they say that the test's requirements are not met.  (Defs' Mem. at 22, 26).[19]  The problem, Defendants say, is that Congress was naïve: "Congress," they advise the Court, "never contemplated a juvenile delinquent that was so violent and dangerous as to be unsuitable for confinement in any secure juvenile facility."  (*Id.* at 26-27).  Nor, they continue, did Congress contemplate "a state statutory scheme" where after a hearing "it was determined that the plaintiff should be confined in an adult correctional facility."  (*Id.* at 27).  Therefore, we are told, Defendants should be excused from compliance with the plain language of the JJDPA.

This argument is entirely misconceived.  The relevant question under *Blessing* is whether the JJDPA's restrictions on placing juveniles in adult facilities are intended to benefit and create rights for juveniles.  Such juveniles can either sue under § 1983 for violations of the JJDPA's adult lockup provisions or they cannot.  Courts will not decide based on an individual child's characteristics in each case whether there is a private cause of action.

Defendants also say that the JJDPA does not unambiguously impose a binding obligation on the state because the provisions of the statute "allow the states flexibility to experiment and devise various state plans and approaches," and give states the ability to amend plans.  (Defs' Mem. at 27).  However, the focus in this case is the JJDPA's requirement that state plans "shall

---

[19] Defendants also discuss the test in *Cort v. Ash*, 422 U.S. 66 (1975), but that test, which has since been refined, relates to whether the statute contains an implied right of action for private enforcement.  At issue here is whether provisions of the JJDPA can be enforced through an action under § 1983, and the applicable test is the one set forth in *Blessing* and *Gonzaga*.

provide" specific restrictions on housing juveniles in adult facilities. *See* 42 U.S.C. 5633(a). This "shall provide" language is identical to the state plan language of the statute in *Briggs*, which the Second Circuit concluded created a binding obligation.

Defendants rely heavily on *Gonzaga University v. Doe*, 536 U.S. 273 (2002), and argue that a provision of a statute may be enforced under § 1983 only if there is "rights-creating language" in the statute and the statute has an individual rather than "aggregate" and "generalized" focus." (*Id.* at 22-23). But *Gonzaga* is easily distinguished, as it was in *Briggs*. *Briggs* noted that unlike the funding provision in *Gonzaga*, the Food Stamp Act's time limits: "(1) contain language that is focused on the interests of the applicant households and calibrated to their economic needs, (2) create a specific requirement that must be followed for every food stamp applicant, rather than a generalized 'policy or practice,' and (3) do not merely direct the distribution of funds." *Briggs*, 792 F.3d at 244. So it is here: the JJDPA contains language that is focused on the interests of juveniles and is calibrated to their needs. It is certainly in the interest of juveniles not to be detained in adult facilities. Under the limited circumstances when juveniles can be placed temporarily in adult facilities, the JJDPA prohibits contact with adults and requires staff present who are trained and certified to work with them. In addition, as in *Briggs*, the JJDPA provision creates a specific requirement that must be followed for all detained juveniles, rather than a generalized "policy or practice," as with the statute in *Gonzaga*. The provision is plainly concerned with specific individuals: detained juveniles. Finally, the Act does not merely direct the distribution of funds. Rather, it provides concrete rules regarding the

28

conditions under which juveniles may be detained.  This case is governed by *Briggs*, not

*Gonzaga*.[20]

Thus, under *Blessing*, there is a rebuttable presumption that the JJDPA's restrictions on

placing juveniles in adult facilities are privately enforceable under § 1983.  This presumption

could be overcome if "Congress precluded recourse to § 1983 either 'expressly,' or 'impliedly,

by creating a comprehensive enforcement scheme that is incompatible with individual

enforcement under § 1983.'"  *Briggs*, 792 F.3d at 245 (quoting *Blessing*, 520 U.S. at 341).  But

Congress did no such thing: the JJPDA contains no express prohibition on § 1983 lawsuits.

Moreover, the JJPDA does not create an enforcement scheme incompatible with individual

enforcement under § 1983.[21]  In *Gonzaga*, weighing against private lawsuits was the fact that

FERPA created a comprehensive agency hearing procedure to address individual complaints.

Here, the JJDPA creates no such mechanism for addressing individual complaints by juveniles.

*See Briggs*, 792 F.3d at 245 ("In stark contrast with FERPA, however, the Food Stamp Act

contains no similar agency adjudication process or enforcement structure that could take the

place of private lawsuits.  Rather, the statute before us is analogous to those in *Wright* and

*Wilder*.  The statutes in both of those cases gave the appropriate federal agencies the power to

---

[20] Defendants contrast the JJDPA with the Medicaid statute at issue in *Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004), where the Second Circuit found private plaintiffs could sue to enforce provisions of the statute.  (Defs' Mem at 25).  Medicaid statutes are covered by the so-called *Suter* amendment, which provides that in an action to enforce provisions of certain covered statutes, "such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. 1320a-2.  Defendants observe that the JJDPA is not covered by the *Suter* amendment and "contains no such similar language."  (Defs' Mem at 25).  However, coverage under the *Suter* amendment is not a prerequisite to finding a right is enforceable.  Indeed, the statute at issue in *Briggs* was also not a Medicaid statute covered by the *Suter* amendment.

[21]  Under the JJDPA, the consequence for a state that fails to comply with the adult lockup provision is a substantial reduction in funding for the following year, or even termination of funding.  42 U.S.C. § 5633(c).

exercise oversight and withhold funds, but that authority was held to be consistent with a private right to sue under § 1983 because the statutes at issue did not construct frameworks for resolving individuals' complaints."); *Horn by Parks*, 22 F.3d at 659 (noting that Congress did not intend to preclude reliance on § 1983 because the JJPDA "contains no provision for private judicial or administrative enforcement" and "[t]hat the Act gives the Administrator of the Office of Juvenile Justice and Delinquency Prevention the power to terminate or withhold funding does not manifest congressional intent to foreclose reliance on § 1983 to vindicate federal rights").

Defendants' reliance on *Sossamon v. Texas*, 563 U.S. 277 (2011), misses the point of that case. (Defs' Mem. 16-17). *Sossamon* held that *the private action provision of the statute at issue,* the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), did not waive the state's sovereign immunity from suit for money damages. RLUIPA itself contains an express private cause of action for "appropriate relief against a government," including states, their officers, and person acting under color of state law. *Id.* at 282; 42 U.S.C. § 2000cc-2(a). Sossamon sued the State of Texas and prison officials for injunctive and monetary relief related to policies that prevented prison inmates from attending religious services. The Court strictly construed the phrase "appropriate relief" in favor of the state, and concluded that "it does not include suits for damages against a State." *Sossamon*, 563 U.S. at 282. Rather, the phrase permitted only injunctive relief. The Court noted that its analysis related to scope of an *express* cause of action in a statute, and cases related to implied rights of action did not "translate to this context." *Id.* at 289.

Unlike RLUIPA, the JJPDA does not contain an express cause of action. The question is, instead, whether private plaintiffs can pursue relief against state officials for violations of the JJPDA through § 1983. The scope of the phrase "appropriate relief" that appears in the express

30

cause of action set forth in RLUIPA is simply not relevant to whether plaintiffs can sue state officials under § 1983 for JJPDA violations.  The relevant analysis is in *Briggs.*  If a statutory right is enforceable under § 1983, plaintiffs can seek both injunctive relief and damages—because § 1983 itself provides both of these remedies.[22]

Defendants fall back on a policy argument that does not work. If plaintiffs could sue for violations of the JJPDA, Defendants say, "the public policy encouraging states to develop delinquency prevention programs would be thwarted, as the threat of federal litigation and potential liability would discourage states from seeking grants." (Defs' Mem. at 26).  According to Defendants, "plaintiff's theory would create absurd results, as states who did not submit plans could both incarcerate juveniles in adult facilities, and also be free from potential liability under the JJPDA by virtue of their not accepting federal funds." (*Id.*). But there is nothing absurd about the structure of the JJDPA.  If states want federal funds, they must comply with federal requirements regarding the rights of juveniles.  If they fail to comply, private plaintiffs may sue to enforce their rights.  This is precisely the structure of the statutory scheme at issue in *Briggs.* If states do not want to be liable, they should either comply with the requirement of the statute or not accept funds.

## C.      Jane Has Not Waived Her JJDPA Argument.

Completely ignoring the fact that the judgment in Jane's state court juvenile transfer hearing was reversed on appeal and never reinstated, *In re Angel R.*, 157 Conn. App. 826, 862 (2015), Defendants argue that Jane's state public defender was obligated to raise the JJDPA at

---

[22] *Sossamon* addressed suits for money damages against the State.  As Defendants note, the Second Circuit later clarified that RLUIPA's express cause of action (providing for "appropriate relief") also does not authorize suits for money damages against state officials in their individual capacity. *See Washington v. Gonyea*, 731 F.3d 143 (2d Cir. 2013).   Of course, Plaintiff here is proceeding under § 1983, which permits plaintiffs to sue state officials in their individual capacities for damages.

that hearing on pain of forfeiting Jane's claim for damages under § 1983.  (Defs' Mem. at 21 n.13).  Defendants exclaim that this damages action is an "ambush of the state court judges," (*id.*), and argue that Jane's claims "are barred by a number of defenses, including waiver, collateral estoppel, and res judicata." (*Id.* at 31).  Additionally, Defendants say that Jane's claims are barred by the *Rooker-Feldman* doctrine.  (*Id.* at 31-32, n.22).  None of these arguments has merit.  Not only was the judgment in the juvenile transfer hearing vacated on appeal but Jane could not have brought a damages claim there in any case, and besides: that hearing involved different parties and legal issues; and this case involves actions taken *after* the hearing that were not required by the state court order.

**Res judicata and collateral estoppel.**  Res judicata and collateral estoppel cannot apply to Jane's JJDPA claims because she could not have brought her claim for damages at the state court juvenile transfer hearing; that hearing raised different legal issues and involved different parties than this case; and her JJDPA claims are based on injuries that took place in the months after the hearing based on conduct that the state court order did not require.

By statute, whether the Defendants' preclusion defenses apply will be governed by Connecticut state law.  *McKithen v. Brown*, 481 F.3d 89, 104 (2d Cir. 2007); *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996).  Under Connecticut law, the doctrines of res judicata and collateral estoppel are similar.[23]  For res judicata to apply, "the following elements must be satisfied: (1) the identity of the parties must be the same in both actions; (2) the same claims

---

[23] The waiver rule cited by the Defendants, Defs' Memo at 21 n.13, by contrast, pertains to the reviewability, by the Connecticut Appellate Court or Connecticut Supreme Court, of claims not previously raised in a case on appeal to those courts.  *See Ravetto v. Triton Thalassic Techs.*, 285 Conn. 716, 730 (2008) (citing Connecticut Practice Book § 60-5).  It is inapplicable here because this action is not an appeal from the juvenile court's order of transfer.  Jane brings her JJDPA claim under § 1983 to seek damages from the Defendants—who had the legal power to remove Jane from York CI at all times—for their actions in the months *after* the state court's order (Compl. ¶ 150).

must be at issue; (3) the earlier judgment must have been rendered by a court of competent jurisdiction, and; (4) the parties must have had the opportunity to fully and fairly litigate the matter in the prior action." *Lamson v. Blumenthal*, No. CV020815427, 2006 WL 932536, at \*2 (Conn. Super. Ct. Mar. 24, 2006) (citing *Tirozzi v. Shelby Ins. Co.*, 50 Conn.App. 680, 686-87, *cert. denied*, 247 Conn. 945 (1998)). "For an issue to be subject to collateral estoppel [or issue preclusion], it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." *Wilcox v. Webster Ins., Inc.*, 294 Conn. 206, 223 (2009). An additional requirement is that "the issue concerning which relitigation is sought to be estopped must be *identical* to the issue decided in the prior proceeding." *New England Estates, LLC v. Town of Branford*, 294 Conn. 817, 839 (2010) (emphasis added).

Neither res judicata nor collateral estoppel applies here. Res judicata cannot apply because at the state court's hearings on DCF's motion to transfer Jane's custody to DOC, she "could not have raised [her] claim," *New England Estates*, 294 Conn. at 848, that transfer to York CI in violation of the JJDPA entitles her to damages under § 1983. At issue at the juvenile transfer hearing was only "whether a transfer [was] in the best interests of the child . . . . [and] whether the juvenile is a danger to himself or herself or others or cannot safely be maintained by the department." *In Re Doe*, 2014 WL 2600505 at \*3. Jane's JJDPA claim under § 1983 "raise[s] different issues," *New England Estates,* 294 Conn. at 844, than the state court hearing constituted under Conn. Gen. Stat. § 17a-12: "[T]he purpose of § 1983 damages is to compensate persons for actual injuries and the amount of compensation is ordinarily determined by the rules

33

applicable to common law torts." *Id.*, 294 Conn. at 848.[24]  Moreover, it would be inequitable for the juvenile court's judgment against Jane, who was the *defendant*, to have preclusive effect in this case, where Jane is the plaintiff suing under § 1983, given that she did not "voluntarily go to state court first." *Hendrickson v. Griggs*, 672 F. Supp. 1126, 1132 (N.D. Iowa 1987) (citing *Migra v. Warren City District Bd. of Ed.*, 465 U.S. 75, 85 n.7 (1984) and *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1144 (2d Cir. 1986), *rev'd on other grouds*, 481 U.S. 1 (1987) ("Texaco did not choose the Texas state court for resolution of the claims between the parties but was summoned into that court by Pennzoil.  Texaco was not, therefore, engaged in forum-shopping . . . .").

Furthermore, even if Jane were authorized under Connecticut law to bring a damages claim under § 1983 in her defense against DCF's motion to transfer her custody under Conn. Gen. Stat. § 17a-12, she could not have raised her JJDPA damages claims both because (1) they are brought against Defendants Katz, Dzurenda, and Semple as individuals, and none of them were parties to the earlier proceeding; and (2) the conduct giving rise to the claims occurred *after* the state court's order.  (Compl. ¶¶ 143-155); *Lamson,* 2006 WL 932536 at *2 (parties must be the same for res judicata to apply); *C & H Mgmt., LLC v. City of Shelton*, 140 Conn. App. 608, 615 (2013) ("An official sued in an individual capacity is generally not considered to be in privity with the government, and consequently not bound by a prior adjudication in which the government was a party."); *N.L.R.B. v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983) ("Whether or not the first judgment will have preclusive effect depends in part on . . . whether

---

[24] This case is therefore similar to *Burgos v. Hopkins*, 14 F.3d 787, 791 (2d Cir. 1994), where the court, applying New York law, held that a prior habeas proceeding did not bar a subsequent § 1983 action under the doctrine of res judicata, because "the sole purpose of . . . habeas corpus is to inquire into the cause of imprisonment or restraint, and to determine whether the detention is void," and the court "does not have the authority to award damages,"14 F.3d at 791, in that hearing.

the facts essential to the second were present in the first"). Indeed, at any point after the transfer order issued, Defendants could have removed Jane from York CI. Conn. Gen. Stat. §§ 17a-13, 18-87.

Collateral estoppel is inapplicable for largely the same reasons: the issues raised by Jane's JJDPA claims were not fully and fairly litigated or decided at the state court juvenile transfer hearing, *Aetna Cas. & Sur. Co. v. Jones*, 220 Conn. 285, 306, 596 A.2d 414, 426 (1991) ("Similarly, if the nature of the hearing carries procedural limitations that would not be present at a later hearing, the party might not have a full and fair opportunity to litigate."); let alone "*identical* to the issue[s] decided in the prior proceeding," *New England Estates*, 294 Conn. at 839 (emphasis added), where Jane brings her JJDPA claims here for damages, against different parties, for their conduct in the months *following* the state court's proceedings.

**Rooker-Feldman.** The *Rooker-Feldman* doctrine is also inapplicable because Jane is not a "state court loser," her claims do not rely on "review and reversal" of a state court decision, and her injuries were produced by the Defendants, not the state court.[25]

First, *Rooker-Feldman* cannot apply because the transfer order was reversed on appeal and thus Jane is not a "state court loser." *Id.* The Second Circuit has held that this "procedural" requirement is not met where, as here, the defendant relies on a state court judgment that was ultimately reversed. *See, e.g.*, *Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) ("The only

---

[25] "The Second Circuit has identified a four-part test to determine when the *Rooker-Feldman* doctrine is applicable: (1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must be complaining about injuries caused by the state court judgment; (3) the plaintiff must be inviting the district court to review and reject that judgment; and (4) the state court judgment must have been rendered prior to the time the plaintiff commenced his or her federal suit." *Book v. Mortgage Electronic Registration Systems*, 608 F. Supp. 2d 277, 288 (D. Conn. 2009) (Underhill, J.) (citing *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005)). "The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive." *Hoblock*, 422 F.3d at 85.

conceivable 'judgment' against plaintiff . . . has already been undone."); *VS v. Muhammad*, 595 F. 3d 426, 430 (2d Cir. 2010).

Likewise, Jane does not invite "review and reversal," *Hoblock*, 422 F.3d at 88, of the state court's judgment because it is already reversed.  Additionally, Jane does not invite "reversal" of the state court transfer order "but rather seeks monetary damages for Defendants' alleged constitutional [and statutory] violations."  *Beard v. Town of Monroe*, 2014 WL 4678038, at *4 (D. Conn. Sept. 18, 2014) (Arterton, J).  As set out above in the discussion of res judicata and collateral estoppel, *see supra* pp. 32-35, the state court proceedings on DCF's motion to transfer Jane into DOC custody involved entirely separate issues (and different parties) from Jane's JJDPA claims for damages under § 1983.  Accordingly, Jane's JJDPA claim is an "independent claim," and cannot be precluded on the basis of *Rooker-Feldman*, even if it may deny some legal conclusion that the state court reached.  *Exxon Mobil Corp. v. Saudi Basic Industries Corp*., 544 U.S. 280, 293 (2005) ("If a federal plaintiff present[s] some independent claim, *albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . .,* then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.") (emphasis added) (citations and internal quotation marks omitted).

The third *Rooker-Feldman* requirement cannot apply because Jane's injuries were produced by Defendants, not the state court.  *See Hoblock*, 422 F.3d at 88 ("[A] federal suit complains of injury from a state-court judgment . . . when the third party's actions are *produced* by a state-court judgment *and not simply ratified, acquiesced in, or left unpunished by it*.") (emphasis added); *Morrison v. City of New York*, 591 F.3d 109, 115 (reversing application of the *Rooker-Feldman* doctrine where the complaint was "an attack on independent discretionary acts"

rather than acts "compelled by court order."). This is more than a but-for causation requirement. A state court ruling cannot bar a later federal suit under *Rooker-Feldman* when the state court only "ratif[ies], acquiesce[s] in, or leave[s] unpunished an *anterior decision*, [by the federal defendants]." *Hoblock,* 422 F.3d at 88 (emphasis added). The injuries alleged in Jane's fifth and sixth counts were not produced by the state court, but by the defendants' independent, discretionary decisions. All of the injuries alleged in Jane's fifth count, ¶¶ 143-152, were produced by Defendant Katz, who "initiated proceedings resulting in Jane being incarcerated at York CI," (*id.*), "[a]t all times . . . had the legal power to remove Jane from York CI," (*id.*, ¶¶ 67, 150) and "chose not to exercise this authority until approximately June 24, 2012." (*id.*, ¶ 151). The conduct was not *produced* by the state court's order: given Defendant Katz's decision to initiate the proceedings, and her legal authority "at all times" to remove Jane from York CI, the state court—at most—"simply ratified, acquiesced in, or left unpunished," *Hoblock*, 422 F.3d at 88, her conduct. This is not enough to bar a later federal suit under *Rooker-Feldman*.

Jane's sixth count is even less vulnerable to a *Rooker-Feldman* argument because she sues for conduct that apparently *violated* the state court's order. The injuries alleged in Jane's sixth count, ¶¶ 153-155, were produced by Defendants Dzurenda and Semple, who "incarcerated Jane in an adult prison containing adult inmates in conditions tantamount to solitary confinement or segregation," (Compl. ¶ 154), *despite the juvenile court order that she "be held in isolation for no more than 72 hours," (id.. ¶ 66)* (emphasis added), instead holding her in isolation for months, (*id.* ¶ 71), including over a month in the mental health unit, (*id.* ¶ 76), and at all times without informing Jane when this isolation would end. (*id.* ¶ 89) ("Throughout her stay at York CI, Jane's isolation was indefinite."). All of Jane's injuries were the result of the defendant's discretionary actions, and not "compelled" by the state court. *See Morrison*, 591 F.3d 109, 115

37

(rejecting application of *Rooker-Feldman* where the complaint attacked "independent discretionary acts" that were not "compelled" by court order).  As a result, the third requirement of the *Rooker-Feldman* doctrine—that the state court must *produce* and not merely *ratify* the federal plaintiff's injuries—cannot be met to bar Jane's JJDPA claims here.

## II.    PREA'S LIMITATIONS ON PLACING JUVENILES IN SOLITARY CONFINEMENT MAY BE ENFORCED UNDER § 1983

As with the JJDPA, Jane seeks to vindicate her Prison Rape Elimination Act of 2003 (PREA) rights through § 1983, not, as Defendants assume, via a private right of action under PREA itself.  Section 7 of PREA, 42 U.S.C. § 15607, provides for states' adoption of "national standards for the detection, prevention, reduction, and punishment of prison rape."  The provision requires states to submit to the Attorney General "a certification that *the State has adopted*, and is in *full compliance* with, the national standards" in order to avoid reductions in federal funding "for prison purposes."  42 U.S.C. § 15607(e)(2)(A) (emphasis added).  PREA Section 7 therefore creates rights defined by the National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106-01 (2012), and § 1983 provides the cause of action to enforce them.  *See Briggs; Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015).

The regulations define a robust set of important rights applicable to Jane's solitary confinement within a juvenile facility.  They provide:

> **§ 115.342 Placement of residents in housing, bed, program, education, and work assignments.**
>
> (b) Residents may be isolated from others only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged.
>
> . . . .
>
> (h) If a resident is isolated pursuant to paragraph (b) of this section, the facility shall clearly document:

38

> (1) The basis for the facility's concern for the resident's safety; and
>
> (2) The reason why no alternative means of separation can be arranged.

> (i) Every 30 days, the facility shall afford each resident described in paragraph (h) of this section a review to determine whether there is a continuing need for separation from the general population.

28 C.F.R. § 115.342 (effective date August 20, 2012). Jane was never afforded the 30-day review PREA requires. (Compl. ¶ 163). Even worse, she was not held in isolation as a "last resort." (Compl. ¶ 162). In choosing to hold Jane in prolonged isolation, DCF flouted PREA's regulations, exposing Jane to the precise harm that the law was intended to prevent.[26] By improperly placing Jane in isolation and failing to afford her a 30-day review, DCF violated Jane's PREA rights defined the regulations and adopted by Connecticut. 42 U.S.C. § 15607(e)(2)(A); 28 C.F.R. § 115.342; Conn. Gen. Stat. § 18-81cc.

As with the JJDPA claim the PREA cause of action follows *a fortiori* from *Briggs.* As in *Briggs,* (1) Congress surely intended to benefit plaintiffs like Jane by creating national standards to protect them; (2) the national standards define specific rights that are well within judicial competence to enforce; and (3) by facilitating the standards' adoption nationwide, Congress unambiguously imposed binding obligations on states, like Connecticut, that have adopted them. We will go through these points, briefly, in turn.

First, PREA was passed to protect inmates' rights, including residents at juvenile correctional facilities. *See* 42 U.S.C. § 15602 ("The purposes of this chapter are to . . . . (7) protect the Eighth Amendment rights of Federal, State, and local prisoners."); 42 U.S.C. §

---

[26] 42 U.S.C. § 15602 ("The purposes of this chapter are to . . . . (7) protect the Eighth Amendment rights of Federal, State, and local prisoners."); 42 U.S.C. § 15601(13) ("The Eighth Amendment rights of State and local prisoners are protected through the Due Process Clause of the Fourteenth Amendment. Pursuant to the power of Congress under Section Five of the Fourteenth Amendment, Congress may take action to enforce those rights in States . . . ."). As the Department of Justice recognized in adopting the regulations codified in §115.342, "[i]solation is known to be dangerous to mental health, especially among youth." National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106-01 (2012).

15609(7) (for purposes of the Act, "[t]he term 'prison' means any confinement facility of a Federal, State, or local government . . . *and includes . . . any juvenile facility used for the custody or care of juvenile inmates*") (emphasis added).  DCF flouted PREA regulations that specifically protect residents of juvenile facilities, like Jane, who are placed in solitary confinement.  28 C.F.R. § 115.342.

Second, Jane's rights were specifically defined by PREA regulations.  "When a federal statute creates a right enforceable through 42 U.S.C. § 1983, federal regulations may be relevant in determining the scope of the right conferred by Congress."  *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015) (citing *Shakhnes v. Berlin*, 689 F.3d 244, 251 (2d Cir.2012)) (quotation marks omitted).  PREA regulations define the statutory rights of residents of juvenile facilities who, like Jane, are placed into isolation.  28 C.F.R. § 115.342(b).  The regulation requires facilities to use isolation only as a "last resort," when "less restrictive measures" are inadequate, and only until an alternative means of safety can be arranged.  *Id.* § 115.342(b).  The regulation, § 115.342(h), also requires juvenile facilities to document the basis for considering isolation, § 115.342(h)(1), and the reason why no alternative means of separation can be arranged, § 115.342(h)(2), making it easier to review the basis for isolation and determining whether it was used as a last resort.  Once placed in isolation, § 115.342(i) grants residents at juvenile facilities a right to a review every 30 days of "whether there is a continuing need for separation from the general population."  None of the substantive and procedural rights protected by PREA are "so vague and amorphous that its enforcement would strain judicial competence."  *Briggs*, 792 F.3d at 242.  The rights are well-defined and specific, and are well within judicial competence to enforce.

Third, by seeking states' adoption of and compliance with the national standards, Congress imposed binding obligations on the states.  In seeking the creation and adoption of national standards, Congress invoked its power to enforce "[t]he Eighth Amendment rights of State and local prisoners" as "protected through the Due Process Clause of the Fourteenth Amendment."  42 U.S.C. § 15601 (13).  Congress expressly stated its purpose of "protect[ing] the Eighth Amendment rights of Federal, State, and local prisoners" and "increas[ing] the accountability of prison officials." 42 U.S.C. § 15602 (6), (7).  PREA Section 7, titled "[a]doption and effect of national standards," uses rights-creating language, requiring "a certification that the State *has adopted*, and is in *full compliance* with," standards issued by the Attorney General "for the detection, prevention, reduction, and punishment of prison rape" in order to remain fully eligible for federal funds.  42 U.S.C. § 15607 (emphasis added).  The final rule issued by the Department of Justice is clear that the standards "apply to facilities operated by, or on behalf of, State and local governments."  77 Fed. Reg. at 37107.  As in *Briggs,* PREA facilitates the adoption of the national requirements by using Congress's spending power, penalizing states that fail to adopt the standards, but individual rights can be found even within statutes passed exclusively under the Spending Clause, let alone laws also passed pursuant to Fourteenth Amendment enforcement power.  *See Briggs*, 792 F.3d at 245-46.

Defendants cite many cases for the proposition that "PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. The statute does not grant prisoners any specific rights."  (*See* Defs' Mem. at 12-14 (quoting *Breer v. Medor*, 2:12-CV-53, 2013 WL 4456896 (D. Vt. Aug. 16, 2013)) (citing *Chinnici v. Edwards*, 2008 WL 3851294, at \*3 (D. Vt. 2008))).  That proposition originates in cases from before the PREA national standards were made effective in August 2012, and none of the cases

41

cited by defendants reexamines the proposition in light of the standards.[27]  PREA "authorizes

grant money, and creates a commission to study the issue," *Chinnici*, 2008 WL 3851294, at *3,

but it has also done much more.  PREA, "the first federal law to address the sexual abuse of

prisoners," *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015), "represents a sea change in

public consciousness and in national commitment to protecting individuals under correctional

supervision from sexual abuse."  *National Prison Rape Elimination Commission Report* 24

(2009).  The State of New Jersey describes PREA as follows:

> This act was established to provide for the analysis of the incidence and effects of
> prison rape in Federal, state, and local institutions and provide information,
> resources, and recommendations and funding to protect individuals from prison
> rape, sexual abuse, and sexual harassment.  The major provisions of PREA
> include adherence to a zero-tolerance standard for the incidence of inmate sexual
> assault and rape, the development of standards for the detection, prevention,
> reduction, and punishment of prison rape, and the collection and dissemination of
> information on the incidence of prison rape.

N.J. Admin. Code § 10A:9-1.3; *see also* 22 La. Admin. Code Pt I, 341("*Prison Rape Elimination*

*Act of 2003 (PREA)*--a federal law enacted to establish a zero-tolerance standard for the

incidence of sexual assault within an institutional setting").  PREA's new standards have been

---

[27] *See, e.g.*, *Krieg v. Steele*, 599 F. App'x 231, 232 (5th Cir. 2015) (relying on earlier cases to dismiss *pro se* claim, without reference to the PREA national standards); *Olive v. Harrington*, No. 11:5-CV-01276BAMPC, 2016 WL 4899177, at *4 (E.D. Cal. Sept. 14, 2016) (relying on pre-2012 cases to dismiss *pro se* claim); *Simmons v. Solozano*, No. 3:14CV-P354-H, 2014 WL 4627278, at *4 (W.D. Ky. Sept. 16, 2014) (construing a *pro se* claim as a PREA claim and relying on *Chinnici* to dismiss); *Breer*, 2013 WL 4456896 at *6 (relying on *Chinnici* and other pre-2012 cases); *Holloway v. Dep't of Corr.*, No. 3:11VCV1290 VLB, 2013 WL 628648, at *2 (D. Conn. Feb. 20, 2013) (same); *Chao v. Ballista*, 772 F.Supp.2d 337 (D. Mass. 2011) (same). Judge Weinstein recently examined the standards and found them to be binding in a decision concerning compliance by the federal Bureau of Prisons, *United States v. D.W.*, 198 F. Supp. 3d 18, 60 (E.D.N.Y. 2016) (Weinstein, J.).

adopted, and are thus binding, in most states, including Connecticut.[28]  The PREA cases cited by defendants have become outdated.

Most of the cases cited by defendants were decided before PREA regulations provided well-defined standards that brought PREA's mandates within judicial competence to enforce. And none of the cases cited by defendants, even the most recent ones, involved a juvenile—for whom regulations define additional protections—let alone a juvenile placed in solitary confinement, circumstances very specifically regulated by PREA.  Indeed, no federal court has yet construed the extent of the rights defined by PREA regulations concerning juvenile facilities. The PREA cases cited by defendants, in addition to being outdated, are therefore distinguishable as well.

## III.    JANE STATES VALID CLAIMS UNDER THE ADA AND THE REHABILITATION ACT

Defendants assert that Jane's claims under the ADA and Rehabilitation Act should be dismissed because (1) Jane has failed to adequately allege that she has a disability within the meaning of the ADA; (2) Jane does not allege Defendants acted with discriminatory animus or ill will based on disability; and (3) qualified immunity bars the claims.  But Jane adequately, and in detail, alleges that she has a disability under the ADA and Rehab Act; she need not allege animus

---

[28] *See, e.g.*, Conn. Gen. Stat. § 18-81cc; Idaho Admin. Code r. 05.01.02.220 (regulations regarding PREA compliance); 505 Ky. Admin. Regs. 1:170 (incorporating PREA regulations by reference); Mont. Admin. R. 20.7.910(2)(i) (requiring private contractors to have PREA compliance policies); 81 Neb. Admin. Code Ch. 10, 003.06 (requiring facilities to "maintain compliance with standards set forth in the Prison Rape Elimination Act"); N.M. Admin. Code 8.14.5.24 ("The department maintains a comprehensive written procedure regarding the detection, prevention, reduction and punishment of sexual misconduct consistent with the Prison Rape Elimination Act (PREA), a copy of which is kept at each facility."); 37 Tex. Admin. Code § 344.620 (requiring juvenile probation officers to pass a competency exam on topics including PREA compliance).

or ill will to maintain a claim for damages under the ADA or Rehab Act; and qualified immunity is not a defense to ADA or Rehab Act claims.[29]

### A.    Jane Has Adequately Alleged She Has a Disability Under the ADA.

The ADA's definition of disability includes having a qualifying impairment, having a record of such an impairment, or being "regarded as" having such an impairment. 42 U.S.C. § 12102.  Jane's allegations satisfy each of the three definitions of disability under the ADA.

### 1.    Jane Has Alleged that her Impairments Substantially Limit Major Life Activities Under the First Prong of the ADA's Definition of Disability.

Defendants assert in conclusory fashion that Jane has failed to allege how her impairments cause her to be "unable to perform any of the activities of daily living."  (Defs' Mem. at 41).  Contrary to Defendants' assertion, the ADA does not, in fact, require an inability to perform major life activities and, in any event, Jane's complaint provides a detailed description of her impairments and their impact.

In 2008, Congress passed the ADA Amendments Act (ADAAA).  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified at 42 U.S.C. §§ 12101-13 (2009) [hereinafter ADAAA]).  The ADAAA reinstated the ADA's "broad scope of protection" by amending its definition of disability, which had been unduly narrowed by the Supreme Court—in decisions like *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999), and

---

[29]  Defendants assert that "to the extent plaintiff is suing any defendants in their individual capacities under the ADA or Rehabilitation Act, those claims should obviously be dismissed." (Defs' Mem. at 32).  However, Plaintiff has not sued state officials in their individual capacities for violations of Title II of the ADA or for violations of § 504 of the Rehabilitation Act.  The Ninth Cause of Action, alleging a violation of the ADA, names officials only in their official capacity, not individual capacity.  The Tenth Cause of Action, alleging a violation of the Rehab Act, does the same.  Thus, this Court need not dismiss ADA or Rehab Act claims against anyone in their individual capacity.  Jane does not object to dismissal of the official capacity claims brought under the ADA and Rehab Act against state officials.  She maintains her ADA and Rehab Act claims against DCF and the State of Connecticut.

*Toyota Motor Manufacturing, Kentucky, Inc.*, 534 U.S. 184 (2002)—and lower courts for nearly twenty years.  ADAAA § 2(a)(4)-(7), (b)(3)-(5).  The expanded definition of "disability" under ADAAA applies here, and thus the definition of disability is to be construed broadly in favor of expansive coverage.

The first prong of the ADA's definition of disability provides that the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities" of an individual.  42 U.S.C. § 12102(14)(A).  In determining disability, the ADAAA requires that impairments must be assessed "without regard to the ameliorative effects of mitigating measures," such as medication, therapy, and reasonable accommodations.  *Id.* § 12102(4)(E)(i).  Moreover, the ADAAA requires that impairments that are "episodic or in remission" must be assessed in their active state.  *Id.* § 12102(4)(D).  A "major life activity" includes "the operation of a major bodily function," including neurological, brain, and reproductive functions.  *Id*. § 12102(2)(B).

The complaint alleges that Jane suffers from Depression, Posttraumatic Stress Disorder, Anxiety, and Developmental Trauma Disorder, and describes the specific characteristics and symptoms of these disorders.  (Compl. ¶¶ 34-46).  With the exception of Developmental Trauma Disorder, all these disorders are specifically listed in the DMS-5.[30]  Jane alleges further that each of these disorders "substantially limit[] one or more major life activities, including [Jane's]

_____

[30] DSM-5 at 160 (discussing Major Depressive Disorder); DSM-5 at 271 (discussing Posttraumatic Stress Disorder); DSM-5 at 189 (discussing Anxiety disorders).
  Defendants correctly note that Developmental Trauma Disorder is not specified in the DSM-5.  (Defs' Mem. at 43).  However, the disorder falls under the category "other specified trauma- and stressor-related disorder," which *is* specified in the DSM.  *See* DSM-5, 309.89.  Developmental Trauma Disorder is a disorder that results from exposure to traumatic or stressful events and causes clinically significant distress or impairment in social, occupational, and other areas of functioning.  Because Jane's Developmental Trauma Disorder is an impairment that substantially limits major life activities, it is a disability under the ADA.

ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, and interacting with others." (Compl. ¶¶ 45, 191). In addition, the complaint alleges that each of these disorders also "substantially limits the operation of major bodily functions, including neurological function and brain function. (*Id.*).

Jane also alleges that she suffers from Gender Dysphoria, which is listed in the DSM-5. (Gender Dysphoria's coverage by the ADA is discussed in detail in Section [] below). Jane's Gender Dysphoria has been so severe it has caused her to experience "debilitating depression and anxiety." (Compl. ¶¶ 23-24). Indeed, Jane's Gender Dysphoria "substantially limits one or more major life activities, including [Jane's] ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function." (Compl. ¶ 188; *see also id.* ¶¶ 30-31).

Defendants say that Jane "fails to allege how she is disabled and unable to perform any of the activities of daily living." (Defs' Mem. at 41). To be clear, in order to prove that an impairment substantially limits a major life activity, plaintiffs *need not* show that they are "unable" to perform activities of daily living. The ADAAA and its implementing regulations explicitly reject this high burden. According to the ADAAA, "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Specifically, "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008," *id*. § 12102(4)(B), which, in turn, provide, *inter alia*, that:

> the standard created by the Supreme Court in the case of [*Toyota*] for "substantially limits," and applied by lower courts in numerous decisions, has

46

created an inappropriately high level of limitation necessary to obtain coverage under the ADA[,] . . . the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and . . . the question of whether an individual's impairment is a disability under the ADA *should not demand extensive analysis*.

ADAAA § 2(b)(5) (emphasis added).

Department of Justice regulations implementing the ADAAA could not be clearer on this point. According to the regulations, an "impairment does not need to prevent, or significantly or severely restrict the individual from performing a major life activity in order to be considered substantially limiting"—much less render the individual "unable" to perform the major life activity. 28 C.F.R. § 35.108(d)(1)(v).[31] Consistent with this broad construction of the definition of disability, the DOJ regulations set forth a list of impairments that, "[g]iven their inherent nature, . . . will, as a factual matter, *virtually always* be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward." *Id*. § 35.108(d)(2)(ii). Among this list of "predictable assessments" are two impairments that Jane has: "[m]ajor depressive disorder" and "post-traumatic stress disorder." *Id.* § 35.108(d)(2)(iii)(K).

---

[31] Mirroring the ADAAA, the regulations further state that:

The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a *demanding standard*. The primary object of attention in cases brought under title II of the ADA should be whether public entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

28 C.F.R. § 35.108(d)(1)(i) (emphasis added).

In short, Defendants are attempting to impose on Jane the very "demanding standard" and "extensive analysis" that Congress rejected when it enacted the ADAAA.  This they cannot do; the ADAAA and its implementing regulations forbid it.  Plaintiff has easily met her burden of showing that each of her impairments, when considered in its active state and without regard to the ameliorative effects of mitigating measures, substantially limit her in a range of major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and, in the case of Gender Dysphoria, specifically, reproducing.  Each of her impairments also substantially limits the operation of major bodily functions, including neurological function and brain function and, in the case of Gender Dysphoria, specifically, endocrine function and reproductive function.  (*See* Compl. ¶¶ 29-32, 34-46, 179-189, 191-193, 215-216).  And, according to the DOJ regulations, two of her impairments—depression and post-traumatic stress disorder—should "virtually always be found" to be disabilities under the ADA, with little to no analysis whatsoever.  42 U.S.C. § 35.108(d)(2)(iii)(K).

Jane's allegations regarding the nature of her impairments and their impact on her plainly suffice to survive a motion to dismiss.  *See, e.g.*, *Martinez-Rivera v. Commonwealth of Puerto Rico*, 812 F.3d 69, 78 n.8 (1st Cir. 2016) (stating that in light of mandated "expansive coverage," plaintiff's allegation regarding her condition was sufficient); *Riley v. St. Mary Med. Ctr.*, No. 13-CV-7205, 2014 WL 2207347, at *3 (E.D. Pa. May 28, 2014) ("Plaintiff's allegations are sufficient under the ADAAA though they do not specifically detail the nature of her limitations. . . . [A] plaintiff's allegation of the existence of a specific limitation, along with the life activities it impacts, is generally sufficient to clear the first hurdle of a motion to dismiss.").

48

### 2.    Jane has Adequately Alleged that She Was Regarded as Having Disabilities and Had a Record of Disabilities.

Jane's allegations also satisfy the ADA's two other definitions of "disability." According to Defendants, "[t]he plaintiff may support a claim of disability under the ADA if she 'has no such impairment, but is treated by the covering entity as having *a substantially limiting impairment*.'" *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)) (emphasis added). This statement is incorrect because the ADAAA explicitly overruled *Sutton* and amended the regarded-as prong to remove the requirement of substantial limitation. *See* ADAAA § 2(b)(3) ("The purposes of this Act are . . . *to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973.") (emphasis added); 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*.") (emphasis added); 28 C.F.R. § 35.108(f)(1) (same); *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012) ("Although both parties thought that Hilton needed to demonstrate that the defendants regarded him as being substantially limited in a major life activity, it is clear that he was only required to raise a genuine issue of material fact about whether [defendants] regarded him as having a mental or physical impairment.").

Accordingly, Jane has easily shown that she "meets the requirement of 'being regarded as having such an impairment" under 42 U.S.C. § 12102(3)(A) because DCF excluded her from

participation in and denied her the benefits of DCF's educational and rehabilitative programs, services, and activities based on Gender Dysphoria, Developmental Trauma Disorder, Depression, Posttraumatic Stress Disorder, and Anxiety, and also subjected her to discrimination based on these conditions.  (*See* Compl. ¶¶ 33, 47, 190, 194, 207, 217, 222).

Finally, Defendants assert that Jane "has failed to set forth any facts alleging that . . . a record of disability existed."  (Defs' Memo. at 43).  Defendants state that "[t]he plaintiff cannot have had a prior history of having 'gender dysphoria'[,] a diagnosis that was just recently included in the DSM-5."  (*Id.*).  This argument is wrong as a matter of fact and law.  As Defendants concede, the DSM-5 was published in May 2013—over six months before the conduct at issue in this case began—and Jane was under active treatment for the dysphoria.  The ADAAA's implementing regulations also support coverage of Gender Dysphoria under the record-of prong.  According to the DOJ regulations, "[w]hether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis."  28 C.F.R. § 35.108(e)(2).[32]

### B.      The ADA's Definition of "Disability" Does Not Exclude Gender Dysphoria.

Defendants argue that Jane's Gender Dysphoria is not protected by the ADA because the statute and its regulations "explicitly exclude . . . *gender identity disorders not resulting from*

---

[32] Guidance promulgated by the Equal Employment Opportunity Commission is also instructive:

> [E]vidence that an individual has a past history of an impairment that substantially limited a major life activity is all that is necessary to establish coverage under the second prong.  An individual may have a "record of" a substantially limiting impairment—and thus be protected under the "record of" prong of the statute—even if a covered entity does not specifically know about the relevant record.

29 C.F.R. Pt. 1630, App. § 1630.2(k).

50

*physical impairments*" ("GIDs" or "GIDs Exclusion") and, by their proposed extension, Gender

Dysphoria. (Defs' Mem. at 41-42) (emphasis in original). Defendants are correct that the ADA

excludes GIDs, but they erroneously assume that the GIDs Exclusion necessarily applies to the

new diagnosis of Gender Dysphoria in the DSM-5, which was published in 2013. It does not.

As the U.S. District Court for the Eastern District of Pennsylvania held last month, as the

Department of Justice concluded in 2015, and as the ADA's text and legislative history make

clear, Gender Dysphoria is not excluded under the ADA. *See, e.g.*, *Blatt v. Cabela's Retail, Inc.*,

No. 5:14-CV-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017); Sec. Statement of Int. of

United States at 5-6, Blatt v. Cabela's Retail, Inc., No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015),

ECF No. 67 [hereinafter DOJ *Blatt* Statement]. Alternatively, if Gender Dysphoria *is* excluded

under the ADA, the GIDs Exclusion violates equal protection under the Due Process Clause of

the Fifth Amendment.[33]

    We discuss these points, in detail because of their relevance not only to this motion but to

the case as a whole.

### 1.    Background on Transgender Identity and the Medical Diagnosis of Gender Dysphoria.

    To understand the diagnoses of GIDs and Gender Dysphoria, it is first helpful to

understand the meaning of "transgender." A transgender person is someone whose gender

identity—that is, an individual's internal sense of being male or female—does not align with his

or her assigned sex at birth. *See, e.g.*, American Psychiatric Association, *Diagnostic and*

*Statistical Manual of Mental Disorders* 451 (5th ed. 2013) [hereinafter "DSM-5"]; U.S. Office of

Personnel Management, *Guidance Regarding the Employment of Transgender Individuals in the*

---

[33] In tandem with this Memorandum in Opposition to Defendants' Motion to Dismiss, Plaintiff has filed a Notice of Constitutional Question with the Attorney General of the United States, pursuant to Federal Rule of Civil Procedure 5.1, notifying the Attorney General of Plaintiff's challenge to the constitutionality of the ADA's GIDs exclusion, 42 U.S.C. § 12211(b)(1).

51

*Federal Workplace*, http://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/.  Usually, people born with the physical characteristics of males psychologically identify as men, and those with the physical characteristics of females psychologically identify as women.  However, for a transgender person, this is not true; the person's body and the person's gender identity do not match.  S*ee* DSM-5 at 452-53.  A growing body of medical research suggests that this incongruence is caused by "genetics and/or in utero exposure to the 'wrong' hormones during the development of the brain, such that the anatomic physical body and the brain develop in different gender paths." Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973*, in *Gender Identity and Sexual Orientation Discrimination in the Workplace: A Practical Guide*, at 16-77 (Christine Michelle Duffy ed. Bloomberg BNA 2014)  (discussing recent medical studies); *see also* DSM-5 at 457 (discussing genetic and, possibly, hormonal contribution to Gender Dysphoria).

For many transgender people, this incongruence between gender identity and assigned sex does not interfere with their lives; they are completely comfortable living just the way they are.  *See* Duffy, *supra*, at 16-10; *see also* DSM-5 at 453 (stating that, in addition to a marked incongruence between gender identity and assigned sex, individuals with Gender Dysphoria exhibit "distress about this incongruence").  For some transgender people, however, the incongruence results in gender dysphoria—i.e., a feeling of stress and discomfort with one's assigned sex.  *See* DSM-5 at 451 ("Gender dysphoria as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender but is more specifically defined when used as a diagnostic category.").  Such gender dysphoria, if clinically significant and persistent, is a serious medical condition.  *See* DSM-5 at 451-53.

In 1980, the American Psychiatric Association introduced the GIDs diagnosis in the third edition of its *Diagnostic and Statistical Manual of Mental Disorders* (DSM). The DSM-III, as it was called, defined GIDs as "an incongruence between anatomic sex and gender identity," and created three GID subtypes: one for adolescents and adults ("Transsexualism"), another for children ("GID of Childhood"), and a third for conditions that did not fit the diagnostic criteria of the first two: "Atypical GID." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 261-66 (3rd ed. 1980). In 1987, a revised version of the DSM, known as the DSM-III-R (which was the version in effect at the time the ADA was being debated), retained these three diagnoses and added a fourth: "GID of adolescence or adulthood, nontranssexual type." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 71-78 (3rd ed., rev. 1987) [hereinafter "DSM-III-R"].[34] In 1994, the DSM-IV combined the diagnoses of Transsexualism and GID of Childhood into the single diagnosis of "GID in children and in adolescents or adults." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 532-38 (4th ed.1994) [hereinafter "DSM-IV"].[35]

In 2013, the DSM-5 changed the GID diagnosis in four ways: it renamed the diagnosis, revised the diagnostic criteria underlying the diagnosis, re-categorized the diagnosis within the DSM, and referenced new science supporting the physiological etiology of the diagnosis. *See* DSM-5 at 451-459. According to the DSM-5, Gender Dysphoria is characterized by: (1) a marked incongruence between one's gender identity and one's assigned sex, which is often accompanied by a strong desire to be rid of one's primary and secondary sex characteristics and/or to acquire primary/secondary sex characteristics of the other gender; and (2) intense

---

[34] The DSM-III-R renamed "Atypical GID" "GID Not Otherwise Specified." *Id.* at 77-78.

[35] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 532-38 (4th ed.1994) [hereinafter "DSM-IV"]. With its removal in 1994, transsexualism is no longer considered to be a medical condition under the DSM.

emotional pain and suffering resulting from this incongruence. *See* DSM-5 at 452. Among adolescents and adults, Gender Dysphoria often begins in early childhood, around the ages of 2-3 ("Early onset gender dysphoria"), but it may also occur around puberty or even later in life ("Late-onset gender dysphoria"). *Id.* at 455-56. If left medically untreated, Gender Dysphoria can result in debilitating depression, anxiety and, for some people, suicidality and death. *Id.* at 454-55.

Like other medical conditions, Gender Dysphoria can be ameliorated through medical treatment. World Professional Association for Transgender Health, Standards of Care 5 (7th ed. 2012) [hereinafter "SOC"], *available at* https://s3.amazonaws.com/amo_hub_content/Association140/files/Standards%20of%20Care%20 V7%20-%202011%20WPATH%20(2)(1).pdf; *see also* DSM-5 at 451 (stating that "many [individuals] are distressed *if* the desired physical interventions by means of hormone and/or surgery are not available") (emphasis added). There is no single course of medical treatment that is appropriate for every person with Gender Dysphoria. Instead, the World Professional Association For Transgender Health, Inc. ("WPATH"), has established internationally accepted Standards of Care ("SOC") for the treatment of Gender Dysphoria. *See* SOC at 1. The SOC were originally approved in 1979 and have undergone seven revisions through 2012. As part of the SOC, many transgender individuals with Gender Dysphoria undergo a medically-recommended and supervised gender transition in order to live life consistent with their gender identity. *See id.* at 9-10.

The current SOC recommend an individualized approach to gender transition, consisting of a medically-appropriate combination of "living part time or full time in another gender role, consistent with one's gender identity," hormone therapy, gender confirmation surgery, and/or

54

psychotherapy.  SOC at 9.  To complete their medical transition, some transgender individuals may only need to live part time or full time in their desired gender role without undergoing hormone therapy or surgery.  *Id.* at 8; *see also* DSM-5 at 454 (discussing those who resolve incongruence between gender identity and assigned sex "*without* seeking medical treatment to alter body characteristics") (emphasis added).  Others may decide with their health care provider that it is medically necessary for them to undergo hormone therapy and/or gender reassignment surgery as well.  SOC at 10; *see also* DSM-5 at 453 (recognizing "cross-sex medical procedure[s] or treatment regimen[s]—namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender").  "[I]n addition (or as an alternative) to the[se] psychological and medical treatment options . . . , other options [that] can be considered to help alleviate gender dysphoria" include "peer support resources, groups, or community organizations that provide avenues for social support and advocacy."  *Id.*

### 2. The ADA's GIDs Exclusion Does Not Apply to "Gender Dysphoria" as a Matter of Statutory Interpretation.

Although the ADA excludes GIDs, it is silent as to Gender Dysphoria.  In 2015, the U.S. Department of Justice filed a Statement of Interest in the case of *Blatt v. Cabela's Retail, Inc.*, construing the GIDs Exclusion "narrowly such that gender dysphoria falls outside its scope."[36] To date, the *Blatt* court is the only one that has analyzed whether the ADA's exclusion of GIDs extends to Gender Dysphoria as a matter of statutory interpretation.  Last month, the *Blatt* court held that Gender Dysphoria is not excluded by the ADA.  *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017).[37]  Bearing in mind that "remedial

---

[36] U.S. Department of Justice, Statement of Interest at 5, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822  (July 21, 2015), *available at* https://www.glad.org/wp-content/uploads/2015/02/blatt-doj-statement-of-interest.pdf

[37] Defendants cite a number of cases in support of their argument that the ADA excludes Gender Dysphoria.  None are availing.  All but one of the cases cited were decided before the publication

legislation should be construed broadly to effectuate its purposes," *Tcherepnin v. Knight,* 389

U.S. 332, 336 (1967); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003)

(construing ADA broadly), with exceptions construed narrowly, *see Reiseck v. Universal

Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010) (construing exemption to FLSA

narrowly), the ADA's text and legislative history, together with interpretations by the *Blatt* court

and DOJ, strongly support the ADA's inclusion of Gender Dysphoria, for four separate reasons.

> **a.      The ADA's GIDs Exclusion Does Not Apply to Gender
> Dysphoria Because the Exclusion Refers Simply to
> Transgender Identity—Not to Disabling Conditions that
> Transgender People May Have.**

In *Blatt*, the court held Gender Dysphoria is not an excluded condition under the ADA.

According to the court, the ADA excludes "two distinct categories" of conditions from its

definition of disability: "first, non-disabling conditions that concern sexual orientation or

identity," such as homosexuality and bisexuality; and "second, disabling conditions that are

associated with harmful or illegal conduct," such as pedophilia, pyromania, and kleptomania.

*Blatt*, 2017 WL 2178123, at \*3.  "Gender identity disorders," the court reasoned, fall into the

of the DSM-5 in 2013, and therefore could not and do not address a central issue in this case: whether the ADA's GIDs exclusion applies to the 2013 diagnosis of Gender Dysphoria. Therefore, these cases are inapposite.  Defendants also cite a 2015 case that involved an ADA claim brought by a transgender prisoner proceeding *pro se*.  *See Gulley-Fernandez v. Wisconsin Dep't of Corr*., No. 15-CV-995, 2015 WL 7777997, at \*3 (E.D. Wis. Dec. 1, 2015).  In that case, the court summarily concluded in a single sentence, without any analysis whatsoever, that "gender identity disorder is not a 'disability' under the Americans with Disabilities Act or the Rehabilitation Act."  *Id.*  Unlike *Blatt*, the court's decision in *Gulley-Fernandez* contained absolutely no analysis of whether the GIDs exclusion applies to the new diagnosis of Gender Dysphoria in light of the ADA's text, structure, and legislative history.  *See id.*  And, unlike in *Blatt*, the court did not have the benefit of a Statement of Interest filed by the U.S. Department of Justice, which concluded that Gender Dysphoria is *not* excluded from the ADA, and an amicus brief filed by six state and national transgender rights organizations, which argued the same.  *See* DOJ *Blatt* Statement at 5-6; Brief of Amici Curiae Gay & Lesbian Advocates & Defenders et al. in Opposition to Defendant's Partial Motion to Dismiss, Blatt v. Cabela's Retail, Inc., No. 5:14-cv-4822-JFL*,* 2015 WL 1322781 (E.D. Pa. Jan. 23, 2015), ECF No. 33 [hereinafter *Blatt* Amic. Br.].  For these reasons, the *Gulley-Fernandez* decision should be accorded no weight, and this Court should instead be guided by *Blatt*.

first category. "[G]ender identity disorders," as used in the ADA, "refer to only the condition of identifying with a different gender"—i.e., being transgender. *Id.* at \*2. Like being gay, lesbian, or bisexual, the court reasoned, being transgender is, by itself, not a medical condition and therefore is not a disability under the ADA. *See id.* at \*3.

Gender Dysphoria, by contrast, *is* a medical condition. "[A] condition like Blatt's gender dysphoria," the court concluded, "goes beyond merely identifying with a different gender and is characterized by clinically significant stress and other impairments that may be disabling." *Id.* at \*2. Specifically, gender dysphoria substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning. *Id.* at \*4.

Because Gender Dysphoria has medically significant clinical features, it did not fall into the first category of exclusions with sexual orientation and transgender identity ("gender identity disorders," in the language of the statute). *Id.* at \*3-4. And because it was "not associated with harmful or illegal conduct," it did not fall into the second category either. *Id.* at \*3. Accordingly, the court determined that Blatt's condition is not excluded by the ADA. *Id.* at \*4

The court observed that interpreting the ADA to exclude Gender Dysphoria would have been inconsistent with the constitutional-avoidance canon of statutory construction. Because the court's interpretation "allow[ed] the Court to avoid the constitutional questions raised in this case"—i.e., that the exclusion of gender identity disorders violates equal protection—"it [wa]s the Court's duty to adopt it." *Id.* at \*4.

### b.     The ADA's GIDs Exclusion Does Not Apply to Gender Dysphoria Because Gender Dysphoria is not a GID.

If this Court is not persuaded by the *Blatt* court's conclusion that the GIDs Exclusions applies only to transgender identity and not to disabling conditions such as Gender Dysphoria,

this Court should find that Gender Dysphoria is not a GID and therefore falls outside the scope of the GIDs Exclusion.

As the ADA's legislative history makes clear, the ADA's list of exclusions was drawn directly from the DSM-III-R, the version of the DSM in effect at the time the ADA was being debated. H.R. REP. NO. 101-485(IV), at 81 (1990) (Energy and Commerce Committee) (dissenting views of Rep. William E. Dannemeyer, Rep. Joe Barton, and Rep. Don Ritter) (referencing DSM-III-R); *accord.* 135 CONG. REC. S11173-01, 1989 WL 183785 (daily ed. Sept. 14, 1989) (statement of Sen. Armstrong) (same). Because the DSM-5's Gender Dysphoria diagnosis bears little resemblance to the GIDs diagnosis in all prior versions of the DSM, Gender Dysphoria is outside the scope of the GIDs Exclusion.

The DSM-5's Gender Dysphoria diagnosis differs substantially from the GIDs diagnosis. First and most obviously, the name of the diagnosis is different. For well over thirty years, incongruence between one's identity and assigned sex was considered to be a "disorder" of identity, that is, something non-normative with the individual. *See* American Psychiatric Association, *Gender Dysphoria* (2013), http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf (stating that GID connoted "that the patient is 'disordered'"). This is no longer the case. Under the DSM-5, incongruence is not the problem in need of treatment—dysphoria is. *Id.* ("It is important to note that gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition."). By "focus[ing] on dysphoria as the clinical problem, not identity per se," the change from GIDs to Gender Dysphoria destigmatizes the diagnosis. DSM-5 at 451; *see also* American Psychiatric Association, *Gender Dysphoria* ("Part of removing stigma is about choosing the right words.

58

Replacing 'disorder' with 'dysphoria' in the diagnostic label is not only more appropriate and consistent with familiar clinical sexology terminology, it also removes the connotation that the patient is 'disordered.'").

Second, the diagnostic criteria are different.  Gender Dysphoria replaces the previous showing of a "strong and persistent cross-gender identification" and a "persistent discomfort" with one's sex or "sense of inappropriateness" in the gender role of that sex, with a "marked incongruence" between gender identity and assigned sex.  DSM-5 at 452; *see also id.* at 814 (stating that DSM-5 "emphasiz[es] the phenomenon of 'gender incongruence' rather than cross-gender identification per se, as was the case in DSM-IV gender identity disorder").  The criteria also include a "post-transition specifier for people who are living full-time as the desired gender (with or without legal sanction of the gender change)."  American Psychiatric Association, *Gender Dysphoria*.  According to the DSM-5, this specifier was "modeled on the concept of full or partial remission," which acknowledges that hormone therapy and gender reassignment surgery may largely relieve the distress associated with the diagnosis.  DSM-5 at 815; *see also id.* at 451 ("[M]any are distressed *if* the desired physical interventions by means of hormone and/or surgery are not available.") (emphasis added).  Significantly, this specifier expands the diagnosis to those who may not formerly have been diagnosed with GID—i.e., those *without* distress "who continue to undergo hormone therapy, related surgery, or psychotherapy or counseling to support their gender transition."  American Psychiatric Association, *Gender Dysphoria*.

Third, the categorization of the Gender Dysphoria diagnosis is different.  In every version of the DSM prior to 2013, GIDs were a subclass of some broader classification, such as "Disorders Usually First Evident in Infancy, Childhood, or Adolescence," alongside other

59

subclasses, such as Developmental Disorders, Eating Disorders, and Tic Disorders.  DSM-III-R at 3-4.  Under the DSM-5, Gender Dysphoria is categorized separately from all other conditions; it is literally in a class all its own.  DSM-5 at 451.

Lastly, medical research supporting the Gender Dysphoria diagnosis is different.  Unlike the DSM's treatment of GIDs, the DSM-5 includes a section entitled "Genetics and Physiology," which explicitly discusses the genetic and, possibly, hormonal contributions to Gender Dysphoria.  *See* DSM-5 at 457.   These findings, together with numerous recent medical studies, strongly suggest that physical impairments contribute to gender incongruence and, in turn, Gender Dysphoria.  *See* Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973*, *in Gender Identity and Sexual Orientation Discrimination in the Workplace: A Practical Guide* 16-72 to -74 & n.282 (Christine Michelle Duffy ed. Bloomberg BNA 2014) (citing numerous medical studies conducted in past eight years that "point in the direction of hormonal and genetic causes for the in utero development of gender dysphoria").  Simply put, Gender Dysphoria has physical roots that GIDs do not share.  Because the "burgeoning medical research" underlying Gender Dysphoria points to a physical etiology, DOJ *Blatt* Statement at 3 (quoting *Blatt* Amic. Br. at 24), the GIDs Exclusion, by its terms, does not apply to Gender Dysphoria.

> **c.    Even if Gender Dysphoria is a GID, the ADA's GIDs Exclusion Does Not Apply to Gender Dysphoria Because Gender Dysphoria Results From a Physical Impairment.**

The ADA excludes "transsexualism . . . [and] gender identity disorders *not resulting from physical impairments*."  42 U.S.C. § 12211(b)(1) (emphasis added).  Therefore, even if this Court were to disregard the significant differences between GIDs and Gender Dysphoria, and determine that the latter is a type of GID, Gender Dysphoria would still fall outside the scope of

the GIDs Exclusion because it "result[s] from [a] physical impairment[]." *Id.*  As the United

States recently put it in *Blatt*:

> While no clear scientific consensus appears to exist regarding the specific origins of gender dysphoria (i.e., whether it can be traced to neurological, genetic, or hormonal sources), the current research increasingly indicates that gender dysphoria has physiological or biological roots. . . . In light of the evolving scientific evidence suggesting that gender dysphoria may have a physical basis, along with the remedial nature of the ADA and the relevant statutory and regulatory provisions directing that the terms "disability" and "physical impairment" be read broadly, the GID Exclusion should be construed narrowly such that gender dysphoria falls outside its scope.

DOJ Blatt Statement at 4-5.[38]

For all of these reasons, and to avoid the constitutional concerns (discussed below) that

result from a contrary holding, the Court should hold that Gender Dysphoria is not excluded

from coverage by the ADA.

### 3.    The GIDs Exclusion is a Transgender Classification that Violates Equal Protection.

Even if Gender Dysphoria is excluded from the ADA's definition of disability, the GIDs

Exclusion violates equal protection under the Due Process Clause of the Fifth Amendment

because it discriminates against transgender people, that is, those whose gender identity does not

conform to their assigned sex at birth.  *See Windsor v. United States*, 699 F.3d 169, 188 (2d Cir.

2012), *aff'd,* 133 S. Ct. 2675 (2013) (Section 3 of Defense of Marriage Act violated equal

protection because it discriminated against gays and lesbians); *see also* Pl.'s Mem. Law in Opp'n

Def.'s Part'l Mot. Dismiss at 15-39, Blatt v. Cabela's Retail, Inc., No. 14-4822, 2015 WL

1360179 (E.D. Pa. Jan. 20, 2015), ECF No. 23 [hereinafter *Blatt* Mem. Law in Opp'n] (arguing

---

[38] *See* Duffy, *supra*, at 16-52, 16-76 (noting similarities between Gender Dysphoria and physical conditions with complex etiologies not fully understood by the medical community that are nevertheless protected by the ADA, including polycystic ovary syndrome, cerebral palsy, strabismus, dyslexia, microvascular angina, stuttering, and Tourette syndrome—the latter two of which were once believed to be purely mental conditions).

that ADA's transgender classification violates equal protection); *see also* Kevin M. Barry et al.,

*A Bare Desire to Harm:  Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev.

507, 549-50 (2016) (same); Duffy, *supra*, at 16-129 to -131 (same).  Although the ADA does not

use the words "transgender," it explicitly excludes three medical conditions (GIDs,

transsexualism, and transvestism)—indeed, the *only* three medical conditions—closely

associated with transgender people.  Because the defining feature of these three conditions is

nonconformity between gender identity and assigned sex at birth, everyone with these conditions

is necessarily "transgender."  *Cf. Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J.,

concurring) (stating that "homosexual conduct . . . is conduct that is closely correlated with being

homosexual" and, therefore, law targeting such conduct "was directed toward gay persons as a

class").  Accordingly, the GIDs Exclusion is a transgender classification.

> a.     **The ADA's Transgender Classification Fails Heightened Scrutiny.**

To withstand strict scrutiny, the challenged action must be "narrowly tailored to further a

compelling governmental interest."  *Shaw v. Reno*, 509 U.S. 630, 643 (1993).  To withstand

intermediate scrutiny, the challenged action must be "substantially related to an important

government interest.  'Substantially related' means that the explanation must be exceedingly

persuasive.  The justification must be genuine, not hypothesized or invented post hoc in response

to litigation."  *Windsor*, 699 F.3d at 185 (citations and internal quotation marks omitted).

The ADA's transgender classification should be subject to strict or intermediate scrutiny

(collectively, "heightened scrutiny") for two reasons: first, because transgender people are a

suspect/quasi suspect class based on the Supreme Court's four-factor test, and second, because

the ADA's transgender classification is a sex-based classification.

### i.    Transgender People Are a Suspect/quasi Suspect Class Entitled to Heightened Scrutiny.

Transgender classifications warrant heightened scrutiny because transgender people are a suspect/quasi-suspect class based on the four factors identified by the U.S. Supreme Court:

A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society, C) whether the class exhibits obvious, immutable, or distinguishing characteristics that define them as a discrete group, and D) whether the class is a minority or politically powerless. Immutability and lack of political power are not strictly necessary factors to identify a suspect class.

*Id.* at 181 (citations and internal quotation marks omitted).

First, transgender people have suffered a history of discrimination. As the U.S. District Court for the Southern District of New York recently stated, this "history of persecution and discrimination" against transgender people is "not much in debate"; indeed, it "is not yet history," as demonstrated by "high rates of discrimination in education, employment, housing, and access to healthcare." *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (Rakoff, J.). Second, transgender people have the ability to participate in and contribute to society. Like the characteristics of other suspect/quasi-suspect classes, the incongruence between a transgender person's assigned sex and gender identity "bears no relation to ability to contribute to society." *Id.* Third, transgender people exhibit immutable distinguishing characteristics. Incongruence between one's assigned sex and one's gender identity is neither chosen nor changeable; it is immutable and, often, quite obvious. *See, e.g.*, *id.* at 139 (transgender status is "a sufficiently discernible characteristic"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015) (discussing immutability of transgender identity). Lastly, transgender people are a minority and lack political power. Transgender people make up

approximately 0.3% of the adult population, and they are markedly underrepresented in government. *See, e.g.*, *Adkins*, 143 F. Supp. 3d at 140 (discussing underrepresentation).

The Supreme Court has not ruled on whether transgender discrimination claims warrant heightened scrutiny under the Equal Protection Clause, a growing number of federal lower courts have applied heightened scrutiny to transgender discrimination claims based on their determination that transgender people are a suspect/quasi-suspect class under the Supreme Court's four-factor test. *See, e.g.*, *Adkins*, 143 F. Supp. 3d at 139-40 (heightened scrutiny because "transgender people are a quasi-suspect class"); *accord. Evancho v. Pine-Richland Sch. Dist.*, No. CV 2:16-01537, 2017 WL 770619, at *13 (W.D. Pa. Feb. 27, 2017) ("intermediate standard"); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016) (heightened scrutiny). Indeed, in *Fabian v. Hosp. of Cent. Connecticut*, 172 F. Supp. 3d 509 (D. Conn. 2016), Judge Underhill explicitly referred to these "changes to the legal landscape," noting Judge Rakoff's decision in *Adkins*, which

> held that under the same analysis applied in [the Second Circuit's decision in] *Windsor*, transgender people are a "quasi-suspect" class and therefore that disparate treatment alleged to violate the Equal Protection Clause is subject to the elevated "intermediate scrutiny" standard.

*Fabian*, 172 F. Supp. 3d at 524 n.8.

### ii. The ADA's transgender classification is based on sex and therefore receives heightened scrutiny.

Heightened scrutiny is warranted for a second reason as well: discrimination against transgender people is necessarily based on sex—a form of discrimination long subjected to intermediate scrutiny under the Equal Protection Clause. *See Craig v. Boren*, 429 U.S. 190, 197 (1976).

Transgender discrimination is sex-based for two reasons.  First, transgender people do not conform to stereotypes associated with their assigned sex at birth and the sex with which they identify. Over the past two decades, the federal circuit courts have recognized with "near-total uniformity" that transgender discrimination is sex discrimination based on sex stereotyping and therefore subject to heightened scrutiny.  *E.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1316-18 & n.5 (11th Cir. 2011) ("[S]ex discrimination includes discrimination against transgender persons because of their failure to comply with stereotypical gender norms"); *accord Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-3522, 2017 WL 2331751, at \*12 (7th Cir. May 30, 2017); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004); *see also Fabian*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016) (relying on *Glenn*, *Smith*, and related cases in holding that "discrimination on the basis of transgender identity is cognizable under Title VII"); EEOC, Examples of Court Decisions Supporting Coverage of LGBT-Related Discrimination Under Title VII, https://www.eeoc.gov/eeoc/newsroom/wysk/lgbt_examples_decisions.cfm (compiling federal court decisions supporting coverage for transgender individuals as sex discrimination)..[39]

Second, transgender people, by definition, have gender identities that do not align with their assigned sex at birth (e.g., a person born with female genitalia who identifies as a man). Therefore, transgender discrimination necessarily implicates sex:  the assigned sex with which the transgender person does not identify, and the other sex with which the person does identify. Federal agencies have adopted this more straightforward theory of transgender discrimination as discrimination "because of sex," and a number of courts have followed suit.  *Compare Macy v.*

---

[39] Because the showing a plaintiff must make to recover under antidiscrimination statutes closely resembles the showing under the Equal Protection Clause, constitutional discrimination claims by LGBT litigants "often rely significantly on case law interpreting federal statutes that prohibit sex discrimination, including Title VII."  Duffy, at 15-5*; see, e.g.*, *Glenn*, 663 F.3d at 1316–18 (relying on Title VII case law in holding that discrimination against transgender employee was sex discrimination in violation of Equal Protection Clause); *accord Smith*, 378 F.3d at 577.

*Holder*, 2012 WL 1435995, at *11 (E.E.O.C Apr. 20, 2012) ("[I]ntentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex,' and such discrimination therefore violates Title VII."), *and* Memorandum from U.S. Attorney Gen. to U.S. Attorneys 1-2 (Dec. 15, 2014), http://www.justice.gov/file/188671/download (same), *with Fabian*, 172 F. Supp. 3d at 526-27 (relying on *Macy* and similar judicial decisions to hold that "employment discrimination on the basis of transgender identity is employment discrimination 'because of sex'"), *and Schroer v. Billington*, 577 F. Supp. 2d 293, 295 (D.D.C. 2006) ( refusal to hire transgender employee after she advised her employer "that she planned to change her anatomical sex by undergoing sex reassignment surgery was literally sex discrimination 'because of . . . sex'").

In *Fabian*, the court recognized both of these sex discrimination theories—sex stereotyping and "because of sex"—under Title VII. *See Fabian*, 172 F. Supp. 3d at 526-27. Under either theory, transgender discrimination is sex-based discrimination under the Equal Protection Clause and therefore receives heightened scrutiny. This conclusion is well-supported by the overwhelming weight of authority, including at least three federal circuit courts and a growing number of lower courts. *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-3522, 2017 WL 2331751, at *12 (7th Cir. May 30, 2017) (concluding that school bathroom policy that prohibited transgender boy from using boys' restroom was "inherently based upon a sex-classification" and therefore "heightened review applie[d]," and  school district failed to meet its burden under Equal Protection Clause); *accord Glenn*, 663 F.3d at 1316 (affirming trial court's grant of summary judgment in favor of transgender employee under

Equal Protection Clause); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) ( transgender employee stated claim for sex discrimination under Title VII and Equal Protection Clause).[40]

Applying heightened scrutiny, the ADA's transgender classification fails because it is not narrowly tailored or substantially related to the achievement of a compelling or important governmental interest.  As the plaintiff in *Blatt* and many commentators have noted, the ADA's legislative history shows that the ADA's transgender exclusion was based on the moral opprobrium of two senior senators, conveyed in the eleventh hour of a marathon day-long floor debate, who erroneously believed that GIDs were "sexual behavior disorders" undeserving of legal protection.  *See, e.g.*, 135 Cong. Rec. S10734-02, *available at* 1989 WL 183115 (daily ed. Sep. 7, 1989) (statement of Sen. Armstrong) ("I could not imagine the [ADA] sponsors would want to provide a protected legal status to somebody who has such [mental] disorders, particularly those [that] might have a moral content.") (emphasis added); *id.* at S10765-01, *available at* 1989 WL 183216 ("If this were a bill involving people in a wheelchair or those who have been injured in the war, that is one thing.  But how in the world did you get to the place that you did not even [ex]clude transvestites?  What I get out of all of this is here comes the U.S.

---

[40] *See also Cummings v. Greater Cleveland Reg'l Transit Auth.*, 88 F. Supp. 3d 812, 815, 819-20 (N.D. Ohio 2015) ( transgender employee stated claim that she was denied equal pay and a series of promotions because of gender identity in violation of Equal Protection Clause); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015) ( transgender inmate who was denied sex reassignment surgery stated claim of sex discrimination under Equal Protection Clause); *Wilson v. Phoenix House*, 2011 WL 3273179, at *1-3 (S.D.N.Y. Aug 1, 2011) ( transgender female inmate stated claim for violation of Equal Protection Clause on the basis of sex when in-patient substance abuse treatment center in which she was confined required her to sleep in male facilities and use male bathrooms, denied her participation in a female support group, and discharged her to state prison when an alternative placement could not be found); *Barnes v. City of Cincinnati Barnes v. City of Cincinnati*, 2002 U.S. Dist. LEXIS 26207, at *30 (S.D. Ohio 2002) (upholding jury verdict in favor of transgender police officer who was demoted after undergoing transition, and concluding that "excluding transsexuals as a class . . . [in the] interest of promoting only competent and capable police officers" is sex discrimination in violation of Equal Protection Clause").

Government telling the employer that he cannot set up any moral standards for his business by asking someone if he is HIV positive, even though 85 percent of those people are engaged in activities that most Americans find abhorrent.") (statement of Sen. Helms); *see also* (statement of Sen. Rudman) ("In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we do not fully understand.").  Moral animus against transgender people is insufficient to constitute a compelling or important governmental interest. *See Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (concluding that "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest"—much less a compelling or important one) (quoting U.S. Department of Agriculture v. Moreno) (emphasis in original).[41]

### b.   The ADA's Transgender Classification Fails the Rational Basis Test.

In fact, the ADA's transgender classification fails even the most minimal level of scrutiny:  rational basis review.  To satisfy the rational basis test, the challenged action must "bear a rational relationship to a legitimate governmental purpose."  *Romer*, 517 U.S. at 635 .  "[A] bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *U.S. Department of Agriculture v. Moreno,* 413 U.S. 528, 534 (1973); *accord Romer*, 517 U.S. at 634-35 (quoting *Moreno*); *Windsor*, 699 F.3d at 180 (same).  Direct evidence of animus in the ADA's legislative history, together with evidence supporting an

---

[41] *See, e.g.*, *Blatt* Mem. Law in Opp'n at 39 ("[T]o argue that moral animus was not the primary motivation for excluding the subset of mental impairments that these Senators viewed as morally problematic runs contrary to the words explicitly spoken on the Senate Floor on September 7, 1989); Barry et al., *A Bare Desire to Harm*, at 574 ("Senators Armstrong, Helms, and Rudman repeatedly invoked immorality as the justification for the transgender exclusions, decrying the ADA's coverage of "sexually deviant behavior."); *accord* Duffy at 16-38 to -39 (compiling ADA's legislative history); Ruth Colker, *Homophobia, AIDS Hysteria, and the Americans with Disabilities Act*, 8 J. GENDER RACE & JUST. 33, 36-38, 42-44, 50 (2004) (same); *Blatt* Amic. Br., app. C (same).

inference of animus drawn from the GIDs Exclusion's structure and practical effect on transgender people, confirm that the classification was founded upon nothing more than "a bare desire to harm" transgender people. *See, e.g.*, *Blatt* Mem. Law in Opp'n (discussing ADA's legislative history); Barry et al., *A Bare Desire to Harm*, at 574-76 (discussing legislative history, structure, and effect of GIDs Exclusion).

In sum, if the Court concludes that Gender Dysphoria is excluded from coverage under the ADA under the GID Exclusion, the Court should strike the GID Exclusion as unconstitutional under the Equal Protection Clause.[42]

### C.    Jane has Properly Alleged Discrimination under the ADA and Rehab Act.

Title II of the ADA addresses behavior, not animus or ill will. It provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In order to establish a violation under the ADA, plaintiffs "must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *accord Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  The discussion above demonstrates that Jane is a qualified individual with a disability, and there is no

---

[42] The ADA contains a severability clause: "Should any provision in this chapter be found to be unconstitutional by a court of law, such provision shall be severed from the remainder of the chapter, and such action shall not affect the enforceability of the remaining provisions of the chapter."  42 U.S.C. § 12213.

dispute that Defendants are subject to the ADA.[43]  As explained below, Jane has also properly

alleged discrimination under the ADA.

The Department of Justice's ADA implementing regulations describe the ADA's

prohibitions against discrimination.[44]  "In enacting Title II, Congress directed the Attorney

General to promulgate regulations to implement Title II(A), *see* 42 U.S.C. § 12134(a), and the

Attorney General's regulations add scope and shape to the general prohibitions in the ADA,

which are not self-reading."  *Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 69 (2d

Cir. 2012).[45]  The DOJ's ADA regulations "are entitled to controlling weight unless they are

'arbitrary, capricious, or manifestly contrary to the statute."  *Innovative Health Sys., Inc. v. City*

*of White Plains*, 117 F.3d 37, 45 n.8 (2d Cir. 1997), *recognized as superseded on other grounds*,

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n. 7 (2d Cir. 2001).

The DOJ regulations state that in providing any aid, benefit, or service, under Title II of

the ADA, a public entity may not, on the basis of disability, "[d]eny a qualified individual with a

disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a

qualified individual with a disability an opportunity to participate in or benefit from the aid,

benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with

---

[43] Defendants do not dispute that DCF is a "public entity" as defined by the ADA, 42 U.S.C. § 12131(1)(B), and provides a "program, service, or activity" within the meaning of the ADA, including educational and rehabilitative programs and services.

[44] These implementing regulations describe the actions that violate 42 U.S.C. § 12132. *See* 28 C.F.R. § 35.130 ("General Prohibitions Against Discrimination").

[45] The House Judiciary Committee Report stated that it is "the purpose of this section . . . to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited." H.R. Rep. 101–485(III) at 52, reprinted in 1990 U.S.C.C.A.N. 445, 475; *see also* H.R. Rep. No. 101–485(II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 (stating that the "Committee has chosen not to list all the types of actions that are included within the term 'discrimination'").

a disability with an aid, benefit, or service that is not as effective in affording equal opportunity .

. . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the

enjoyment of any right, privilege, advantage, or opportunity enjoyed by others[.]" 28 C.F.R. §

35.130(b)(1)(i), (ii), (iii), and (vii).

In addition, a public entity may not (1) "impose or apply eligibility criteria that screen out

or tend to screen out an individual with a disability or any class of individuals with disabilities

from fully and equally enjoying any service, program, or activity, unless such criteria can be

shown to be necessary," *id*. § 35.130(b)(8); or (2) "utilize criteria or methods of administration . .

. that have the effect of subjecting qualified individuals with disabilities to discrimination on the

basis of disability . . . or the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the public entity's program with respect to individuals with

disabilities."  *Id*. § 35.130(b)(3)(i)(ii).  A public entity is also prohibited from aiding and

perpetuating discrimination against persons with disabilities in the programs, services, or

activities it provides.  *Id*. § 35.130(b)(1)(v).

The ADA's "integration mandate" requires public entities to "administer services,

programs, and activities in the most integrated setting appropriate to the needs of qualified

individuals with disabilities."  *Id*. § 35.130(d); *see also id.* § 35.152(b)(2) (requiring that

prisoners with disabilities be housed in the most integrated setting appropriate to their needs

under the program access obligation); [46] Guidance on ADA Regulation on Nondiscrimination on

---

[46] In enacting the ADA, Congress, having found that "[i]solat[ion] and segregat[ion]" were
pervasive in areas such as education and institutionalization prior to the ADA's implementation,
42 U.S.C. § 12101(a)(2), (3), directed the Department of Justice ("DOJ") to write regulations
implementing Title II's prohibition against discrimination, *id*. § 12134.  Pursuant to this
mandate, the DOJ has issued these and other regulations defining the forms of discrimination
prohibited by Title II of the ADA. *See* 28 C.F.R. § 35.101 *et. seq.*

the Basis of Disability in State and Local Government Services Originally published July 26, 1991, 28 C.F.R. pt. 35, App. B ("Integration is fundamental to the purposes of the Americans with Disabilities Act.  Provision of segregated accommodations and services relegates persons with disabilities to second-class status."); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination based on disability."); *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) ("*Olmstead* unquestionably holds that the 'unjustified institutional isolation of persons with disabilities' is, in and of itself, a prohibited 'form of discrimination.'").

Finally, a public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7); *see also Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016) (in assessing a claim that a state entity discriminated by failing to make a reasonable accommodation, "we ask whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled" and "to assure meaningful access, reasonable accommodations in the [ ] program[s] or benefit[s] may have to be made") (internal quotation marks omitted) (alterations in original).

The complaint details the ways in which DCF violated Jane's Title II rights.  The complaint alleges that when DCF locked Jane in solitary confinement, DCF excluded her from participating in and denied her the benefits of DCF's educational and rehabilitative programs, services, and activities by reason of her disabilities.  (Compl. ¶ 198); 42 U.S.C. § 12132 28 C.F.R. § 35.130(b)(1)(i).  DCF subjected Jane to conditions of solitary confinement for ten months based on her disability-related behavior, and watched her deteriorate mentally because of her disabilities.  (Compl. ¶ 209).

DCF singled Jane out for decidedly non-integrated treatment, choosing to warehouse her in isolation rather than provide her with appropriate psychological and social programming. Such an approach violated the ADA's "integration mandate." 28 C.F.R. §§ 35.130(d), 35.152(b)(2).[47] Moreover, by isolating Jane, DCF denied her the ability to participate in and benefit from many services and activities provided to other children in DCF custody, including children at CJTS and the Pueblo Unit. (Compl. ¶ 199-202). To the extent DCF provided Jane with services and activities, these services and activities were unequal to those DCF provided to other residents at CJTS and the Pueblo Unit as they were provided in isolation—Jane had no opportunity for peer interaction and group therapy. Such unequal and inferior treatment violated the ADA. 28 C.F.R. § 35.130(b)(1)(i), (iv). In addition, as the complaint alleges, by subjecting Jane to solitary confinement, DCF utilized a method of administration that substantially impaired the accomplishment of the objectives of DCF's educational and rehabilitative programs, services, and activities. (Compl. ¶ 203); 28 C.F.R. § 35.130(b)(3)(i)(ii). DCF also violated the ADA by failing to make reasonable modifications to its policies, procedures, and practices and provide Jane with the treatment, support, and social interaction that she needed. (Compl. ¶ 204); 28 C.F.R. § 35.130(b)(7).[48] Finally, the complaint alleges the particular ways in which DCF

---

[47] In particular, the complaint asserts that by locking Jane in solitary confinement at CJTS and refusing to remove Jane from solitary confinement at York CI, "DCF failed to house Jane in the most integrated setting appropriate to her needs and deprived her of the social, educational, psychological, and rehabilitative benefits of programs administered by DCF for other children." (Compl. ¶ 199).

[48]  The U.S. Department of Justice has detailed how juvenile justice facilities violate the ADA by failing to provide reasonable programming modifications enabling youth with disabilities to avoid imposition of seclusion due to their disability-related behaviors. *See* Statement of Interest of the United States in *G.F. v Contra Costa County*, No. 3:13-cv-03667-MEJ (N.D. Cal.), available at http://www.justice.gov/crt/about/spl/documents/contracosta_soi_2-13-14.pdf.
    The complaint asserts that prior to placing Jane in isolation at CJTS and transferring her to York CI, DCF did not attempt accommodations such as increased mental health counseling.

73

subjected Jane to discrimination based on Gender Dysphoria—by confining Jane to a boys'

facility (where some staff members referred to Jane using a male pronoun and her male given

name), denying her the opportunity to express herself as female, removing her from the girls'

Pueblo Unit, and failing to provide adequate therapy and support to treat her dysphoria.  (Compl.

¶ 204, 207).

Jane has also adequately alleged a violation of the Rehabilitation Act.  The Second

Circuit has observed that "[b]ecause the standards imposed by Title II on public entities are

generally equivalent to those of § 504 [of the Rehabilitation Act], we 'treat claims under the two

statutes identically' in most cases." *Wright*, 831 F.3d at 71; *accord Henrietta D. v.*

*Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003).  Thus, the discussion regarding the ADA claim set

forth above applies to the Rehabilitation Act claim as well.

>    **D.**     **A Plaintiff May Maintain an ADA Suit for Damages Without the Need to Allege that Defendants Acted with Discriminatory Animus or Ill Will Based on Disability.**

May Jane consistent with the Eleventh Amendment, seek damages for Defendants'

violation of the ADA?  She may.[49]  The Eleventh Amendment provides states with immunity

---

(Compl. ¶ 204).  In addition, following the fight at the Pueblo Unit on July 12, 2014, "DCF did not attempt or make reasonable modification at the Pueblo Unit such as increased mental health counseling, increased supervision, or positive behavior interventions and supports." (*Id.*). "Indeed, DCF decided to transfer Jane back to CJTS immediately following the incident—while allowing the other girls involved in the fight to stay at the Pueblo Unit, despite their similar behaviors and histories." (*Id.*).

[49] Defendants bear the burden of establishing entitlement to Eleventh Amendment immunity. *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006).  There is no sovereign immunity with respect to the Rehab Act claim: Defendants have waived any sovereign immunity by accepting federal funds.  *See, e.g.*, *Mutts v. S. CT State Univ.*, No. 3:04 CV 1746 (MRK), 2006 WL 1806179, at *4 (D. Conn. June 28, 2006); aff'd sub nom. *Mutts v. S. Connecticut State Univ.*, 242 F. App'x 725 (2d Cir. 2007); *Super v. J. D'Amelia & Associates, LLC*, No. 3:09CV831 SRU, 2010 WL 3926887, at *12 (D. Conn. Sept. 30, 2010); 42 U.S.C. § 2000d–7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of

74

from suits for damages, but "[u]nder section five of the Fourteenth Amendment, Congress can abrogate the immunity to enforce the substantive rights guaranteed by the Fourteenth Amendment." *Bolmer v. Oliveira*, 594 F.3d 134, 146 (2d Cir. 2010) (citing *Tennessee v. Lane*, 541 U.S. 509, 518 (2004)). "Congress has unambiguously purported to abrogate states' immunity from Title II claims." *Id.*[50] Although there has been debate about the extent to which Congress's abrogation of Eleventh Amendment immunity under the ADA is a constitutional exercise of its Section Five powers, *id.* at 146, there is no question that Congress's abrogation is valid if a plaintiff demonstrates that the State violated both Title II of the ADA and also substantive due process or Eighth Amendment rights. Jane alleges such constitutional violations here and need not also allege discriminatory animus or ill will based on disability.

The key case is *United States v. Georgia*, 546 U.S. 151 (2006), which held that Title II of the ADA validly abrogated state sovereign immunity to create a private right of action for money damages against the State for conduct that "actually violates" the Fourteenth Amendment in addition to the ADA. In *Georgia*, a paraplegic inmate brought a suit for damages under Title II of the ADA against the State of Georgia, the Department of Corrections, and several individual prison officials alleging that he was confined to his cell for 23-24 hours per day and had been denied access to prison programs and services on account of his disability. *See id.* at 154-55. He also claimed a violation of the Eighth Amendment based on these conditions of confinement.[51]

---

the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973 . . .").

[50] 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter.").

[51] In *Georgia*, the plaintiff's claims for money damages against the State under Title II of the ADA were based "at least in large part, on conduct that independently violated the provisions of

The Supreme Court reversed the Eleventh Circuit's decision dismissing the Title II ADA claim as barred by sovereign immunity, holding that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159 (emphasis in original). On remand, the Eleventh Circuit was instructed to determine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 159.

Defendants rely on *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001),[52] but as the Second Circuit held in *Bolmer v. Oliveira*, 594 F.3d 134, 139 (2010), *Garcia* does not survive *Georgia*—at least where the claims involve violations of substantive due process or Eighth Amendment rights. The *Bolmer* court concluded: "(1) *Garcia* is not applicable when Congress's abrogation is supported by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others" and under *Georgia* and *Tennessee v. Lane*, 541 U.S. 509 (2004), "Congress validly abrogated states' Eleventh Amendment immunity where the same conduct by the defendant violated both Title II

---

§ 1 of the Fourteenth Amendment." *Id.* (As the Court observed, § 1 of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment).

[52] *Garcia* stated that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability."

76

and substantive due process." *Id.* at 149.[53]    The Court observed that whether *Garcia* survives

*Georgia* or not, "it is quite clear that *Garcia*'s discriminatory animus requirement for Equal

Protection-based claims cannot be applied to claims based solely on the substantive due process

---

[53] Numerous district courts in this Circuit have recognized that, after *Georgia*, *Garcia*'s "discriminatory animus or ill will" requirement does not apply where a plaintiff complains of conduct that actually violates substantive due process or the Eighth Amendment. *See, e.g.*, *Skipp v. Connecticut Judicial Branch*, No. 3:14-CV-00141 JAM, 2015 WL 1401989, at *7 (D. Conn. Mar. 26, 2015) ("To the extent that Count Four of the second amended complaint alleges state actions that violate both Title II of the ADA and the Fourteenth Amendment, Congress has abrogated sovereign immunity for such claims."); *Alster v. Goord*, 745 F. Supp. 2d 317, 339 (S.D.N.Y. 2010) (denying summary judgment, noting that "[b]ecause Alster's prison conditions, if true, violated the Eighth and Fourteenth Amendments, the State's sovereign immunity from Title II claims is abrogated under *Georgia*"); *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 410 (S.D.N.Y.), on reconsideration, 452 F. Supp. 2d 328 (S.D.N.Y. 2006) (on reconsideration, denying defendants' motion to dismiss Title II ADA claim where plaintiff alleged that conduct also violated the Eighth Amendment; applying *Georgia* and noting that *Garcia*'s animus requirement did not apply); *see also Mercer v. Champion*, 139 Conn. App. 216, 227, 55 A.3d 772, 781 (2012) ("Therefore, in accordance with *Georgia*, as followed in *Mercer*, as long as the private cause of action against the state for money damages stems from conduct that violates the fourteenth amendment, Title II validly abrogates state sovereignty without necessitating a showing of discriminatory animus or ill will.").

Defendants cite two cases from this District to support the statement that "for an inmate to state a cognizable ADA or Rehab Act claim, the plaintiff must also allege that her mistreatment was motivated either by 'discriminatory animus or ill will due to disability.'" (Defs' Mem. at 34) (citing *Nails v. Laplante*, 596 F. Supp. 2d 475 (D. Conn. 2009); *Lewis v. Dep't of Correction*, No. 3:16-CV-1586 (VAB), 2017 WL 487016, at *6 (D. Conn. Feb. 6, 2017). As noted, animus or ill will is not a requirement for alleging a violation of the ADA. To the extent the Second Circuit held in *Garcia* that abrogation of sovereign immunity for a damages action required such an allegation, that holding arose in the equal protection context and does not apply in circumstances where the conduct, as here, also violates substantive due process and Eighth Amendment rights. *Nails* and *Lewis* both involved pro se plaintiffs. In *Nails*, the court concluded that because the plaintiff failed to assert a cognizable Eighth Amendment claim, sovereign immunity was not validly abrogated and thus the ADA claim for damages failed. *Lewis* is simply an Initial Review Order from the court (and thus no briefs from the parties were filed before it was issued), and the Order in fact permits the ADA claim to proceed. The Order cites to *Garcia* for an "animus" or "ill will" requirement, and does not cite to *Georgia*. As discussed, the Second Circuit recognized in *Bolmer* that there is no animus or ill will requirement when the plaintiff alleges an Eighth Amendment or substantive due process violation.

right Bolmer alleges was violated here, since the test for whether the constitution was violated in each case is distinct." *Id.*

Jane has alleged that Defendants' conduct violated not only Title II of the ADA, but also her Eighth Amendment and substantive due process rights under the Fourteenth Amendment. (Compl. First Cause of Action (Fourteenth Amendment violation); Second Cause of Action (Fourteenth Amendment violation); Third Cause of Action (Eighth Amendment violation); Fourth Cause of Action (Eighth Amendment violation); ¶ 208 ("Instead of complying with the ADA, DCF elected to hold Jane in conditions of confinement that violated her rights under the Eighth and Fourteenth Amendments of the United States Constitution). Under *Georgia* and *Bolmer*, she may maintain a damages action for these violations.

In fact, even if the Court were to determine that Jane had not adequately alleged a substantive due process or Eighth Amendment violation, it should still find that the State does not have sovereign immunity from the damages claims. In *Georgia*, the Court instructed the Eleventh Circuit on remand to determine "insofar as [the State's] misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159. Under *Georgia*, this Court should reach this question only if it concludes that Jane has not adequately alleged a constitutional violation.

In the exercise of its Section 5 power under the Fourteenth Amendment, "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 721–22 (2003). Section 5 legislation must demonstrate a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of*

78

*Boerne v. Flores*, 521 U.S. 507, 520 (1997); *accord Dunion v. Thomas*, 457 F. Supp. 2d 119, 122

(D. Conn. 2006); *Andino v. Fischer*, 698 F. Supp. 2d 362, 377-78 (S.D.N.Y. 2010). "The

congruence and proportionality inquiry, first set forth in *City of Boerne*, examines (1) the

constitutional right at issue; (2) whether Congress identified a history and pattern of

unconstitutional discrimination by the States against the disabled with respect to public services;

and (3) whether the rights and remedies created by the statute are congruent and proportional to

the constitutional rights it purports to enforce and the record of constitutional violations adduced

by Congress." *Goonewardena v. N.Y.*, 475 F. Supp. 2d 310, 323 (S.D.N.Y. 2007).

Regarding the first question, the Supreme Court in *Tennessee v. Lane*, 541 U.S. 509

(2004), concluded that Title II enforces rights under the Equal Protection Clause as well as a

range of rights under the Fourteenth Amendment's Due Process Clause. *Id.* at 522-23; *see also*

*id* at 525 (noting that one area targeted by Title II is "a pattern of unequal treatment in the

administration of . . . the penal system"). Regarding the second question, the Court concluded

that the history of unconstitutional disability discrimination justified Congress's enactment under

Section 5 of a prophylactic remedy. *Id.* at 523-28. As to the third question, the *Lane* Court

explained that the congruence and proportionality of remedies must be judged based on the

constitutional rights at stake in the particular class of cases at issue. *Id.* at 30-31. (At issue in

*Lane* was "the class of cases implicating the accessibility of judicial services"). Thus, here the

issue is whether Title II is congruent and proportional legislation as applied to the class of cases

implicating prison conditions.

A range of constitutional rights are at issue in the prison context—including, *inter alia*,

the Equal Protection and Due Process Clauses, the First and Eighth Amendments, and the right

of access to courts. Moreover, Congress identified a history and pattern of unconstitutional

79

discrimination by the States against prisoners with disabilities.  *See* Intervener United States'

Memorandum of Law, *John Ashley Hale v. Ron King*, Civ. No. 2:06-cv-245-MTP (S.D. Miss.)

(Aug. 13, 2012) ("A widespread and deeply-rooted pattern of official indifference (at best) to the

health, safety, suffering, and medical needs of prisoners with disabilities has been well

documented, including in materials before Congress when Title II was debated and enacted.").[54]

The validity of Section 5 legislation turns not only on the pervasiveness of

discrimination, but also on the "gravity of the harm [the law] seeks to prevent."  *See Lane*, 541

U.S. at 523.  The consequences of state action in the prison context are grave—given the total

control the state exercises over the prisoner.  As applied in prisons and other detention facilities,

Title II regulates conduct that is prohibited by the Constitution itself or creates a substantial risk

of constitutional violation.  After identifying a constitutional problem, Congress was entitled to

pass prophylactic legislation that requires States to take action that the Constitution itself might

not compel.  Accordingly, if this Court reaches this question, the Court should conclude that

Title II validly abrogated sovereign immunity with respect to prison conditions cases.

E.    **Defendants' Argument for Dismissal of the ADA Claim Improperly Relies on Facts Outside the Complaint.**

Defendants acknowledge that the Court cannot look outside the facts alleged in the

complaint on a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6).  (Defs' Mem. at

36 n.25).  Yet they do just that, *see id.* at 36 ("plaintiff was undoubtedly the center of staff's

attention" receiving "all appropriate daily services" and "detailed and caring attention"; plaintiff

received "multiple weekly meetings" with specialists "specifically geared to plaintiff's individual

needs"), *id.* at 41 (plaintiff's lack of access to programs was "solely due to her state court

---

[54] The Department of Justice's brief thoroughly explains why Title II validly abrogated sovereign immunity in the prison conditions context, and details the severity of the problems faced by prisoners with disabilities.  The brief is available at https://www.justice.gov/sites/default/files/crt/legacy/2012/08/14/haledctbrief.pdf.

lawyers instructing her to refuse to participate"). Suffice it to say that Jane has a different version of events and, as Defendants' statements illustrate, there are many factual issues bearing on the ADA and Rehab Act claims that must be developed through discovery before they can be resolved.

### F. Qualified Immunity Does Not Bar Plaintiff's ADA and Rehab Act Claims.

Defendants assert that they are "entitled to qualified immunity bars as to all of the plaintiff's money damages claims" (Defs' Mem. at 56), but qualified immunity is not a defense to the claims in the Ninth and Tenth causes of action because those claims are brought under Title II of the ADA and the Rehab Act against the state and its officials in their official capacities.

Significantly, Plaintiff need not establish that Defendants violated *clearly established* Eighth Amendment or Fourteenth Amendment rights in order to pursue her claim for money damages under Title II of the ADA. Instead, a constitutional violation suffices. *See Georgia*, 546 U.S. at 159 (abrogation valid for conduct that "*actually* violates the Fourteenth Amendment"). Accordingly, by showing that she was placed in solitary confinement and otherwise treated in violation of the ADA, Jane may recover damages arising from the unconstitutional conditions of her confinement even if Defendants would otherwise be entitled to qualified immunity on the constitutional claims.

## IV.    JANE'S CONSTITUTIONAL CLAIMS SHOULD NOT BE DISMISSED

As with the ADA claim, Defendants muster allegations of facts that are outside the face of the complaint to argue that Jane's Constitutional claims are "simply not plausible" and "without basis in fact." (Defs' Mem. at 45-49). Jane contests Defendants' account of the nature of her incarceration at CJTS and York CI, and these factual disputes are grist for summary judgment or trial, but not a Rule 12(b)(6) motion. Her actual claims are serious and substantial.

81

In the first and second counts, Jane asserts Fourteenth Amendment substantive due process claims against DCF and DOC officials.  As a child held by the state for non-criminal confinement, Jane is protected not only by the Eighth Amendment's prohibition on cruel and unusual punishment but also by heightened requirements of substantive due process under the Fourteenth Amendment.  Individuals held by the state for non-criminal purposes are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *Santana v. Collazo*, 714 F.2d 1172, 1180 (1st Cir. 1983) (applying *Youngberg* analysis, explaining that "the conditions of juvenile confinement, like those of confinement of the mentally ill, are subject to more exacting scrutiny than conditions imposed on convicted criminals").

Under the *Youngberg* Fourteenth Amendment analysis, when conditions of confinement reflect a "substantial departure from accepted professional judgment, practice, or standards," they violate the Constitution.  *Youngberg*, 457 U.S. at 323.  As the summary at pages 4-15, *supra* shows, the complaint alleges that Defendants' extreme departures from accepted practice have placed their conduct well outside the permissible realm of professional discretion.  *See, e.g.*, *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1155 (D. Haw. 2006) (concluding that "the defendants' use of isolation [on children] was not within the range of acceptable professional practices and constitutes punishment in violation of the plaintiffs' Due Process rights").

The harm that results from placing children in solitary confinement—and Jane was in solitary confinement for 281 days—is well-established, particularly where the child suffers from mental illness.  Indeed, officials were well aware of these harms 35 years ago when Congress

enacted the JJDPA's strict restrictions on placing juveniles in adult facilities—where they had often been held in isolation.[55]

In 2016, President Obama banned solitary confinement entirely for juvenile offenders in the federal system.[56] Prominent medical and correctional associations calling for a ban on solitary confinement of juveniles include the American Academy of Child and Adolescent Psychiatry,[57] the American Psychological Association,[58] the American Public Health Association,[59] and the National Commission on Correctional Health Care.[60] The American

---

[55] *See* Reauthorization of the Juvenile Justice and Delinquency Prevention Act of 1974: Hearings Before the S. Comm. on the Judiciary, 96th Cong. 26-30, 27 (March 27 and 28, 1980) (Statement of Deputy Attorney General Renfrew).

[56] *See* Barack Obama: *Why We Must Rethink Solitary Confinement*, Washington Post, January 25, 2016; *see also* White House, Office of the Press Secretary, Fact Sheet: Department of Justice Review of Solitary Confinement (Jan. 26, 2016), https://www.whitehouse.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

[57] The American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement altogether for juveniles, noting that "potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety and psychosis." Am. Acad. of Child & Adolescent Psychiatry, Policy Statement: Solitary Confinement of Juvenile Offenders (April 2012), http://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx. "Solitary confinement," as defined by the American Academy of Child and Adolescent Psychiatry, is "the placement of an incarcerated individual in a locked room or cell with minimal or no contact with people *other than staff of the correctional facility*." *Id.* (emphasis added).

[58] Am. Psychological Ass'n, Solitary Confinement of Juvenile Offenders (2015) ("Juvenile solitary confinement is associated with serious consequences for mental and physical health, and APA supports efforts to eliminate the practice."), https://www.apa.org/about/gr/issues/cyf/solitary.pdf.

[59] Am. Pub. Health Ass'n, Solitary Confinement as a Public Health Issue (Nov. 5, 2013) ("[A]ll juveniles under 18 years of age should be excluded from placement in solitary confinement regardless of whether they are held in adult or juvenile facilities."), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue.

Medical Association, "[r]ecognizing the harmful physical, emotional and psychological impact of solitary confinement," adopted a policy opposing juvenile solitary confinement except in limited, extraordinary circumstances.[61]

The U.S. Attorney General's National Task Force on Children Exposed to Violence proposed abandoning solitary confinement for children, observing that "nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."[62] National standards provide strict limits on the use of isolation for children,[63]

---

[60] Nat'l Comm'n on Correctional Health Care, Position Statement on Solitary Confinement (Apr. 2016) ("Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting.  They experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation."), http://www.ncchc.org/solitary-confinement.

[61] "AMA Adopts New Policies to Improve Health of Nation at Interim Meeting," November 11, 2014, http://www.ama-assn.org/ama/pub/news/news/2014/2014-11-20-ama-policies-improve-health-of-nation.page. Am. Med. Ass'n, Policy Statement: Solitary Confinement of Juveniles in Legal Custody (Nov. 2014), https://www.ama-assn.org/ssl3/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=/resources/html/PolicyFinder/policyfiles/HnE/H-60.922.HTM.

[62] Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, *Rep. of the Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, Defending Childhood: Protect, Heal, Thrive* 178 (2012), *available at* http://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.  Former Attorney General Eric Holder recently stressed that "[a]cross the country, far too many juvenile detention centers see isolation and solitary confinement as an appropriate way to handle challenging youth, in particular youth with disabilities." He warned that solitary confinement is "particularly detrimental to young people with disabilities—who are at increased risk under these circumstances of negative effects including self-harm and even suicide." Press Release, Department of Justice (May 14, 2014), http://www.justice.gov/opa/pr/attorney-general-holder-criticizes-excessive-use-solitary-confinement-juveniles-mental.

[63] The Juvenile Detention Alternatives Initiative (JDAI), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to periods of less than four hours.  Juvenile Detention Alternatives Initiative (JDAI), A Guide to Juvenile Detention Reform: Juvenile Detention Facility

and the international community has condemned the placement of children in solitary

confinement.[64]

Studies of the impact of solitary confinement on incarcerated adults have revealed an

array of detrimental physiological and psychological effects.[65]  Indeed, a district court in the

Southern District of New York has observed that even with respect to adult prisoners, "[t]he

consequences of long-term solitary confinement are so well-known that numerous medical

associations, including the American Psychiatric Association, the American Public Health

---

Assessment, Standards Instrument (2014 Update),
http://www.aecf.org/m/resourcedoc/aecfuveniledetentionfacilityassessment-2014.pdf.

[64]  The United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which
establish minimum standards for the protection of juveniles in correctional facilities, prohibit the
solitary confinement of juveniles. United Nations Rules for the Protection of Juveniles
Deprived of their Liberty, http://www.un.org/documents/ga/res/45/a45r113.htm.
The United Nations Special Rapporteur on Torture has declared that solitary confinement
of youth is cruel, inhumane and degrading treatment and in some cases, torture.  *See* Special
Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,
Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, ¶ 77, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Mendez),
http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf.
The United Nations Standard Minimum Rules for the Treatment of Prisoners (the
Mandela Rules) state that solitary confinement should be prohibited in cases involving children
(Rule 45), http://www.refworld.org/docid/5698a3a44.html.

[65] Effects include hypersensitivity to stimuli-perceptual distortions and hallucinations, increased
anxiety and nervousness, fears of persecution, blunted affect and apathy, talking to oneself,
confusing thought processes, sleep disturbances, changes in appetite an weight, withdrawal,
depression, and lack of impulse control.  *See, e.g.*, Stuart Grassian, *Psychopathological Effects of
Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1452 (1983); Richard Kom, *The Effects of
Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8, 15 (1988); Craig Haney,
*Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq.
124, 134 (2003); *see also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash.
U. J.L. & Pol'y 325, 333 (2006); Lindsay M. Hayes, *And Darkness Closes in . . . a National
Study of Jail Suicides*, 10 Crim. Just. & Behav. 461, 471, 475, 480 (1983); Jeffrey L. Metzner &
Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical
Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104-05 (2010); Craig Haney & Mona Lynch,
*Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary
Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 543 (1997).

Association, the National Alliance on Mental Illness, the Society of Correctional Physicians, and Mental Health America, have all issued formal policy statements opposing the practice— especially with regard to mentally ill inmates, on whom the effects of solitary confinement are particularly pronounced." *Peoples v. Annucci*, No. 11-CV-2694 (SAS), 2016 WL 1464613, at *3 (S.D.N.Y. Apr. 14, 2016).

Youth lack the essential coping skills to manage acute and chronic stressors.[66]  As a result, they are less equipped than adults to handle solitary confinement.  In addition, youth have a greater need for social stimulation and attachment than adults.  Close peer relationships promote healthy adolescent adjustment, high perceived self-worth, pro-social behavior and decreased risk of emotional and behavioral problems.[67]  Youth exposed to solitary confinement are more likely to commit suicide, attempt suicide, and engage in other acts of self-harm.[68] Indefinite isolation (isolation with no defined end date), as Jane experienced, is particularly harmful.

Numerous courts have recognized the harm to youth from isolation and have found due process violations in cases involving youth placed in solitary confinement.  *See generally H.C. v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986) ("Juveniles are even more susceptible to mental

---

[66] Rudolf H. Moos, *Life Stressors, Social Resources, and Coping Skills in Youth: Applications to Adolescents with Chronic Disorders*, 30 J. Adolescent Health 22 (2002).

[67] Deborah Laible et al.. The Differential Relations of Parent and Peer Attachment to Adolescent Adjustment, 29 J. Youth & Adolescence 46 (2000), available at http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1050&context=psychfacpub.

[68] Lindsay M. Hayes, Dep't of Justice Office of Juvenile Justice and Delinquency Prevention, Juvenile Suicide in Confinement: A National Survey (2009), available at https://www.ncjrs.gov/pdffilesl/ojjdp/213691.pdf; Carly B. Dierkhising et. al, *Victims Behind Bars: A Preliminary Study of Abuse During Juvenile Incarceration and Post-Release Social and Emotional Functioning*, 20 Psychology, Public Policy& Law 181 (2014); *see also* Sandra Simkins et al., *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 Wash. U. J.L. & Pol'y 241 (2012).

anguish than adult convicts."); *Santana v. Collazo*, 793 F.2d 41, 48 (1st Cir. 1986) (remanding for further proceedings, noting that "defendants have failed to meet their burden of showing a legitimate interest in confining juveniles in isolation for as long as twenty days"); *Santana v. Collazo*, 714 F.2d 1172 (1st Cir. 1983) (experts' testimony on lack of therapeutic and disciplinary benefits from isolation sufficient to warrant remand for further factual findings); *Milonas v. Williams*, 691 F.2d 931, 940-43 (10th Cir. 1982) (affirming the district court's grant of a permanent injunction prohibiting, *inter alia*, the use of isolation rooms for juveniles); *Doe v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at \*1 (M.D. Tenn. Mar. 22, 2017) (entering preliminary injunction enjoining defendants from "placing juveniles in solitary confinement or otherwise isolating them from meaningful contact with their peers as punishment or discipline;" noting that plaintiffs "have shown that courts around the country have found increased protections for juveniles and persons with diminished capacities from inhumane treatment under the Eighth and Fourteenth Amendments"); *Turner v. Palmer*, 84 F. Supp. 3d 880, 884 (S.D. Iowa 2015) (denying defendants' motion to dismiss on qualified immunity grounds concluding that juvenile's allegations about her confinement in an isolation cell "are sufficient to state plausible violations of the Fifth, Eighth, and Fourteenth Amendments of which a reasonable person would have known"); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1155 (D. Haw. 2006) (concluding that "the defendants' use of isolation [on children] was not within the range of acceptable professional practices and constitutes punishment in violation of the plaintiffs' Due Process rights;" noting that "[t]he expert evidence before the court uniformly indicates that long-term segregation or isolation of youth is inherently punitive and is well outside the range of accepted professional practices" and "[c]ourts that have considered this issue have likewise concluded that the use of isolation for juveniles, except in extreme circumstances, is a violation of Due Process");

87

*Feliciano v. Barcelo*, 497 F. Supp. 14, 35 (D.P.R. 1979) ("Solitary confinement of young adults is unconstitutional."); *Morgan v. Sproat*, 432 F. Supp. 1130, 1140 (S.D. Miss. 1977) (a facility's use of isolation for juveniles violated their due process and Eighth Amendment rights; limiting isolation to no more than 24 hours and only "where there is substantial evidence that [juveniles] constitute an immediate threat to the physical well-being of themselves or others"); *Pena v. N.Y. Div. for Youth*, 419 F. Supp. 203, 210-11 (S.D.N.Y. 1976) (boys' placement in isolation for punitive reasons violates due process where there was no treatment and infrequent assessment for release); *Inmates v. Affleck*, 346 F. Supp. 1354, 1372 (D.R.I. 1972) (noting that "[t]his court is convinced that solitary confinement [for juveniles] may be psychologically damaging, anti-rehabilitative, and at times inhumane" and violate due process rights); *Lollis v. N.Y. State Dep't of Soc. Servs.*, 322 F. Supp. 473, 480 (S.D.N.Y. 1970) (concluding that plaintiff's solitary confinement was unconstitutional after considering extensive expert testimony stating that the extended use of isolation on children is "cruel and inhuman," and "counterproductive to the development of the child").

Citing *Youngberg*, Defendants assert that their treatment of Jane was "well within acceptable standards of care for such delinquent offenders," staff provided "a high level of age and gender appropriate services to plaintiff," and the "level of services provided significantly surpasses any constitutional minimum floor." (Defs' Mem. at 45-46, 49). Jane disputes these characterizations. But in any event, these matters involve factual issues that cannot be resolved at this stage of the litigation.

The third and fourth counts of the complaint assert Eighth Amendment claims against DCF and DOC officials. Jane's alleged conditions of confinement violated the Eighth Amendment, given the obvious risk—and outright harm—to her health and safety that resulted

88

from the prolonged and indefinite isolation.  The Supreme Court has established a two-part test

for determining whether conditions of confinement are "cruel and unusual" in violation of the

Eighth Amendment.  First, "the deprivation alleged must be, objectively, sufficiently serious."

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).  For a claim

based on a failure to prevent harm, "the inmate must show that he is incarcerated under

conditions posing a substantial risk of serious harm."  *Id.*  Second, the plaintiff must demonstrate

that the defendants showed "deliberate indifference to inmate health and safety."  *Id*. (internal

quotation marks omitted).  Deliberate indifference exists when a prison official "knows that

inmates face a substantial risk of serious harm and disregards that risk by failing to take

reasonable measures to abate it."  *Id.* at 847.  "Officials need only be aware of the risk of harm,

not intend harm.  And awareness may be proven 'from the very fact that the risk was obvious.'"

*Spavone v. New York State Dep't of Corr. Servs*., 719 F.3d 127, 138 (2d Cir. 2013) (quoting

*Farmer*, 511 U.S. at 842) (citation omitted).  The law is clear that "[t]he Eighth Amendment

forbids deliberate indifference to serious medical needs of prisoners, which includes needs for

mental health care." *Id*. at 138 (citations and internal quotation marks omitted).

Here, officials should have been well aware that placing a child with mental illness in

prolonged isolation without access to necessary treatment creates a substantial risk of serious

harm.  Jane's history of extreme trauma and resulting impairments, of which state officials were

aware, made her particularly vulnerable to the harms of isolation.  The risk of harm was

particularly pronounced given Jane's placement in an adult prison environment at York CI,

where staff was trained to guard adults convicted of serious crimes (rather than to work with

children with complex needs), and where she was subject to frequent strip searches.  The risk of

harm was still worse given the stigmatizing nature of Jane's confinement as a transgender girl at

a boys' facility and DCF's decision to single her out for transfer to an adult prison, a decision they had made for only one other child in 14 years.  And certainly officials should have been aware they were exacerbating Jane's Gender Dysphoria by housing her at a boys' facility and denying her the ability to express herself as female.  While placing Jane in these conditions of extreme isolation and deprivation, Defendants denied Jane mental health treatment appropriate to her needs.  These circumstances suffice to show that state officials were deliberately indifferent to the risks posed to Jane by the conditions of her confinement, and that they did not take reasonable measures to abate the harms.  *See, e.g.*, *V.W. by & through Williams v. Conway*, No. 9:16-CV-1150, 2017 WL 696808, at *19 (N.D.N.Y. Feb. 22, 2017) (granting preliminary injunction enjoining defendants from imposing disciplinary isolation on juveniles at facility, reasoning that "there is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults," plaintiffs' "submissions clearly demonstrate that juveniles face an objectively sufficiently serious risk of harm from the solitary confinement practices at the Justice Center," and defendants' practices showed "conscious disregard of the substantial risks posed"); *Nelson v. Heyne*, 355 F. Supp. 451, 456 (N.D. Ind. 1972) (holding that extended periods of solitary confinement of juveniles at the Indiana Boys School was cruel and unusual punishment).

In sum, Jane's thoroughly alleges significant deprivations of her Fourteenth and Eighth Amendment rights.  The constitutional claims should not be dismissed.

## V.    DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY

Defendants claim that they are entitled to absolute immunity "as they relied in good faith on [a] valid order of the Superior Court for Juvenile Matters, which, after a six day evidentiary hearing order that Jane Doe be transferred to DOC."  (Defs' Mem. 50).  Defendants assert that state officials who carry out court orders are "acting in a quasi-judicial capacity" and thus

entitled to absolute immunity. They say they were under a court injunction to keep Jane out of

the general population at CJTS and thus they cannot be held liable for doing what the state court

ordered. (*Id.*). But Defendants considerably understate their own role, which went well beyond

just following orders.

> On April 8, 2014, the Superior Court for Juvenile Matters (Kaplan, J.) ordered as follows:

> She is ordered transferred to Niantic as a transgender female. She is to be held in isolation for no more than 72 hours. She is to be examined, evaluated and classified under the appropriate State and Federal statutes, guidelines, rules and procedures. Following the classification process, the Commissioner of Correction shall make his own placement determination. This transfer shall be reviewed by the court every 6 months to determine whether it should be continued or terminated, unless the Commissioner of DCF has already exercised the powers granted said Commissioner under § 17a-13 by removing [Jane] from the John R. Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution, Niantic. The transfer shall terminate upon the expiration of the commitment in this juvenile matter.

The court order did not strip Defendants of all discretion and authority regarding Jane's

placement and conditions of confinement. Rather, Defendants retained the authority and

responsibility to set the conditions of confinement after Jane's transfer was ordered by the court.

The order specifically directs the Commissioner of Correction to "make his own placement

determination" and reminds the DCF Commissioner of her statutory authority to remove Jane

from DOC custody at any time. Thus, the order provided wide discretion for both the

Commissioner of Correction and the DCF Commissioner to determine the location and

conditions of Jane's confinement. Accordingly, Defendants cannot claim that the conditions

under which they held Jane were mandated by court order. Indeed, the conditions they chose for

Jane were in direct conflict with Judge Kaplan's order. Not only did they hold Jane in isolation

for far longer than 72 hours, they did not detain her in accordance with governing federal

statutes.

Following the transfer of a child to the custody of the Commissioner of Correction under Conn. Gen. Stat. § 17a-12, the DCF Commissioner retains the authority to remove the child from DOC custody at any time. *See* Conn. Gen. Stat. § 17a-13 ("Any person committed to the Department of Children and Families who is transferred to the John R. Manson Youth Institution, Cheshire, or the York Correctional Institution, pursuant to section 17a-12, shall be deemed, while so transferred, to be under the jurisdiction of the Department of Correction except that the Commissioner of Children and Families shall retain his powers to remove such person and to place him in another facility or in the community or to terminate the commitment."). Indeed, the DCF Commissioner ultimately exercised her authority to remove Jane from DOC custody pursuant to § 17a-13 on June 24, 2014. Thus, at any time prior to that date, the DCF Commissioner could have removed Jane from York CI and put her in a suitable placement.

In addition, Conn. Gen. Stat. § 18-87 provides that the Commissioner of Correction "may transfer any inmate of any of the institutions of the Department of Correction to any other appropriate state institution with the concurrence of the superintendent of such institution or to the Department of Children and Families when the Commissioner of Correction finds that the welfare or health of the inmate requires it." Conn. Gen. Stat. § 18-87.[69] Thus, the DOC Commissioner could have transferred Jane to a different state institution. Moreover, even while keeping Jane under the custody of the DOC Commissioner, DOC and DCF officials could have worked to ensure that Jane had necessary treatment and regular contact with an appropriate peer group.

Defendants' actions with respect to the location and conditions of Jane's confinement were administrative—not adjudicative or prosecutorial. Judge Kaplan's order granted

---

[69] Only inmates under age 18 may be transferred by DOC to DCF, and only if the DCF Commissioner consents. Conn. Gen. Stat. § 18-87.

92

Defendants wide discretion over placement and conditions of Jane's confinement, and Defendants were not merely carrying out Judge Kaplan's order.  In fact, Defendants violated the order by holding Jane in isolation at York CI for more than 72 hours and in conditions that violated federal law.  Accordingly, the order does not afford Defendants absolute immunity. Defendants were in no way acting in a "quasi-judicial" capacity.

Similarly, DCF Defendants are not entitled to absolute immunity for the period of time when Jane was held at CJTS, which occurred both before and after Jane's incarceration at York CI.  According to Defendants, DCF officials cannot be liable for isolating Jane at CJTS because Judge Kaplan ordered that Jane—a transgender girl with female characteristics including breasts—not be detained in general population with the boys at CJTS.  (Defs' Mem. at 52).

Judge Kaplan's order was entirely reasonable given the strong likelihood that Jane would have faced harassment or worse if confined with delinquent boys in general population at CJTS, and Jane's expressed fear about such a placement.  What Defendants miss in making this argument is that Jane should not have been at CJTS in the first place—in isolation *or* in general population.  DCF should have placed Jane—a transgender girl with a severe trauma history who was undergoing hormone treatment for Gender Dysphoria—in a setting where she could have interacted with appropriate peers and treatment providers.  Judge Kaplan ordered DCF to refrain from placing Jane in general population at CJTS—he did not mandate that she be incarcerated at CJTS.  Jane, an adjudicated delinquent, had been committed by the court pursuant to Conn. Gen. Stat. § 46b-140(j)(2) to the custody of DCF, and DCF had full authority at all times during that commitment to move Jane to an appropriate setting.  *See* Conn. Gen. Stat. § 46b-140(j)(2) (providing for a delinquent child to be "committed to the Commissioner of Children and Families for placement by the commissioner, in said commissioner's discretion, (A) with respect

to the juvenile offenders determined by the Department of Children and Families to be the highest risk, in the Connecticut Juvenile Training School, if the juvenile offender is a male, or in another state facility, presumptively for a minimum period of twelve months, or (B) in a private residential or day treatment facility within or outside this state, or (C) on parole"). Accordingly, DCF Defendants are not protected by absolute immunity.

The Supreme Court has been "quite sparing" in its recognition of absolute immunity. *Burns v. Reed*, 500 U.S. 478, 487 (1991). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486-87; *accord DiBlasio v. Novello*, 344 F.3d 292, 296-97 (2d Cir. 2003). "Absolute immunity is accorded to judges and prosecutors functioning in their official capacities and, under certain circumstances, is also extended to officials of government agencies 'performing certain functions analogous to those of a prosecutor' or a judge." *DiBlasio*, 344 F.3d at 296-97.[70] The focus in assessing whether absolute immunity applies is the function performed by an individual, rather than the title or identity of the person. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995). Absolute immunity does not extend to any acts by any individual that are classified as administrative or executive tasks. *Id.*

---

[70] Courts have extended absolute immunity to non-judicial officials only in limited circumstances, where the officials had an integral relationship with the judicial process. *See, e.g.*, *Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 3 (1st Cir. 1976) (a court-appointed receiver "who faithfully and carefully carries out the orders of his appointing judge must share the judge's absolute immunity"); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238-39 (7th Cir. 1986) ("It is difficult to think of a task more intimately related to a judicial proceeding than that of enforcing a money judgment entered by a court. Because the Sheriff was acting in furtherance of his 'official duties in aid of the court,' he is entitled to quasi-judicial absolute immunity from suit for damages arising from those acts.") (citation omitted); *Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. 1981) ("Court clerks enjoy an even narrower ambit of immunity than judges and prosecutors. They have absolute immunity from actions for damages arising from acts they are specifically required to do under court order or at a judge's direction, and only qualified immunity from all other actions for damages.").

In determining the location and conditions of Jane's confinement, Defendants were not merely carrying out an order from the Court or acting in a "quasi-judicial" capacity. *See, e.g.*, *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003) (prison officials not entitled to absolute immunity because "[t]he Superior Court's orders entered in this case did not direct the defendants—expressly or otherwise—to confine Hamilton in conditions that they knew posed a substantial risk of serious harm").  They are not entitled to absolute immunity.

## VII.   QUALIFIED IMMUNITY DOES NOT BAR RELIEF AND, IN ANY EVENT, INVOLVES FACTUAL ISSUES THAT CANNOT BE RESOLVED AT THIS STAGE OF THE CASE

Defendants assert that "qualified immunity bars all money damages in this case" because "the rights alleged by plaintiff to have been violated or infringed were not clearly established at the time of the events giving rise to this action." (Defs' Mem. at 36).  As explained above, qualified immunity is not a defense to Plaintiff's ADA and Rehabilitation Act claims.  In addition, it would be inappropriate to dismiss Plaintiff's claims brought under § 1983 on qualified immunity grounds at this stage of the litigation because of the many factual questions bear on the issue.

Qualified immunity is an "affirmative defense on which the defendant officials bear the burden of proof." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015). The Second Circuit has explained that "a qualified immunity defense can be presented in a Rule 12(b)(6) motion, but . . . the defense faces a formidable hurdle when advanced on such a motion and is usually not successful." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006).  On a motion to dismiss, a "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004).

Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The relevant question is whether the "state of the law" at the time of the defendants' conduct gave them "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741; *see also id.* ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."); *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("Finally, we are mindful that the right at issue in a qualified immunity case need not be limited to the specific factual situation in which that right was articulated.").

Qualified immunity plainly does not bar relief for Jane for her claims brought under § 1983 for violations of the JJDPA and PREA because Defendants violated the clear language of those provisions. As to the JJDPA claims, Defendants point to a "split of authority" on whether plaintiffs can sue for a violation of the JJPDA through § 1983. (Defs' Mem. at 16 n.10). But the qualified immunity defense relates to whether defendants should have known that their conduct violated the constitution or federal statute, not whether private plaintiffs may sue for damages as a result of the violation. *See, e.g.*, *Henry A. v. Willden*, 678 F.3d 991, 1006 n.7 (9th Cir. 2012) ("[W]hether a federal statute is privately enforceable and whether an official is entitled to qualified immunity for a violation of that statute are two separate inquiries. There need not be 'clearly established law' showing that a statute is privately enforceable."); *Del A. v. Edwards*, 855 F.2d 1148, 1152 (5th Cir. 1988) ("[T]he Supreme Court's tests for qualified immunity naturally focus on the conduct of the reasonable official in light of the asserted right and the

96

particular circumstances.  The ultimate test is whether 'a reasonable official would understand that what he is doing violates that right.'  The test is not whether a reasonable official would understand that he ultimately faces possible liability."[71] *See also Thrower v. Pennsylvania*, 873 F. Supp. 2d 651, 657 (W.D. Pa. 2012) (same); *Johnson ex rel. Estate of Cano v. Holmes*, 377 F. Supp. 2d 1084, 1090 (D.N.M. 2004) (same).

Jane's complaint alleges that Defendants' conduct violated the plain language of the JJDPA and PREA.  Defendants do not claim that their conduct complied with PREA.  As to the JJDPA, they say that their conduct "arguably" complied—but they cite a regulation that plainly does not excuse their conduct.  Because the complaint alleges a violation of clearly established federal statutory law, the JJDPA and PREA claims should not be dismissed on qualified immunity grounds.

Nor should the Constitutional claims be dismissed, and certainly not at this stage.  Jane's complaint alleges that Defendants' conduct substantially departed from accepted professional standards and thus that Defendants did not actually exercise professional judgment in their actions.  (Compl. First Cause of Action; Second Cause of Action).  She has thus alleged a violation of clearly established law under the Fourteenth Amendment.  *See Youngberg*, 457 U.S. at 323.  Her complaint also alleges that that state officials were deliberately indifferent to the substantial risk of harm to her from the conditions of her confinement in violation of the Eighth Amendment.  (Compl. Third Cause of Action; Fourth Cause of Action).  A prisoner's right under the Eighth Amendment to be free from deliberate indifference to her serious medical or mental

---

[71]  This case was vacated by the Fifth Circuit for rehearing en banc, 862 F.2d 1107 (5th Cir. 1988), but then the appeal was dismissed before the en banc decision.  *See* 867 F.2d 842 (5th Cir. 1989).

97

health needs has been clearly established for decades.  *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

The Second Circuit has stressed that qualified immunity defenses will rarely succeed at the motion to dismiss stage.  *See Field Day*, 463 F.3d at 191-92 ("a qualified immunity defense can be presented in a Rule 12(b)(6) motion, but . . . the defense faces a formidable hurdle when advanced on such a motion and is usually not successful"); *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) ("[d]efendants moving to dismiss a suit by reason of qualified immunity would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)"); *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002) (qualified immunity inquiry "turns on factual questions that cannot be resolved at this stage of the proceedings").  Here, there is not even a benefit in efficiency from dismissing the constitutional claims on qualified immunity grounds—Defendants will still need to defend against the ADA and Rehab Act claims, where qualified immunity is not a defense, and the federal statutory claims.

District courts within this Circuit recognize that qualified immunity involves a fact-specific inquiry and thus it is usually premature to address the defense in a motion to dismiss. *See Castro v. Narcisse*, No. 3:12-CV-01535 VLB, 2013 WL 5423689, at *7 (D. Conn. Sept. 26, 2013) (noting that "[t]he Second Circuit has unflinchingly held that a defendant advancing a qualified immunity defense at the motion to dismiss stages faces a 'formidable hurdle,' is 'usually not successful,' and 'would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)'"); *Yeomans v. Wallace*, 291 F. Supp. 2d 70, 76 (D. Conn. 2003) (denying motion to dismiss on qualified immunity grounds because "[a]dditional facts are required to determine the reasonableness of [the defendant's]

actions"); *see also Woodhouse v. City of Mount Vernon*, No. 13-CV-189, 2016 WL 354896, at *6 (S.D.N.Y. Jan. 27, 2016) ("The claim may not be dismissed on qualified immunity grounds because [the plaintiff] sufficiently alleged a claim of excessive force and the right to be free from excessive force is clearly established."); *France v. Cty. of Westchester*, No. 12-CV-5576 (KMK), 2016 WL 1270259, at *9 (S.D.N.Y. Mar. 30, 2016) (declining to dismiss claim on qualified immunity grounds at motion to dismiss stage); *Simmons v. Kelly*, No. 06CIV6183RJS, 2009 WL 857410, at *8 (S.D.N.Y. Mar. 31, 2009) ("Here, Defendants' qualified immunity defense turns on an issue of material fact that cannot be resolved without discovery, and so, 'any ruling regarding the availability of the qualified immunity affirmative defense would be premature at this time.'"); *Maloney v. Cnty. of Nassau*, 623 F.Supp.2d 277, 292 (E.D.N.Y. 2007) ( "Because this defense necessarily involves a fact-specific inquiry, it is generally premature to address the defense of qualified immunity in a motion to dismiss." (internal quotation marks and citation omitted)); *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y. 2004) ("Resolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.").

Plaintiff is entitled to develop through discovery the facts bearing on her constitutional claims and the possible qualified immunity defense. At this stage of the case, it would be premature to dismiss Jane's constitutional claims based on qualified immunity.

<u>**CONCLUSION**</u>

The motion should be denied.

Respectfully submitted,
THE PLAINTIFF


 /s/ David N. Rosen
David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com



Sarah French Russell
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
(203) 382-3238
(203) 582-3237
CT26604
sarah.russell@quinnipiac.edu

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2017, a copy of the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

        /s/ David N. Rosen
       David N. Rosen