Russell, Sarah 8/27/2021
For Educational Use Only

Exhibit C

Shorter v. Barr, Slip Copy (2020)

2020 WL 1942785

2020 WL 1942785
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida.

Christopher SHORTER, Plaintiff,

v.

William BARR, in his official capacity as
Attorney General of the United States of
America, Ian Connors, in his individual capacity,
and John Doe #1 and #2, etc. Defendants.

Case No. 4:19cv108-WS/CAS
|
Signed 03/13/2020

**Attorneys and Law Firms**

Marie A. Mattox, Tallahassee, FL, for Plaintiff.

Herbert Stanley Lindsey, US Attorney, Tallahassee, FL, for Defendants.

## REPORT AND RECOMMENDATION

CHARLES A. STAMPELOS, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff, a former Bureau of Prisons inmate proceeding with counsel, filed a second amended complaint under the Rehabilitation Act of 1973, 29 U.S.C. § 794, and pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971). ECF No. 40. Plaintiff, a transgender female who has been diagnosed with Gender Dysphoria, sues William Barr, in his official capacity as Attorney General of the United States and as Director of the United States Department of Justice, pursuant to the Rehabilitation Act of 1973. Plaintiff brings an Eighth Amendment claim pursuant to Bivens against Defendants Ian Connors in his individual capacity as the National Inmate Appeals Administrator of the Federal Bureau of Prisons, and John Doe #1 and John Doe #2 in their individual capacities as members of the Transgender Clinical Care Team of the Federal Bureau of Prisons, alleging deliberate indifference to Plaintiff's serious medical needs. *Id.*

Defendants William Barr and Ian Connors move to dismiss the Second Amended Complaint (the "Complaint) on several grounds. ECF No. 48. Plaintiff filed a response in opposition to the motion to dismiss. ECF No. 52. Defendants were given leave to file a reply to the response and Plaintiff was given leave to file a sur-reply. ECF No. 56. Defendants filed a notice to the Court withdrawing their argument that the Plaintiff failed to exhaust administrative remedies concerning her Rehabilitation Act claim. ECF No. 57. No further reply was filed by Defendants and no sur-reply was filed by Plaintiff.

**The Complaint**

**Factual Allegations**

Plaintiff alleges that she is 41 years old and was serving a 96-month sentence in the custody of the Bureau of Prisons ("BOP") at the time of the events alleged.[1] ECF No. 40 at 3. She was born as a male but has been transitioning as a female and has known that she has a female identity since her childhood. *Id.* at 9. She alleged that she has been living full-time as a woman since 2008 and is known as "Chrissy" among friends and family. She began hormone therapy including estrogen that suppressed her production of testosterone. *Id.*

She alleges that Gender Dysphoria, previously known as Gender Identity Disorder, is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"), and International Classification of Diseases-10 ("ICD-10"). *Id.* at 5. She alleges that if left untreated, Gender Dysphoria can lead to serious medical problems and significant psychological distress, dysfunction, depression, and self-harm. *Id.* at 6.

Plaintiff entered the Federal Bureau of Prisons around February 9, 2012, at Jesup Federal Correctional Institution in Georgia and was later transferred to Oakdale Federal Correctional Institution in Louisiana. *Id.* at 9. Plaintiff alleges that she was diagnosed with Gender Dysphoria by Dr. Barbara Moorehead, chief psychologist at Oakdale on October 2, 2014. *Id.* Plaintiff presented to BOP health services on December 15, 2014, for establishment of a treatment plan and requested testosterone blockers and estrogen patches, which she alleges she was using prior to incarceration. *Id.* at 10. Plaintiff alleges that on May 29, 2015, Defendant Barr, through the BOP, approved estrogen therapy and on June 4,

**Russell, Sarah 8/27/2021**
**For Educational Use Only**

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

2015, Plaintiff was prescribed the Estradiol patch. Estrogen therapy began on June 17, 2015. *Id.*

 **\*2** On January 4, 2015, she was transferred to Miami Federal Correctional Institution. *Id.* She saw Dr. Inerio Alarcon on April 19, 2016, for a lump in her right breast and an ultrasound was ordered. *Id.* Plaintiff was concerned about the risk of breast cancer because of a family history and on May 9, 2016, she met with Dr. Alarcon to request discontinuation of hormone therapy and to request surgical castration. *Id.* at 11-12. Dr. Alarcon prescribed Medroxyprogesterone to facilitate breast growth consistent with World Professional Association for Transgender Health ("WPATH") standards. *Id.* at 11. Plaintiff alleges that the accepted standards of care are the WPATH standards. *Id.* at 7.

An ultrasound was performed on Plaintiff's breast on May 24, 2016, and another ultrasound, a mammogram, and a bone density study were performed on August 25, 2016. A subsequent lumpectomy procedure on September 22, 2016, found no malignancy but was positive for lobular hyperplasia. *Id.* at 12. Plaintiff alleges that she was hospitalized on November 17, 2016, for chest pains "associated with her hormone therapy." *Id.* Plaintiff discontinued Estradiol and Medroxyprogesterone therapy on December 12, 2016, "due to complications" and consistent with the Endocrine Society Clinical Practice Guidelines and the WPATH standards of care. *Id.*

During this time frame, Plaintiff was referred on April 26, 2016, to Dr. Torres at BOP psychology services at the Federal Correctional Institution in Miami for a suicide risk assessment over concern for suicidal ideation, emotional distress and preoccupation with genital mutilation and self-castration. *Id.* at 11. Plaintiff alleges that Dr. Torres concluded that a suicide watch was unwarranted, but Plaintiff should "continue care under the increased care level of 'Care2-MH' because Plaintiff had an extensive history of suicide attempts." *Id.* Plaintiff alleges she saw Dr. Torres again that same day and denied suicidal ideations, but reported that she filed complaints against medical staff because she did not believe she was receiving adequate medical care for her Gender Dysphoria. *Id.* She alleges she again requested surgery because of the risk of continuing hormone therapy. *Id.* On February 15, 2017, Plaintiff was again referred to Dr. Torres at psychological services for an expressed desire to self-castrate in an effort to commit suicide. *Id.* at 13. Plaintiff

reported that she felt hopeless because an appointment with a transgender endocrinologist was scheduled for several months out. Plaintiff requested an evaluation for transition surgery. *Id.* Dr. Torres noted that Plaintiff's mood improved because the Warden said there would be a meeting to consider expediting the endocrinology appointment. *Id.*

On February 22, 2017, Dr. Alarcon, along with the clinical director at FCI Miami, Dr. Chipi the chief psychologist, a medical doctor, and the BOP transgender team, met by teleconference to discuss Plaintiff's request for surgery.[2] *Id.* at 13. The surgery was denied because, Plaintiff alleges, the team erroneously concluded that the hormone treatment plan "had not remained at goal for a year and that Plaintiff had not had 'a full-time real-life experience in [Plaintiff's] preferred gender to demonstrate consolidation of gender identity.' " *Id.* at 13-14. On that same date, Plaintiff reported to Dr. Skibinski at BOP psychology services that she stopped taking hormones prescribed at FCI Miami due to side effects as well as the risk of cancer. *Id.* at 14.

 **\*3** Plaintiff filed an Informal Resolution on February 27, 2017, claiming an Eighth Amendment violation by Drs. Chipi and Alarcon for refusing adequate treatment. *Id.* Plaintiff requested breast augmentation and castration and a consult with the University of Miami's LBGTQ Center. *Id.* A response was received March 8, 2017, stating the request for surgeries was submitted to the BOP Transgender Clinical Care Team for review and for approval by the BOP medical director. *Id.* On March 9, 2017, Plaintiff filed an Administrative Remedy Appeal for not receiving medical treatment for Gender Dysphoria, and requesting consultation with a transgender specialist. *Id.* at 15. She alleges that Defendants Connors, John Doe #1, and John Doe #2 participated in the denial. *Id.* On July 27, 2017, Plaintiff received a response that the requests were under consideration. *Id.* at 17.

Plaintiff alleges that on March 13, 2017, she met with Dr. Christopher Estes, an offsite OBGYN physician at Westchester General Hospital to assess medical needs and transgender issues. *Id.* at 15. Dr. Estes noted Plaintiff's poor progress in transition and cited an increased risk of breast cancer. Plaintiff alleges that Dr. Estes noted that her gender transition "remains poorly addressed." *Id.* She alleges that Dr. Estes prescribed Vaniza and Finasteride, and a repeat of lab

2020 WL 1942785

work, which directives were followed by BOP health services at FCI Miami. *Id.*

Plaintiff met with Dr. Estes on April 20, 2017, to follow up and reported feeling badly about herself and her transition. *Id.* Dr. Estes recommended Plaintiff obtain two letters from mental health providers for orchiectomy to confirm her Gender Dysphoria. *Id.*

Plaintiff alleges that FCI Miami Clinical Director, Chief Psychiatrist, BOP Medical Director, BOP Transition Clinical Care Team, John Doe #1, and John Doe #2 met by teleconference to discuss the request for surgery, but no decision was made. *Id.* at 16.

Dr. Estes saw Plaintiff on July 13, 2017, and increased Plaintiff's Finasteride, ordered a refill of Vaniza, and prescribed breast forms. *Id.* The purchase of breast forms was approved on July 20, 2017, and Plaintiff obtained the same size forms she wore in the community prior to incarceration. *Id.* Plaintiff alleges that Dr. Estes deemed orchiectomy and "top surgery" necessary to address her persistent Gender Dysphoria and referred Plaintiff to Dr. Gregory Dowbak, a plastic surgeon, for an evaluation for the surgeries. *Id.* On or about July 20, 2017, Dr. Alarcon submitted a consultation request for Plaintiff to see Dr. Dowbak for the surgical evaluation. *Id.* Plaintiff alleges the evaluation never occurred. *Id.* On July 25, 2017, a teleconference was held in which Plaintiff's request for surgery was discussed but, Plaintiff alleges, was denied for non-medical reasons and contrary to the Endocrine Society Clinical Practice Guidelines and WPATH standards of care. *Id.* at 16-17. Plaintiff believes Defendants Connors, John Doe #1, and John Doe #2 participated in the denial. *Id.* at 17.

On July 27, 2017, Plaintiff received a response to her Request for Administrative Remedy (No. 908238-F1) stating the request was under consideration. On August 2, 2017, Plaintiff filed a Regional Administrative Remedy Appeal (No. 908238-R1) citing two requested remedies of surgery, and noting Dr. Estes' request for her consultation with Dr. Dowbak. *Id.* at 17. An August 31, 2017, response indicated the surgery request was awaiting review. Plaintiff alleges Defendants Connors, John Doe #1, and John Doe #2 participated in the denial. *Id.*

Plaintiff alleges that on September 28, 2017, Dr. Estes reported that she was on the maximum dose of medications with some response but not to an acceptable level. *Id.* Dr. Estes again recommended a consult with Dr. Dowbak as previously requested and a consultation request was submitted by Drs. Alarcon and Chipi the next day. *Id.* On September 30, 2017, Plaintiff filed a Central Office Administrative Remedy Appeal (No. 908238-A1), alleging the Transgender Clinical Care Team had been reviewing requests since February 2017 without action, causing Plaintiff to suffer. *Id.* at 17-18. Plaintiff believes Defendants Connors, John Doe #1, and John Doe #2 participated in the denial. *Id.* at 18.

**\*4** Plaintiff alleges that on October 2, 2017, a teleconference was held with the Transgender Clinical Care Team and the Transgender Executive Council in which Plaintiff's surgery requests were discussed and denied for non-medical reasons. *Id.* Plaintiff believes Defendants Connors, John Doe #1, and John Doe #2 participated in the denial. *Id.* Plaintiff alleges that after a November 15, 2017, assessment meeting, the Transgender Clinical Care Team determined there were no medical issues and made no decision on Dr. Estes' request that Plaintiff be given a surgical consultation. *Id.* at 19.

Plaintiff filed an Administrative Tort Claim on December 11, 2017, due to denial of the Dowbak consult. *Id.* Plaintiff alleges that surgical intervention was denied after a December 20, 2017, multi-disciplinary meeting of the Transgender Clinical Care Team and the Transgender Executive Council. *Id.*

Plaintiff saw Dr. Anguiera-Serrano, an endocrinologist, off-site on January 5, 2018. *Id.* Plaintiff alleges Dr. Anguiera-Serrano noted that Plaintiff's testosterone was not being suppressed even with the maximum dose of medications and that the doctor agreed with the recommendation for surgery as the best treatment at this time. *Id.* Dr. Anguiera-Serrano prescribed Lupron. *Id.* at 19-20. Plaintiff alleges that between April 18, 2018, and May 3, 2018, she had complications from the Lupron therapy. *Id.* at 21.

Plaintiff alleges that a decision was made at a February 5, 2018, multi-disciplinary teleconference of the Transgender Clinical Care Team and the Transgender Executive Council to deny her surgery despite multiple physicians' determinations that surgery was medically necessary. *Id.* at 20. In response to a second Informal Resolution filed February 14, 2018,

Russell, Sarah 8/27/2021
For Educational Use Only

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

Plaintiff was informed that the surgery was denied at the "regional level." Plaintiff believes Defendants Connors, John Doe #1, and John Doe #2 participated in this denial. *Id.* Plaintiff filed a Regional Administrative Remedy (No. 933147-F1) on February 22, 2018, asking for an explanation of the denial of surgery. She also filed a request to transfer to Tallahassee Federal Correctional Institution, a female facility. *Id.*

Plaintiff alleges that she received another response on March 28, 2018, denying the surgery and stating she did not meet the BOP criteria for the requested surgery. She believes Defendants Connors, John Doe #1, and John Doe #2 participated in this denial. *Id.* at 21. Plaintiff submitted a Regional Administrative Remedy (No. 933147-R1) on April 3, 2018, noting that the BOP required her to be housed in a female facility for over one year before surgery would be allowed. *Id.* She alleges Dr. Alarcon told her that BOP would not transfer her to a female facility and would use the failure to reside in a female facility as a reason to deny surgery. *Id.* Plaintiff alleges that she received a response to the regional Administrative Remedy on May 22, 2018, denying surgery because she failed to meet the requirement that she be housed in a female facility for one year. She believes that Defendants Connors, John Doe #1, and John Doe #2 participated in the denial. *Id.* at 22.

On July 4, 2018, Plaintiff submitted a Central Office Administrative Remedy Appeal (No. 933147-A1) contending that the BOP clinical guidelines were contrary to WPATH standards of care. *Id.* The appeal also contended that the Transgender Offender Manual was improperly amended to include a provision that "the designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all the [factors listed], and where there has been significant progress towards transition." *Id.* at 22 (citing amendments noticed May 11, 2018). Plaintiff received a response to the Central Office Remedy Appeal on August 1, 2018, stating that the appeal lacked merit. She believes Defendant Connors participated in the denial of the appeal. *Id.* at 23.

 **\*5** Plaintiff alleges that on July 6, 2018, she saw Dr. Anguiera-Serrano who noted that Plaintiff is having side effects to Lupron and "does require the orchiectomy," and that the FCI Miami health department submitted a consultation for plastic surgery that same day. *Id.* at 23. Plaintiff alleges

that she saw Dr. Anguiera-Serrano again on November 2, 2018, and it was noted that "patient requires orchiectomy and breast augmentation for gender change" and that surgery is the only resource to properly treat her because she has had adverse effects from medical therapy. *Id.* at 23-24. Plaintiff alleges she was given a prescription for breast augmentation and bilateral orchiectomy and that Drs. Chipi and Alarcon requested general surgery. *Id.* at 24.

Plaintiff alleges that a multidisciplinary teleconference was held on December 13, 2018, at which the requests for surgery were denied as elective. *Id.* She believes Defendants Connors, John Doe #1, and John Doe #2 participated in the denial for general surgery. *Id.* Plaintiff alleges that on December 21, 2018, Dr. Alarcon's notes indicate that Plaintiff's case was discussed by the Transgender Executive Council and that recommendations were issued for maximizing hormone therapy, providing gender-affirming recommendations, and beginning release planning. Plaintiff was released from the Bureau of Prisons on February 14, 2019. *Id.*

**Count One**

Plaintiff sues Defendant Barr, in his official capacity, for violation of the Rehabilitation Act, § 794(a) and alleges that Plaintiff is qualified as an individual with a disability as defined by § 705(20) of the Act. *Id.* at 26-27. She alleges her Gender Dysphoria is a serious medical and disabling condition of which Defendant was aware due to Plaintiff's having received hormone therapy and having expressed female gender in all aspects of her life both prior to and during her incarceration. *Id.* at 27. Plaintiff alleges that Bureau of Prisons officials refused to reasonably accommodate Plaintiff in the face of qualified medical professional opinions that Plaintiff needed surgery to treat her Gender Dysphoria. *Id.* Plaintiff alleges that denial of surgery and other accommodations by Barr on behalf of the Bureau of Prisons and the Department of Justice exacerbated her physical and mental impairments, caused pain and suffering, loss of enjoyment of life, and other damages in the past, present, and future. *Id.* at 28.

**Count Two**

Plaintiff alleges that Defendants Connors, John Doe #1, and John Doe #2 violated her Eighth Amendment rights by acting with deliberate indifference to her serous medical need for

Russell, Sarah 8/27/2021
For Educational Use Only

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

necessary treatment for Gender Dysphoria. *Id.* at 28-29. She alleges the Defendants recklessly disregarded the substantial risk of serious harm by repeatedly denying Plaintiff's prescribed medical treatments, specifically orchiectomy and breast augmentation. *Id.* at 29. She alleges the Defendants' actions and inaction have caused her exacerbation of physical and mental impairments, pain and suffering, loss of enjoyment of life, and other damages.

**Relief Sought**

Plaintiff seeks a declaration that the Bureau of Prisons denied her medically necessary treatment and accommodation for Gender Dysphoria and that Defendants acted with deliberate indifference to her objectively serious medical needs. *Id.* at 30. She seeks general and compensatory damages including economic and noneconomic losses, and a permanent injunction against future violations. She seeks reasonable attorneys' fees, costs, litigation expenses, interest where appropriate, and other just and proper relief. She seeks trial by jury. *Id.* at 30-31.

**The Motion to Dismiss**

**\*6** Defendant Barr moves to dismiss the Rehabilitation Act claim against him and contends that the Rehabilitation Act excludes individuals in Plaintiff's position. ECF No. 48 at 4.

He cites 29 U.S.C. § 705(20)(F), which exempts "gender identity disorders not resulting from physical impairments" from the definition of disability, and explains that the phrase "gender identity disorder" was replaced by the phrase "gender dysphoria" in the Diagnostic and Statistical Manual of Mental Disorders, 5th edition ("DSM"), in 2013. *Id.* at 5. He notes, however, that the case law is in disagreement on this issue. *Id.*

Defendant Connors moves to dismiss the deliberate indifference claim against him on the ground that the Court lacks personal jurisdiction over him. He argues that the complaint alleges no conduct by Connors occurring in Florida and no facts showing minimum contacts in Florida. *Id.* at 10. Connors also moves to dismiss, contending that Plaintiff has no automatic right to sue under the authority of Bivens. *Id.* at 11. He argues that although Bivens has been extended to allow Eighth Amendment claims of deliberate indifference to medical needs, it has not been extended to denial of inmate grievances or specific accommodations for Gender Dysphoria. Connors argues that alternative administrative

remedies exist in the Bureau of Prisons administrative process, thus rendering a Bivens remedy inappropriate. *Id.* at 14-15. He also argues that prison housing and transfer claims are not within the purview of Bivens. *Id.* at 16-18.

Defendant Connors also moves to dismiss the claim based on qualified immunity. *Id.* at 19. Defendant Connors contends that the facts alleged by Plaintiff do not support a finding of deliberate indifference, which must be shown by reckless disregard of a substantial risk of serious harm. *Id.* at 24. He argues that the facts show Plaintiff received medical attention and only disputes the adequacy of that attention, and that under the Eighth Amendment, Plaintiff is not entitled to the particular type of treatment she desires. *Id.* at 25.

Connors further contends that his investigating and responding to administrative grievances does not state a claim for a constitutional violation. *Id.* at 26-27.

**Plaintiff's Response to Motion**

Plaintiff responds to the contention that Gender Dysphoria is expressly excluded from the Rehabilitation Act by noting, as did Defendant Barr, that no Circuit Court of Appeals has ruled on the question and further citing this Court's order denying dismissal in Harvard v. Inch, 411 F. Supp. 3d 1220 (N.D. Fla. 2019), which stated in part:

> Each Plaintiff alleging a violation of their rights protected by the ADA and RA have sufficiently pled impairments that substantially interfere with major life activities. Plaintiff Harvard has schizoaffective disorder, gender dysphoria, and bipolar disorder which substantially limits her brain function. [Plaintiff's suicide watch and self-injury] shows that her mental illnesses substantially limit her ability to [take] care of herself.

*Id.* at 1240. Plaintiff contends that this statement sufficiently recognizes Gender Dysphoria as being within the purview of the Rehabilitation Act. ECF No. 52 at 4-5.

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

Plaintiff further responds that the deliberate indifference claim against Defendant Connors should not be dismissed for lack of personal jurisdiction because in resolving personal jurisdiction, the Court considers whether personal jurisdiction exists over the nonresident under Florida's long-arm statute and whether the exercise of jurisdiction comports with the Due Process Clause. *Id.* at 8-9. Plaintiff contends that under Florida law, a nonresident commits a tortious act in Florida when he commits an act outside the state that causes injury within Florida, and is thus subject to specific personal jurisdiction. *Id.* at 9.

 **\*7** Plaintiff responds that the deliberate indifference claim against Defendant Connors is properly within the purview of Bivens. Bivens allows claims for deliberate indifference to medical needs by federal officials, and her claim for denial of adequate treatment for properly diagnosed Gender Dysphoria is not an attempt to apply Bivens in a new context or new type of claim. *Id.* at 17-18.

Plaintiff disputes that Defendant Connors is entitled to qualified immunity. *Id.* at 19. Plaintiff contends that the complaint sufficiently alleges an Eighth Amendment claim against Connors—not just that he denied grievances or appeals—in that it is alleged that he participated in multidisciplinary teleconferences on July 25, 2017, October 2, 2017, and December 13, 2018, which resulted in denials of Plaintiff's requests for surgery. *Id.* at 21.

**Legal Standards**

In determining if a complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief can be granted the Court must determine if the plaintiff has alleged enough plausible facts to support the claim stated. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (retiring the standard from Conley v. Gibson, 355 U.S. 41 (1957)). A complaint's well-pleaded facts must be accepted as true when ruling on a motion to dismiss, Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007), and dismissal is not permissible because of "a judge's disbelief of a complaint's factual allegations." Twombly, 550 U.S. at 556 (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)). A

motion to dismiss is not the vehicle by which the truth of a plaintiff's factual allegations should be judged. Instead, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69 (1993).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556); *see also* Speaker v. U.S. Dep't of Health, 623 F.3d 1371, 1380 (11th Cir. 2010). "The plausibility standard" is not the same as a "probability requirement," but "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). A complaint that "pleads facts that are 'merely consistent with' a defendant's liability, 'stops short of the line between possibility and plausibility.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

The pleading standard is not heightened, but flexible, in line with Rule 8's command to simply give fair notice to the defendant of the plaintiff's claim and the grounds upon which it rests. Swierkiewicz v. Sorema, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."). Nevertheless, a complaint must provide sufficient notice of the claim and the grounds upon which it rests. *See* Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005). Thus, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003).

 **\*8** The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they

Russell, Sarah 8/27/2021
For Educational Use Only

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

receive while in prison. Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). Basic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety. Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr. Inst., 452 F. App'x 848, 850-51 (11th Cir. 2011) (unpublished)).

Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoted in Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)). "In either of these situations, the medical need must be 'one that, if left unattended, 'pos[es] a substantial risk of serious harm.' " Farrow, 320 F.3d at 1243 (internal quotations omitted); see also Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009).

Deliberate indifference requires more than negligence,[3] but it is unnecessary to show a defendant intended to cause harm. Farmer, 511 U.S. at 835 (1994). Deliberate indifference requires a plaintiff to show that a defendant was subjectively reckless and consciously disregarded a substantial risk of serious harm. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991) (explained in Farmer, 511 U.S. at 838-40). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.' " Farrow, 320 F.3d at 1243 (quoting Estelle, 429 U.S. at 105-06). See also Harris, 706 F. App'x at 950).

In a claim for the denial of medical care, a plaintiff must show: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000); Farrow, 320 F.3d at 1243. Thus, to show a defendant acted with deliberate indifference, "a prisoner must show the prison official's: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.' " Bingham, 654 F.3d at 1176 (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999))).

"However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' " McElligott, 182 F.3d at 1254 (citation omitted) (quoted in Farrow, 320 F.3d at 1243). "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris, 941 F.2d at 1505 (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)). As explained in Estelle, where the prisoner received treatment, but complained that more should have been done:

> **\*9** But the question whether an X-ray —or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

429 U.S. at 107. Although a prisoner does not have an Eighth Amendment right to any particular type of medical treatment, he must be provided constitutionally adequate medical treatment. Estelle, 429 U.S. at 103-06. "In considering a deliberate indifference claim, '[e]ach individual Defendant must be judged separately and on the basis of what that person knows.' " Burnette v. Taylor, 533 F.3d 1325,

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

1331 (11th Cir. 2008) (quoted in Melton v. Abston, 841 F.3d 1207, 1224 (11th Cir. 2016)).

**Analysis**

**Rehabilitation Act Claim**

Defendant Barr, in his official capacity, contends that Plaintiff's medical condition, Gender Dysphoria, is excluded from the definition of disability under the Rehabilitation Act. As Defendant Barr concedes, the case law is in disagreement on this question and no Circuit Court of Appeals has answered the question. The Act exempts from the definition of disability not all gender identity disorders but only those "gender identity disorders not resulting from physical impairments."

29 U.S.C. § 705(20)(F). Plaintiff's allegations sufficiently raise a dispute of fact concerning whether her Gender Dysphoria results from physical impairments involving the function of her hormonal system in conjunction with her cognitive function, and the effect on her mental health. One district court has aptly explained:

> A further distinction can be made between the definition given in DSM-IV of "gender identity disorders," and that now given in DSM-V of "gender dysphoria." In contrast to DSM-IV, which had defined "gender identity disorder" as characterized by a "strong and persistent cross gender-identification" and a "persistent discomfort" with one's sex or "sense of inappropriateness" in a given gender role, the diagnosis of [Gender Dysphoria] in DSM-V requires attendant disabling physical symptoms, in addition to manifestations of clinically significant emotional distress.

> While the court need not take a position on whether [Gender Dysphoria] may definitively be found to have a physical etiology—nor would it be confident doing so without the aid of expert testimony—the continuing re-evaluation of [Gender Dysphoria] underway in the relevant sectors of the medical community is sufficient, for present purposes, to raise a dispute of fact as to whether Doe's [Gender Dysphoria] falls outside the ADA's exclusion of gender identity-based disorders as they were understood by Congress twenty-eight years ago. [4]

Doe v. Massachusetts Dep't of Correction, No. CV 17-12255-RGS, 2018 WL 2994403, at *6-7 (D. Mass. June 14, 2018) (not reported in Fed. Supp.).

Plaintiff contends that dismissal of the claim as exempted from the definition of disability should be denied because this Court indicated in Harvard v. Inch, 411 F. Supp. 3d 1220 (N.D. Fla. Oct. 24, 2019), that the plaintiffs had alleged a violation of their rights under the ADA and the Rehabilitation Act by sufficiently pleading impairments, including Gender Dysphoria, that substantially interfere with major life activities. Id. at 1240. The Court stated, "Plaintiff Harvard has schizoaffective disorder, gender dysphoria, and bipolar disorder which substantially limits her brain function." Id. This statement is not fully dispositive of the present question because Gender Dysphoria was but one condition in a list of mental illnesses and because the issue of whether Gender Dysphoria is excluded from the definition of disability was not the focus of the case. However, the Court's statement can be read to indicate that a recognized mental illness, such as Gender Dysphoria, that substantially limits a plaintiff's ability to care for herself can constitute a disability for purposes of the Rehabilitation Act. Plaintiff has alleged that her Gender Dysphoria has resulted in her depression, suicidal ideation, and desire to harm herself. She has alleged that a medication regimen has not sufficiently addressed her condition because of her poor response to hormone suppression medication and the adverse side effects of certain other medications provided to her.

**\*10** The court in Doe v. Massachusetts Dep't of Correction noted the continuing reevaluation of Gender Dysphoria in the relevant sectors of the medical community and deferred a decision on whether Gender Dysphoria "falls outside the ADA's exclusion of gender identity-based disorders as they were understood by Congress twenty-eight years ago." The court also relied on "the prudential doctrine of constitutional avoidance" to deny a motion to dismiss. Doe, 2018 WL 2994403, at *7-8. More recently, the district court in Iglesias v. True, 403 F. Supp. 3d 680, 687-88 (S.D. Ill. Jul. 25, 2019), noted the significant disagreement as to whether Gender Dysphoria falls into the Rehabilitation Act's exclusion, [5] and concluded, "No Courts of Appeal appear to have ruled on the issue. At this point in the case, the Court cannot categorically say that gender dysphoria falls within the RA's exclusionary

Russell, Sarah 8/27/2021
For Educational Use Only

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

language and will err on the side of caution to allow Plaintiff's claim to proceed." *Id.* at 688. This Court should also err on the side of caution and deny Defendant Barr's motion to dismiss the Rehabilitation Act claim on the basis of the Act's exclusion of "gender identity disorder not resulting from physical impairments."

**Eighth Amendment Claim**

**A. Jurisdiction**

Defendant Connors, National Inmate Appeals Administrator, moves to dismiss the claim for deliberate indifference to Plaintiff's serious medical condition brought pursuant to <u>Bivens</u> on several grounds. Connors first argues that the Court lacks specific personal jurisdiction over him. ECF No. 48 at 9. Connors contends that at all relevant times he did not live in Florida and does not have necessary minimum contacts to permit the Court to exercise jurisdiction over him. *Id.* at 10. He contends that his "mere act of signing the administrative remedy forms or rejections does not create a purposeful contact with the state." *Id.* He also argues that to be liable under <u>Bivens</u>, the defendant must be personally responsible for a constitutional violation. *Id.* at 11.

 **\*11** In determining whether the court has personal jurisdiction over a nonresident defendant the court employs a two-part analysis. Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A., 421 F.3d 1162, 1166 (11th Cir. 2005). First, the court must determine if jurisdiction can be obtained over the defendant under Florida's long-arm statute. *Id.* If so, the court must then decide whether the nonresident defendant has sufficient "minimum contacts" with Florida to satisfy the constitutional requirements under the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.' " *Id.*

Under Florida law, specific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within Florida and concerns a nonresident defendant's contacts with Florida only as those contacts related to Plaintiff's cause of action. Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1352 (11th Cir. 2013). Florida's long-arm statute provides for specific personal jurisdiction over persons who commit a tortious act

within this state. [6] *See* § 48.193(1)(a)2., Fla. Stat. A defendant commits a tortious act within the state when he commits an act outside the state that causes injury within Florida. *Id.* at 1353 (citing Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008)); *see also* Posner v. Essex Ins. Co., 178 F.3d 1209, 1216 (11th Cir. 1999). Plaintiff sufficiently alleged actions by Defendant Connors that, even if committed while outside the state, caused Plaintiff's alleged injury in Florida.

The Eleventh Circuit has addressed the issue of personal jurisdiction under circumstances somewhat similar to those alleged in the present case. The Court stated:

> The parties do not dispute that Defendant Watts is a non-resident of Florida. About Defendant Watts's contact with Florida, Plaintiff alleges only that Watts received—in Washington, D.C.—two administrative grievances sent from Florida by Plaintiff. This evidence is insufficient to show either that Defendant Watts had significant, purposeful contacts with Florida about the subject of this lawsuit or that Watts had systematic and continuous general contacts with Florida. For background, *see* Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1291 (11th Cir. 2000) (discussing the nature and quality of minimum contacts necessary to support both specific and general jurisdiction over a non-resident defendant). Moreover, that Defendant Watts is a government officer is not, in and of itself, sufficient to establish personal jurisdiction in Florida's federal district courts. *See* Stafford v. Briggs, 444 U.S. 527, 544-45 (1980). The district court dismissed properly Defendant Watts for lack of personal jurisdiction.

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

Dugan v. Jarvis, 725 F. App'x 813, 816-17 (11th Cir. 2018) (unpublished). In the present case, however, Plaintiff alleges that Defendant Connors not only reviewed and denied appeals, but that he participated on three occasions in multi-disciplinary teleconferences that resulted in denial of the recommended surgery, allegedly for non-medical reasons. *See* ECF No. 40 at 16-17, 18, 24. These allegations are sufficient, at this stage in the litigation, to establish specific personal jurisdiction over Defendant Connors.

The exercise of specific personal jurisdiction over Defendant Connors must also comport with due process. The touchstone of this analysis is whether the defendant had minimum contacts with the state such that the maintenance of the suit does not offend traditional notions of fair play and focuses on the relationship among the defendant, the forum, and the litigation. Waite v. All Acquisition Corp., 901 F.3d 1307, 1312 (11th Cir. 2018). In the present case, Plaintiff alleges that Defendant Connors personally participated in three multidisciplinary teleconferences which resulted in Plaintiff being denied surgery for non-medical reasons. Defendant Connors' alleged participation in the conferences spanning a period of over a year and a half provides the basis to conclude that he had sufficient purposeful minimum contacts on a "systematic and continuous" basis. Dugan, 725 F. App'x at 816. At this stage of the proceeding, the allegations are sufficient to demonstrate minimum contacts that satisfy due process. Accordingly, the claim against Defendant Connors should not be dismissed for lack of specific personal jurisdiction.

**B. Appropriateness of Bivens' Remedy**

**\*12** Defendant Connors also moves to dismiss the claim of deliberate indifference to Plaintiff's serious medical need on the ground that allowing the claim to go forward based on Gender Dysphoria would constitute an unwarranted extension of Bivens into a new context. ECF No. 48 at 11. Defendant Connors contends that this claim calls for applying Bivens in a new context because the Supreme Court has not recognized a Bivens remedy for denying inmate grievances or for specific accommodations.[7] *Id.* at 13. Defendant Connors cites Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), for the established proposition that expanding Bivens is a disfavoured judicial activity and cannot be expanded to create

an implied remedy in a "new context" or "new category of defendants." He argues that if the claim is made in a new context, special factors must be considered and would indicate that the claim and any implied remedy for it should not go forward. ECF No. 48 at 13-14.

The Court in Ziglar held that a suit challenging the "high-level detention policy [of aliens] created in the wake of a major terrorist attack" "bore little resemblance to the three Bivens claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id.* at 1860. In determining if the claim is made in a new context, the Court explained as follows:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

Recently, the Supreme Court held in Hernandez v. Mesa, 140 S. Ct. 735 (2020), that a claim by a Mexican family for the death of their child who was shot across the border by a border patrol agent was a new context because it was meaningfully different than any of the claims recognized by the Court as appropriate extensions of Bivens. The Court declined to extend Bivens to that new "context" because "a cross-border shooting claim has foreign relations and national

Russell, Sarah 8/27/2021
For Educational Use Only

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

security implications." Hernandez, 140 S. Ct. at 739. The Court also noted that the injury occurred outside our borders. Id. at 747.

In the present case, Plaintiff alleges an Eighth Amendment claim against Defendant Connors, an employee of the Bureau of Prisons, for deliberate indifference. A Bivens' remedy is recognized in this context against prison officials for failing to adequately treat an inmate's medical condition. Carlson v. Green, 446 U.S. 14, 16 n.1, 17 (1980) (holding that a Bivens action is allowed for Eighth Amendment claims based on federal government officials' "deliberat[e] indifferen[ce]" to a federal prisoner's medical needs). Plaintiff's Eighth Amendment claim against the individual federal officers may be brought pursuant to Bivens. The motion to dismiss the claim against Defendant Connors based on inapplicability of Bivens should be denied.

**C. Qualified Immunity**

Defendant Connors asserts qualified immunity against claims for money damages and asserts the only acts he performed were denial of administrative appeals which do not meet the test of personal involvement and that there is no established right to surgery for Gender Dysphoria. ECF No. 48 at 20-25. However, as noted, Plaintiff alleged that Defendant Connors also participated in multidisciplinary teleconferences which resulted in denial of Plaintiff's prescribed surgeries.

**\*13** Qualified immunity shields government officials sued in their individual capacities from liability for a plaintiff's § 1983 claims if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoted in McNeeley v. Wilson, 649 F. App'x 717, 720-21 (11th Cir. 2016) (unpublished)). The initial inquiry is whether the public official proves "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." McNeely, 649 F. App'x at 721 (citation omitted). The next step is to determine: (1) "whether the plaintiff's allegations, if true, establish a constitutional violation" and (2) "whether the right violated was 'clearly established.' " Id.

At the time of the events at issue in this case, the law was clearly established that deliberate indifference to a serious medical need is a violation of the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Carlson, 446 U.S. at 16 n. 1, 17. Defendant Connors concedes that Plaintiff has a "serious medical need, namely, gender dysphoria." ECF No. 48 at 23 (citing Kothmann v. Rosario, 558 F. App'x 907, 911 (11th Cir. 2014) (unpublished)). He contends, however, that Plaintiff has received medical attention and has no clearly established right to surgical treatment for her Gender Dysphoria as she requested. Id. at 24-25.

Plaintiff alleged that several physicians recommended surgery as the only viable treatment, but Plaintiff was denied the recommended treatment. Thus, Plaintiff has alleged the denial of a clearly established right, and the qualified immunity defense should be rejected.

**Recommendation**

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion to dismiss filed by Defendants Barr and Connors, ECF No. 48, be **DENIED**. It is also **RECOMMENDED** that Defendants Barr and Connors be required to file answers to Plaintiff's second amended complaint, ECF No. 40, within fourteen (14) days of the date an Order is entered adopting this Report and Recommendation and that the case be **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on March 13, 2020.

**<u>NOTICE TO THE PARTIES</u>**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal</u>**

**Russell, Sarah 8/27/2021**
**For Educational Use Only**

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

use only and does not control. **If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on** the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

**All Citations**

Slip Copy, 2020 WL 1942785

### Footnotes

1    The female pronoun is used in reference to Plaintiff who alleges she was in the process of transitioning gender roles as a transgender female when she was incarcerated.

2    The Second Amended Complaint's reference to the date as February 22, 2016, appears to be a typographical error. *See* ECF No. 40 at 13.

3    "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham, 654 F.3d at 1176 (citing Brown v. Johnson, 387 F.3d 1344, 1451 (11th Cir. 2004)).

4    The exemptions in the Americans with Disabilities Act (ADA) and in the Rehabilitation Act for gender identity disorder are identical. *See* 42 U.S.C. § 12211(b)(1) and 29 U.S.C. § 705(20)(F).

5    *See, e.g.* London v. Evans, No. CV 19-559 (MN), 2019 WL 5726983, at *6 (D. Del. Nov. 5, 2019) (noting that there is "significant disagreement" as to whether gender dysphoria falls into the ADA's categorical exclusions);

     B latt v. Cabela's Retail, Inc., No. 5:14-cv-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (holding that Gender Dysphoria is not excluded from ADA coverage and denying motion to dismiss); Tetlow v. Maryland Dept. Pub. Safety and Corr. Servs., No. TDC-18-1522, 2019 WL 4644271, at *7 (D. Md. Sept. 24, 2019) (dismissing where Plaintiff did not argue how her condition is not excluded by RA exclusion for gender identity disorders not resulting from physical impairment); Doe v. Northrop Grumman Sys. Corp., No. 5:19-cv-00991-CLS, 2019 WL 5390953, at *8 (N.D. Ala. Oct. 22, 2019) (concluding "that a condition of 'gender dysphoria' (formerly described as a 'gender identity disorder') that does not result from a physical impairment is expressly excluded from the definition of disabilities covered by the Americans with Disabilities Act"); Parker v. Strawser Constr., Inc., 307 F. Supp. 3d 744, 755 (S.D. Ohio 2018) (holding that ADA claim was foreclosed because the plaintiff's amended complaint did not allege "that her gender dysphoria was caused by a physical impairment or that gender dysphoria always results from a physical impairment"); Gulley-Fernandez v. Wisconsin Dep't of Corr., No. 15-CV-995, 2015 WL 7777997, at *3 (E.D. Wis. Dec. 1, 2015) (holding that Agender identity disorder is not a 'disability' under the Americans with Disabilities Act or the Rehabilitation Act); Mitchell v. Wall, No. 15-CV-108-WMC, 2015 WL 10936775, at *2 (W.D. Wis. Aug. 6, 2015) (denying plaintiff's motion to amend the complaint "because [Gender Identity Disorder] is specifically excluded as a disability under the ADA and Rehabilitation Act"); Diamond v. Allen, No. 7:14-CV-124 HL, 2014 WL 6461730, at *4 (M.D. Ga. Nov. 17, 2014) (dismissing prisoner's ADA claim because A 'gender identity disorders not resulting from physical impairments' are not considered disabilities under the ADA").

6    Deliberate indifference to serious medical need is a tort of constitutional dimension. See Anderson v. City of Atlanta, 778 F.2d 678, 686 (11th Cir. 1985) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

**Russell, Sarah 8/27/2021**
**For Educational Use Only**

**Shorter v. Barr, Slip Copy (2020)**

2020 WL 1942785

7    Plaintiff is not seeking a <u>Bivens</u> remedy for denial of a grievance or denial of requested accommodation. She alleges an Eighth Amendment claim for deliberate indifference to her serious medical need.

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---