UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JANE DOE,

    Plaintiff

V.                           Case No. 3:16-CV-1934

JAMES DZURENDA, ET AL.,

    Defendants

## RULING AND ORDER

Plaintiff Jane Doe brings this action under 42 U.S.C. § 1983 for money damages against the State of Connecticut, the Department of Children and Families ("DCF"), the Department of Correction ("DOC") and DOC and DCF officials in their individual and official capacities for alleged violations of her rights under federal law while confined as a juvenile in state facilities.[1]  The complaint alleges that in 2014, plaintiff, then a sixteen-year-old transgender girl with mental impairments, was held in solitary confinement in a high security facility for boys and an adult prison for women in violation of her rights under the Fourteenth and Eighth Amendments to the U.S. Constitution, the Juvenile

---

[1] The individual defendants are former DOC Commissioners James Dzurenda and Scott Semple, former DCF Commissioner Joette Katz, and William Rosenbeck, former Superintendent of the Connecticut Juvenile Training School for Boys.

1

Justice and Delinquency Prevention Act ("JJDPA"), 42 U.S.C. § 5601 et. seq., the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15601, et. seq., Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, et. seq.[2]

The defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the action in its entirety. The main issues are whether the claims for damages against the individual defendants sufficiently allege violations of requirements of substantive due process that apply in the context presented here; whether quasi-judicial absolute immunity bars the claims because defendants were carrying out court orders; whether qualified immunity bars the claims because the applicable law was not clearly established; whether the JJDPA and PREA create

---

[2] There are ten counts in all. Counts one and two allege that all four officials violated plaintiff's rights under the Fourteenth Amendment's due process clause by confining her in isolation for extended periods, placing her at a facility for boys and an adult prison for women, and threatening to transfer her to an adult prison for men. Counts three and four allege that the officials were deliberately indifferent to excessive risks to plaintiff's health and safety in violation of the Eighth Amendment. Counts five and six allege JJDPA claims against Katz, Dzurenda, and Semple in their individual capacities related to plaintiff's incarceration at a prison for adult women. Count seven alleges PREA violations against Katz and Rosenbeck in their individual capacities related to plaintiff's detention at a facility for boys. Count eight alleges deprivation of liberty interests grounded in the JJDPA and PREA in violation of due process. Counts nine and ten allege violations of the ADA and Rehabilitation Act.

individually enforceable rights under 42 U.S.C. § 1983; and whether plaintiff's gender dysphoria constitutes a cognizable disability under the ADA notwithstanding the statute's exclusion of "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1).

For reasons explained below, the motion is denied as to the ADA and Rehabilitation Act claims but granted as to the other claims. The Fourteenth Amendment claims for damages against the DCF and DOC officials in their individual capacities sufficiently allege violations of substantive due process but are dismissed based on qualified immunity. The Eighth Amendment claims are dismissed because its prohibition of cruel and unusual punishments does not directly apply to juveniles confined pursuant to a delinquency adjudication and commitment order. The JJDPA claims and the PREA claim are dismissed because neither statute creates rights that are privately enforceable through § 1983.[3]

_____

[3] Plaintiff filed this action after she was released from DCF custody and thus no longer subject to the requirement of the Prison Litigation Reform Act that she exhaust administrative remedies. 42 U.S.C. § 1997e(a). See Greig v. Goord, 169 F.3d 165, 167 (2d Cir. 1999) ("[L]itigants. . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of [the] provision."). Plaintiff previously filed two actions without exhausting administrative remedies: the first, Doe v. Connecticut Department of Corrections, 14-cv-469 (filed April 9, 2014), sought a temporary restraining order preventing her transfer from DCF custody to DOC custody; the

## I.   Background

The following facts are drawn from the allegations in the complaint, which are accepted as true, and from statements of fact in published decisions of state courts in closely related litigation. See In re Doe, No. F04JV32912660A, 2014 WL 2600505 *1 (Conn. Super. Ct. May 6, 2014), rev'd, In re Angel R., 157 Conn. App. 826 (2015).

Plaintiff is transgender – biologically male, identifying as female.  She became involved with DCF at age five due to neglect.  Throughout her childhood, she suffered severe and repeated physical, sexual, and emotional abuse, some of which occurred in DCF

---

second, Doe v. Dzurenda, 15-cv-498 (filed April 6, 2015), sought damages for the same violations of federal rights alleged here. Both actions were voluntarily dismissed.  Plaintiff moved to dismiss the second action without prejudice after she filed this action arguing that it would serve to moot issues relating to the exhaustion requirement. In support she cited cases permitting litigants who filed lawsuits as prisoners to refile their suits after release like any other non-prisoner litigant. See Harris v. City of New York, 607 F.3d 18, 24 (2d Cir. 2010)(plaintiff whose suit is dismissed under the PLRA's three-strikes provision but has been released can refile and seek in forma pauperis status like any non-prisoner); Dilworth v. Goldberg, No. CIV. 2224 RJH GWG, 2011 WL 3501869, at*15 (S.D.N.Y. July 28, 2011)(declining to dismiss for non-exhaustion claims refiled after release), report and recommendation adopted, 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). The motion was granted over defendants' objection.  In support of the present motion to dismiss, defendants again assert that the action is barred by plaintiff's failure to exhaust.  I agree with plaintiff that her failure to exhaust administrative remedies in connection with the prior actions does not warrant dismissal here.

placements.  At all relevant times, she suffered from depression, post-traumatic stress disorder, anxiety, developmental trauma disorder, and gender dysphoria, which substantially limited activities of eating, sleeping, learning, concentrating, thinking, communicating and interacting with others.  Before the events at issue, DCF recognized plaintiff as a transgender girl and provided her with hormone therapy and other transition-related services.

Between the ages of nine and sixteen, while in DCF placements, plaintiff "exhibited a history of assaultive behavior."  In re Doe, 2014 WL 2600505, at *1.[4]  "There were eleven occasions in which police were called to either a facility or a program regarding an incident with [her]."  Id.[5]  Plaintiff exhibited assaultive behavior toward staff members and peers, including females.  Id.

On November 21, 2013, plaintiff was adjudicated delinquent following her plea of guilty to assault on an officer in violation of Conn. Gen. Stat. § 53a-167c.  She was committed to DCF custody for up to eighteen months pursuant to Conn. Gen. Stat. § 46b-140.

---

[4] The facts drawn from In re Doe are taken from findings of fact in the Court's opinion dated May 6, 2014.  The findings were made by a preponderance of the evidence following an evidentiary hearing spanning six days in which plaintiff was represented by counsel.
[5] These incidents occurred at ages nine, ten, eleven, twelve, fourteen, and sixteen. Id.

5

Pursuant to this delinquency conviction and order of commitment, DCF initially placed plaintiff at Meadowridge Academy in Massachusetts, a therapeutic boarding school that provides specialized trauma-informed treatment services. In re Doe, 2014 WL 2600505, at *2. Plaintiff was placed in the girl's dormitory. Id. During her two-month placement at Meadowridge, she "committed multiple assaults, first pulling the hair and spitting on one staff member, kicking another, and attacking another student, pulling her hair and scratching and punching her." Id. Then, on January 28, 2014, she attacked a female staff member and was discharged from Meadowridge. Id.

At a subsequent hearing on the issue of plaintiff's dangerousness, the Superior Court credited the testimony of the victim of the assault and found as follows:

> The assault occurred after the Respondent was agitated and the assaulted staff member and another staff member were trying to calm her down. The Respondent made threats that she would punch or cut the two staff members. The other staff member grabbed the Respondent. She pulled an arm free, which the assaulted staff member tried to hold down. The Respondent then ripped at her hair and bit her, leaving puncture wounds. All three fell to the ground, after which the Respondent, wearing army boots, kicked the assaulted staff member in the head, arm, face, and ear. The assaulted staff member believes she was kicked six times. She estimated that the Respondent weighed approximately 180 pounds and stood five feet eight inches, compared to her own 135 pounds and five feet five

6

inches.

Id. (citations of hearing transcript omitted).

On January 31, 2014, following plaintiff's discharge from Meadowridge, DCF placed her at the Connecticut Juvenile Training School ("CJTS"), a high security facility for boys in DCF custody.[6] Plaintiff obtained an injunction requiring DCF to house her apart from the general population at CJTS.[7] She was placed in a housing unit that included small rooms for sleeping and a large room containing a table, chairs and television. She remained there for nine weeks. Throughout this time, she was restricted to the housing unit and was not permitted to go outdoors. At all times when she was in the housing unit, two DCF employees were present in the unit with her. Initially, she was the only child in the unit. Later, an injured boy was placed in the unit. Other than interactions with this boy, plaintiff had no contact with any other child. With the exception of occasional professional visits, her contact with adults was limited to employees of DCF.[8]

─────────────────

[6] CJTS closed in 2018.

[7] See In re Doe, 2014 WL 2600505, at *2 ("[Plaintiff's] attorney filed and was granted a temporary injunction preventing CJTS from housing her with the general population of the school based on her statement that she was scared to enter the general population of the school.").

[8] Defendants provide the following description of plaintiff's placement at CJTS:
While at CJTS, [plaintiff] was initially kept in an eighteen-bed unit by herself with two full-time staff around the clock.

A few days after placing plaintiff at CJTS, DCF filed a motion in Superior Court pursuant to Conn. Gen. Stat. § 17a-12 to transfer her to the John R. Manson Youth Institution ("Manson"), a high security facility operated by DOC for males under 21, many with pending adult charges or serving adult sentences.  Section 17a-12 had been used only once in the previous fourteen years, for an individual who was not living under the care and custody of DCF's guardianship.

"In order to make a transfer decision [pursuant to § 17a-12], a fact finder must consider whether such a transfer is in a child's best interest, whether a child is dangerous to himself, herself or others, whether DCF cannot safely retain the child's custody, and whether DOC offers a suitable environment for such a juvenile."  In re Angel R., 157 Conn. App. at 850 (citing In re Steven M., 264 Conn. 747, 756–57 (2003)).  Plaintiff opposed the

---

Staff tried to provide her with educational and recreational activities on a one-to-one basis.  She initially refused to participate in any of the individualized programming, but later began to participate in the individualized programming provided. The CJTS staff member in charge of [plaintiff's] compliance with the behavioral level system implemented at CJTS stated that [she] was "on level," but also stated that she did not have to meet any requirements to stay on level because she did not participate in the programs that were offered in the general population units.  CJTS eventually moved one male student who was recovering from a broken jaw into the unit with her.  They [were] on opposite ends of the unit, which is structured as a semicircle lined with individual rooms for each resident. A common area separate[d] [plaintiff] and the male resident and two staff members [were] present at all times.

transfer on the grounds that DOC would confine her to a cell for twenty-three hours a day, deny her appropriate programing, and place her with males.  As an alternative, she asked to be placed at the recently opened Pueblo Unit, a locked DCF facility for girls adjacent to CJTS. In re Doe, 2014 WL 2600505, at *5.  While the litigation was pending, plaintiff remained at CJTS.

On April 8, 2014, following a six-day evidentiary hearing, the Superior Court (Kaplan, J.) granted DCF's motion to transfer plaintiff to DOC custody.  The Court found by a preponderance of the evidence that plaintiff was "clearly too dangerous to be held at CJTS or any facility run by DCF."  Id. at *5.  It was also "clear" that continuing to house plaintiff "in solitude or near solitude" was "not in [her] best interest."  Id. at *10.  Plaintiff's request to be transferred to the Pueblo Unit was denied.  The Court stated that "housing plaintiff at the DCF girl's facility would be just as difficult as housing her at CJTS in view of her history of assaulting female staff and other female residents, which made her equally dangerous in [a] women's juvenile facility."  Id.  Because plaintiff is transgender, she was ordered transferred to York Correctional Institution, a high security adult women's prison operated by DOC.[9]

---

[9] The Court provided the following reasons for transferring plaintiff to York instead of Manson:

In support of its finding that plaintiff was too dangerous to be held at a DCF facility, the Court relied on the testimony of defendant Rosenbeck, the Director of CJTS, who described plaintiff as "the most dangerous resident they have had at CJTS." Id. at *4. At the hearing, Rosenbeck testified regarding "specific behaviors that made [plaintiff] especially dangerous and difficult to secure: an inability to de-escalate, targeting of female staff, and smearing of feces. Id. at 1. He stated that the incidents became steadily more aggressive and intense as [plaintiff] increased in size and strength," and that "he had not seen the same level of behavior in any other juveniles at the training school." Id. He further stated that "CJTS staff are often assaulted, but that this is in the

---

The Respondent was previously classified as female by DCF, the Court Support Services Division, and the Massachusetts placement. She attends the GUIPPE Program at Connecticut Children's Medical Center, which deals with issues faced by transgendered youth. Given this prior classification, the court is inclined to send her initially to the women's DOC facility in Niantic [i.e. York] for assessment. The decision as to whether a transgender girl should be treated as male or female requires a complex assessment. There is insufficient evidence that DCF performed an evaluation before reversing its policy of treating the Respondent as female. The court recognizes that determination of her long-term placement will be best left to DOC's expertise. It also recognizes that DCF maintains the ability to recall the Respondent from DOC custody at any time. Once the Respondent is transferred to [York], DOC may perform whatever evaluations it deems necessary in keeping with state and federal law to determine where the Respondent should be housed.
In re Doe, 2014 WL 2600505, at *10.

course of an intervention, when they are trying to break up a fight between residents. [Plaintiff] in contrast, specifically target[ed] staff members." Id. "When asked whether placement in DOC was in plaintiff's best interest given her trauma history, Rosenbeck stated that plaintiff needed to be transferred to DOC due to her dangerousness, even though that would not necessarily be best for anyone who had experienced trauma." Id. at *5.

The transfer order directed that plaintiff "be held in isolation [at York] for no more than 72 hours," and that she be "examined, evaluated and classified under the appropriate State and Federal statues, guidelines, rules and procedures." Id. at *11. The order provided that, "[f]ollowing the classification process, the Commissioner of Correction shall make his own placement determination." Id. The order noted that DCF's Commissioner retained statutory authority under Conn. Gen. Stat. § 17a-13 to remove plaintiff from DOC custody at any time. Id.

Plaintiff appealed the transfer order on the ground that § 17a-12, as applied to her, violated due process because, among other reasons, it permitted the court to order her transferred to DOC without requiring DCF to prove its allegations by proof beyond a reasonable doubt. The Connecticut Appellate Court ultimately reversed the order. In re Angel R., 157 Conn. App. at 862. The Court

recognized that a child in DCF custody due to a delinquency adjudication retains a liberty interest in avoiding transfer to an institution operated by DOC because DOC does not operate under the child-protective mandates applicable to DCF;[10] and the child-protective features of DCF's operations are "notably absent" from DOC's charter.[11]  In view of this disparity, a juvenile's liberty interest in avoiding transfer to DOC custody requires DCF to prove facts justifying a transfer by clear and convincing evidence.  Id. at 853–54.  Because DCF was not held to a clear and convincing standard regarding plaintiff's level of dangerousness or its inability to safely maintain her in its care, plaintiff was denied due process.  Id. at 858, 862.

---

[10]   Under Conn. Gen. Stat. § 46b-121h, the goals of the juvenile justice system are to: "(1) Hold juveniles accountable for their unlawful behavior; (2) Provide secure and therapeutic confinement to those juveniles who present a danger to the community; (3) Adequately protect the community and juveniles; (4) Provide programs and services that are community-based and are provided in close proximity to the juvenile's community; (5) Retain and support juveniles within their homes whenever possible and appropriate; (6) Base probation treatment planning upon individual case management plans; and (7) Include the juvenile's family in the case management plan . . . ."

[11]DOC's mission statement reads:

"The [DOC] shall strive to be a global leader in progressive correctional practices and partnered re-entry initiatives to support responsive evidence-based practices aligned to law-abiding and accountable behaviors.  Safety and security shall be a priority component of this responsibility, coinciding with an unwavering respect for the human dignity of staff, victims, citizens and offenders."  DOC Administrative Directive 1.1.

Following issuance of the transfer order on April 8, plaintiff was immediately transferred from CJTS to York, where she remained until June 24, a period of approximately 11 weeks. Throughout her stay at York, plaintiff's placement was indefinite and she was given no specific guidelines for what she needed to do to be moved out of the prison.

During her first five weeks at York, plaintiff was held in a locked cell in the mental health unit for approximately 21 to 22 hours per day. She had one hour of solitary recreation each day, and received limited educational services in another cell in the mental health unit. While in her cell, plaintiff was watched at all times by a correctional officer, including when she showered and used the toilet.

On May 13, plaintiff was moved to a self-contained housing unit at York consisting of three rooms and a bathroom. Plaintiff slept in one of the rooms and was observed by correctional officers through a window in the door of the room. The bathroom door also had a window. At all times, at least two officers were inside the unit with her. She was able to walk outside the unit into a small outdoor space.[12]

---

[12] Defendants provide a less stark description of the housing unit. They state that "DOC built a single occupancy apartment for plaintiff, complete with a small kitchenette, and a television, with sliding doors to an outdoor patio and garden area."

13

Plaintiff spent approximately 23 hours a day in the unit or immediately outside it.  She left the unit for recreation in the prison gym for one hour per day, and for occasional professional visits. She was subjected to strip searches in connection with these visits, which caused her severe distress given her trauma history and gender dysphoria.

Plaintiff received limited educational services in the housing unit each weekday.  DCF said she could be transported to CJTS to attend school there, and DOC said she could attend school with adult inmates at York. Plaintiff declined to place herself in either environment because she feared she would be ridiculed, harassed and physically assaulted.[13]

---

[13] Regarding services plaintiff received at York, defendants state: "DOC provided a medical and mental health intake screening and assessment. This resulted in an individualized treatment plan developed by psychiatrists with age and gender appropriate experience and training. DOC's mental health staff also provided numerous individual sessions with [plaintiff], including sessions with a psychiatrist and a psychologist and the regular provision of art therapy."  They add that plaintiff's "mental health [was] noted to be stable throughout her placement at York," and that, although "she generally cooperated with mental health assessments," she "remained relatively unengaged with treatment, claiming to both DOC and DCF staff that she [did] not have any need for therapy." Defendants state that DOC "continued to support the plaintiff's transgender status" and provided her with "a continuity of care" that included "regular transportation to the GUPPE Program at the Connecticut Children's Medical Center, visits and phone calls with the True Colors organization, and with an individual transgender mentor, whose visits at York CI were facilitated by both DCF and DOC."

Approximately six weeks later, on June 24, DCF Commissioner Katz removed plaintiff from York and placed her at the Pueblo Unit.  At Pueblo, plaintiff was positively engaged in individual and group therapy and in school work.  On July 12, plaintiff was involved in a fight with three other Pueblo residents.  All four were restrained and DCF records describe all four as hitting each other and staff.  Within hours of the fight, DCF returned plaintiff to CJTS.  The others were not removed from Pueblo. Due to additional delinquency proceedings relating to the events at Pueblo, plaintiff was subsequently committed to DCF custody until April 2016.

On returning to CJTS, plaintiff was placed in the same housing unit where she resided before going to York. She was required to be in her room from 8:30 p.m. to 7:30 a.m.  While in the day room, she was observed by two CJTS staff members who remained with her at all times.  Other CJTS staff members came to this room to meet with her. Her only human contact, other than occasional professional visits, was with CJTS staff.  Plaintiff declined to be housed with the male population because she feared she would be harassed, humiliated, and assaulted.

From July 12 until August 15, plaintiff was not permitted to go outdoors.  Subsequently, she went out for one hour of recreation a day.  At times, she declined offers to go outside when boys were present.

Plaintiff was required to wear the same uniform as the boys and was not permitted to use make-up or wear a wig.  Prior to October 2014, when she was allowed to use hair extensions, she could not express herself physically as a girl. It is psychologically damaging and harmful for a transgender female to be placed in a male facility and to be unable to express herself as female.

Other than unauthorized contact with peers on September 16, plaintiff's first interaction with peers came on December 23, 2014.  Until shortly before December 23, she was not informed when she would next interact with peers.

At both CJTS and York, plaintiff experienced increasing levels of stress, frustration, anxiety, loneliness, depression and trauma.  Her mental and emotional distress was exacerbated by her history of severe abuse and trauma.  She was not provided with intensive individual psychotherapy and had no opportunity to participate in group therapy with peers.[14]

---

[14] Defendants provide the following statement regarding what occurred after plaintiff returned to CJTS:
DCF continued to arrange for ongoing medical, educational, substance abuse, and mental health treatment services. Included during times of the plaintiff's placements at CJTS were the following: school, offered daily (including math, English/literature, science, civics); art- and music-based therapy (total of three times weekly); individual counseling (to include counseling directed to past trauma and mental health needs and counseling for substance abuse); physical exercise (daily, including time outside for large muscle activity).

## II. Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met if the factual allegations plausibly satisfy the elements of a cognizable legal claim. Conclusory allegations and legal conclusions are not entitled to the assumption of truth. Iqbal, 556 U.S. at 678-79.

## III. Discussion

### A. Constitutional Claims (Counts One through Four)

---

DCF also continued to facilitate transgender-specific treatment through CCMC, for endocrinology and hormone therapy. Regarding related services, DCF arranged for a transgender "life coach" – an adult transgendered person who specializes in providing assistance to others. It also coordinated with the True Colors program, and the plaintiff in fact engaged with activities through that program. Significantly, DCF also coordinated with The Institute of Living (IOL), in Hartford, to add the plaintiff to a special transgender youth service program. On the first date that the plaintiff was brought to IOL for an orientation to the program, however, she ran from DCF staff, was on escape status, only found later elsewhere in the Hartford community. The plaintiff ultimately was convicted for this escape (Conn. Gen. Stat. § 53a-171). In 2015, DCF arranged for the plaintiff to reside at a therapeutic group home, the Alison Gill Lodge in Manchester. While there, the plaintiff left the facility (on "AWOL" a number of times and engaged in substance abuse. After about ten weeks of attempting to maintain this placement for the plaintiff, she was again returned to CJTS. In October 2015, the plaintiff was returned to her mother's home, with offers from DCF for both continuing child protection-based and juvenile-justice based services. The plaintiff has not been in State custody since then.

17

<u>The Complaint States a Claim for Relief Based on Prolonged Isolation In Violation of Substantive Due Process</u>

The gravamen of the damages claims against the individual defendants is that they caused plaintiff harm by "confining [her] in isolation for extended and indefinite periods." The complaint alleges that plaintiff's confinement at CJTS and York approximated solitary confinement and caused her to suffer physical pain and mental and emotional anguish. In addition, it denied her opportunity for healthy development of relationships with peers and adult role models and deprived her of access to needed services.

Defendants deny that plaintiff was held in conditions approximating solitary confinement and contend that their actions were at all times consistent with individualized treatment plans that complied with accepted standards. In addition, they contend that they are entitled to quasi-judicial absolute immunity - because plaintiff was confined in conformity with court orders - and qualified immunity - because plaintiff is applying novel legal theories to highly unusual facts.

Qualified immunity protects state officials against damages claims under § 1983 if the federal right they allegedly violated was not clearly established at the time. It is therefore necessary to determine what federal right may have been violated by plaintiff's

18

prolonged isolation, as alleged in the complaint, and whether it was so clearly defined by controlling authority in 2014 as to defeat qualified immunity.

Plaintiff contends that her isolation at CJTS and York violated requirements of substantive due process under the Fourteenth Amendment.[15] She relies on Youngberg v. Romeo, 457 U.S. 307 (1982), where the Court recognized that individuals held by the state in non-criminal confinement are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Id. at 322.[16] In addition, she contends that her isolation violated the cruel and unusual punishments clause of the Eighth Amendment.

Defendants do not dispute that as a child held by the state in non-criminal confinement, plaintiff was protected by the substantive due process right recognized in Youngberg. Nor do they dispute that plaintiff was protected by the Eighth Amendment's ban on cruel and

---

[15] The Fourteenth Amendment's due process clause has a substantive component that bars certain state actions "'regardless of the fairness of the procedures used to implement them.'" County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).
[16] In Youngberg, an adult with profound intellectual and developmental disabilities who had been institutionalized claimed a right to safe conditions, freedom from bodily restraints, and minimally adequate "habilitation," defined as training and development of needed skills. The Court sustained his claim in substantially all respects.

19

unusual punishments.  They contend instead that plaintiff was not deprived of these protections.

No Supreme Court or Second Circuit case considers whether Youngberg protects minors held in non-criminal confinement.  Soon after Youngberg was decided, however, the Second Circuit extended its protections to "'anyone in a state institution' regardless of how they came to be institutionalized." J.M. v. Sessions, 162 F.4th 364,369 (2d Cir. 2025)(quoting Soc'y for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1246 (2d Cir. 1984).  Other circuits have recognized that Youngberg applies to juveniles held by the state in non-criminal confinement.  See Gary H. v. Hegstrom, 831 F.2d 1430, 1431-32 (9th Cir. 1987); Hewett v. Jarrard, 786 F.2d 1080, 1084-85 (11th Cir. 1986); Santana v. Collazo, 714 F.2d 1172, 1179-81 (1st Cir. 1983); Milonas v. Williams, 691 F.2d 931, 942 (10th Cir. 1982).  And district courts uniformly agree that Youngberg applies in this context.

With regard to the Eighth Amendment, there is a similar lack of controlling authority. However, in Ingraham v. Wright, 430 U.S. 651 (1977), the Supreme Court determined that the Eighth Amendment protection against cruel and unusual punishments applies only to prisoners confined pursuant to a criminal conviction. Id. at 671-72 and n. 40.  On this basis, the Second Circuit has held that a pretrial detainee's claims of unconstitutional conditions of confinement are governed

20

by the due process clause rather than the cruel and unusual punishments clause.  See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017).  Under Darnell, "to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, [a] pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee[,] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.  In other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively."  Id. at 35.[17]

---

[17] Darnell relied on the holding in Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015), that excessive force claims brought under the Fourteenth Amendment do not require the same subjective intent standard as excessive force claims brought under the Eighth Amendment.  Prior to Kingsley, the same standard of subjective deliberate indifference – equivalent to recklessness under criminal law - applied to both types of claims.  Kingsley relied on the holding in Bell v. Wolfish, 441 U.S. 520, 541-43 (1979), that a pretrial detainee can prevail on a due process claim "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."  Kingsley, 576 U.S. at 398.  The opinions in Kingsley and Darnell were issued after the events at issue here.

A pretrial detainee and a juvenile confined pursuant to a commitment order based on conduct that would be a crime if committed by an adult are not similarly situated in all material respects.  But in neither context has the individual been convicted of a crime rendering him subject to punishment.  See Bell, 441 U.S. at 535 n. 16. Accordingly, I conclude that the Eighth Amendment does not directly apply in this case.  See Jackson v. Johnson, 118 F. Supp. 2d 278, 287 (N.D.N.Y. 2000), aff'd in part, dismissed in part, 13 F. App'x 51 (2d Cir. 2001)(applying Fourteenth Amendment rather than Eighth Amendment to claims arising from use of potentially dangerous restraint technique in juvenile detention center).[18]

Under Youngberg, an individual held by the state in non-criminal confinement is entitled to "conditions of reasonable care and safety," and "reasonably nonrestrictive confinement conditions."  457 U.S. at 324. A state may restrain residents of an institution "when and to the extent professional judgment deems this necessary" to "assure" "reasonable safety for all

---

[18] On the appeal in Jackson, the Second Circuit considered whether denial of a motion for summary judgment based on qualified immunity was appealable.  The Court stated that whether the defendant's response to the potential dangers of the restraint technique "was reasonable or constituted deliberate indifference to [his] constitutional rights is a question for a jury to determine."  13 F. App'x at 54.  This framing suggests that an objective deliberate indifference standard should be applied to claims by juveniles seeking damages for harm caused by dangerous conditions of confinement.

residents and personnel within the institution." Id. at 324. Unlike in the criminal context, punishment as retribution is not a legitimate objective.[19]

Youngberg provides that a defendant's conduct may violate due process if it "substantially depart[s] from accepted professional judgment, practice, or standards." Id. at 323. In Santana, the First Circuit applied this test to a claim for prospective relief with regard to the use of prolonged isolation in a juvenile detention facility. In deciding what federal right may have been violated in the present case, I am guided by the First Circuit's decision.[20]

---

[19] A Fourteenth Amendment standard that prohibits punishment of juveniles held in non-criminal confinement is further supported by the rehabilitative objectives of juvenile justice. See Pena v. New York State Division for Youth, 419 F. Supp. 203, 206 (S.D.N.Y. 1976); see generally, Restatement of the Law - Children and the Law § 12.21 cmt. a (Tentative Draft No. 6 2024)("Youths in correctional facilities have a more robust liberty interest under the Fourteenth Amendment than do adult prisoners, whose interest is minimal. Although both justice systems aim to hold offenders accountable for their offenses, the juvenile justice system gives far greater weight to the goal of rehabilitation and reintegration of young offenders into society as a key purpose of confinement and withdrawal of individual liberty.").

[20] Santana was a class action challenging conditions of confinement in two juvenile detention facilities in Puerto Rico. See 793 F.3d at 41-42. There were two appeals. Id. at 42. On the first appeal, the Court resolved some issues and remanded for further proceedings on the issue "whether isolation as imposed on juveniles at [one of the facilities] satisfie[d] constitutional standards." Id. On the appeal following the remand, the Court engaged in the analysis followed here.

In Santana, the Court stated that it was necessary to consider the nature and duration of the restrictions on the liberty of the juveniles placed in isolation, whether there was a reasonable relationship between the isolation and the interests in safety, security and rehabilitation, and whether the isolation accorded with the considered judgment of a qualified professional as to what was necessary to serve these interests. 793 F.2d at 44-48. The Court stated that "If the need for extended isolation, can be *significantly* reduced or eliminated by other equally effective but less confining methods requiring relatively minimal additional effort, it is unreasonable not to use them." Id. at 45. (emphasis in original).[21]

The Court was unwilling to assume that the interests in protecting juveniles from harm, discouraging offending behavior and preventing escapes justified confining juveniles in isolation for as long as twenty days. Testimony by the plaintiffs' experts suggested that extended isolation for the most serious offenders within a juvenile facility might be reasonable, particularly if no other options are available. Id. at 47. But the plaintiffs' experts and national standards favored only the briefest commitments to isolation and courts had with

---

[21] The Court considered it "unlikely that, under Youngberg, 'reasonableness' in this context means that corrections officials are bound to employ the 'least restrictive" alternative.'" Id.

near unanimity limited isolation of juveniles to twenty-four hours, with only rare exceptions allowed.  Id. 45-46 and n.7 (citing cases).[22]   To show that prolonged isolation was reasonably related to justifiable institutional objectives, the defendants would have to show that "whatever legitimate needs are served by extended isolation are unlikely to be achieved by resort to other less burdensome practices such as shorter periods of isolation and/or a system of incentives and deterrents based on the granting and deprivation of privileges."  Id. at 46.  The case was remanded to enable the district court to "thoroughly explore defendants' professed need to use prolonged isolation, including the practicability of less restrictive alternatives."  Id. at 48.

Plaintiff submits that defendants substantially departed from accepted practice by isolating her at CJTS, then at York, then again at CJTS.  In support she cites R.G. v. Koller, 415 F. Supp. 2d 1129 (D. Haw. 2006), where Youngberg was applied to claims of a "gay female," a "boy who was perceived to be gay," and a "transgender girl" who challenged the conditions of their confinement in a secure juvenile correctional facility.  Id. at 1133. The facility used isolation as a means of protecting the

---

[22] The Court cited U.S. Department of Justice standards limiting confinement of juveniles to twenty-four hours, and American Bar Association standards setting a maximum of eight hours of isolation for safety reasons.

plaintiffs from harassment and abuse by other teenagers. Id. at 1148, 1154.[23]  Relying on expert testimony that "long-term segregation or isolation of youth [held in secure detention] is "well outside the range of accepted professional practices," id. at 1155, the Court determined that "[c]onsistently placing [LGBT] juvenile wards in isolation, not to impose discipline for violating rules, but simply to separate [them] from their abusers" was "at best, an excessive, and therefore unconstitutional, response to legitimate safety needs of the institution."  Id. at 1155-56.

Defendants respond that plaintiff was never held in "solitary confinement," defined as "the confinement of a

---

[23] The Court summarized the facts relating to the isolation claim of the transgender girl – referred to as "C.P." – as follows: [I]n response to C.P.'s complaints of harassment, defendants first subjected her to social isolation by physically segregating her from the other wards in the module and later by sending her to a holding cell.  When not locked down, C.P. was instructed by [staff] not to have anything to do with any of the male wards—she was not supposed to sit with or near them, speak with them, look at them, or interact with them in any way. When C.P. returned to [the facility] in August 2005, defendants held her in solitary confinement for six days, again, allegedly for her "protection." She was isolated in a holding cell under video surveillance for twenty-three hours a day, with nothing in her cell other than her pillow and a blanket. She was allowed one hour a day to leave the cell for recreation and showering. She was not permitted letters, writing instruments, radio, or television, nor was she allowed to interact with any other wards. C.P. reported to medical staff that she was "going crazy" in the holding cell.
415 F. Supp. 2d at 1148 (citations to hearing transcript omitted).

prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction."[24]   They state that plaintiff was "in almost constant contact" with "caseworkers, social workers, psychologists, school teachers, attorneys, advocates and others, all of whom visited and interacted with [her] on a daily basis." She had "frequent visits by all types and varieties of child care and mental health professionals" and was provided with "gender appropriate services," including visits to the Connecticut Children's Medical Center "for continuity of care" as a "transgender youth."[25]

---

[24] The quoted definition is taken from an article cited in plaintiff's briefing.  See Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J.L. & Pol'y 325, 327 (2006).  In a more recent article by another author that addresses isolation of juveniles, "solitary confinement" is similarly described as "the physical and social isolation of an individual within a single cell for twenty-two and one-half to twenty-four hours per day" where "[a]ny remaining time is generally spent in a barren yard, or cage."  Deborah Paruch, The Solitary Confinement of Juveniles: It Is A Cruel and Unusual Punishment, 57 Idaho L. Rev. 689, 716–18 (2021).  This article notes that while there is no established definition of "solitary confinement" used in correctional facilities, "three factors are present in all solitary confinement schemes: social isolation, reduced activity and environmental input, and loss of autonomy and control over almost all aspects of daily life."  Id.

[25] Defendants add that "at all relevant times plaintiff was treated within the guidelines of individually tailored treatment plans developed by child care professionals, with expertise in dealing with plaintiff's issues."  But these plans are not part of the record and neither the complaint or the decision in In re Doe provides information concerning the contents of any treatment plan at CJTS or York.  Though it is reasonable to presume that treatment

Defendants further submit that the restrictive conditions of plaintiff's isolation were reasonably necessary for her safety and the safety of others. With regard to plaintiff's safety, they emphasize that her own concern about the risk of being harassed, abused and assaulted at CJTS resulted in the issuance of the injunction requiring that she be housed apart from the general population. With regard to the safety of others, they point to plaintiff's history of violent assaults on staff and other juveniles, including females, which the Superior Court cited in ordering her transferred to York on the ground that she was too dangerous to be housed at any DCF facility.

Defendants' arguments have force. The conditions of plaintiff's confinement, as alleged in the complaint, differ markedly from the conditions that characterize solitary confinement as defined above. Based on the allegations of the complaint, it appears that plaintiff may have been held in conditions approximating solitary confinement during her first five weeks at York, where she remained in a locked cell for 21 to 22 hours per day, but not otherwise. The injunction requiring DCF to house plaintiff separately at CJTS, and the order transferring

plans were in place, I cannot presume that the plans specifically called for the nature and duration of the isolation alleged in the complaint or did so in accordance with accepted standards.

her to DOC custody have obvious significance for the reasonableness of her isolation.  And plaintiff's own preference for avoiding interaction with boys at CJTS and adult females at York, as alleged in the complaint, bears on the reasonableness of her social isolation.

Nonetheless, it is plausible that the nature and duration of the isolation alleged in the complaint violated plaintiff's right to reasonably nonrestrictive conditions of confinement under Youngberg.  Accepting the complaint's allegations as true, plaintiff was isolated in a locked cell for 21 to 22 hours a day for five weeks in the mental health unit at York. As the First Circuit recognized in Santana, much shorter periods of isolation can violate due process.

Moreover, the standard of objective deliberate indifference adopted in Darnell for due process claims by pretrial detainees could support a plaintiff's verdict here.  Under this standard, deliberate indifference could be found if a defendant unreasonably failed to reduce plaintiff's isolation even though the defendant knew, or should have known, that it posed an excessive risk to her health or safety.  Darnell, 849 F.3d at 35.  The complaint alleges that defendants were aware of plaintiff's serious medical conditions, her trauma history, and the harms of prolonged isolation on juveniles generally and on traumatized transgender youth specifically, yet isolated her for lengthy periods at CJTS, then York, and then

29

again at CJTS.  Accepting these allegations as true, a jury could find that defendants should have been aware that the nature and duration of plaintiff's isolation in the mental health unit at York, and potentially even at other times, created a substantial risk of serious harm to her mental health.  See V.W. by & through Williams v. Conway, No. 9:16-CV-1150, 2017 WL 696808, at *19 (N.D.N.Y. Feb. 22, 2017) (enjoining defendants from imposing disciplinary isolation on juveniles in view of "broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults").

A jury could also find that defendants failed to take reasonable steps to abate this risk.  Plaintiff's allegations suggest that she could have been placed in significantly less confining conditions without jeopardizing legitimate safety or security objectives. She does not specifically allege what those conditions would have entailed either at CJTS or York.  Nonetheless, it is plausible that defendants may have failed to take reasonable steps to mitigate the negative effects of plaintiff's isolation. I therefore conclude that she has sufficiently alleged a plausible claim for objective deliberate indifference, the standard that now applies

to due process claims of institutionalized persons under Darnell.[26]

The plausibility of plaintiff's due process claim is further supported by the JJDPA and PREA, which are discussed below in connection with plaintiff's claims based on these statutes.  Defendants do not dispute that both statutes may help define the content of liberty interests protected by the Fourteenth Amendment.  And at least one federal court has recognized that failure to conform to PREA regulations may provide evidence of a substantial departure from prevailing standards for purposes of Youngberg.  See Walsh v. N.J. Department of Corrections, Civil Action No. 17-2442 (JBS-AMD), 2017 WL 3835666, at *3 n.5 (D.N.J. Aug. 31, 2017)("If a prisoner has a constitutional cause of action, such as for a deliberate indifference to dangerous conditions of confinement, the fact that a prison facility may have failed to adopt and enforce the [PREA] national standards may, or may not, be evidence of deliberate indifference depending on the circumstances.").

Absolute Quasi-Judicial Immunity Does Not Apply to the Prolonged Isolation Alleged in the Complaint

---

[26] In this regard, it is plausible that defendants could have done more without compromising safety and security to reduce the total amount of time plaintiff was required to spend in isolation, to provide her with longer respite periods from isolation, to reduce or eliminate restrictions on her ability to exercise or spend time outdoors, and to provide services and programs tailored to her particular needs as a traumatized transgender youth.

Defendants move to dismiss the damages claims against the DCF and DOC officials in their individual capacities on the ground that they are entitled to absolute quasi-judicial immunity.  They state that the DCF defendants were operating under a court injunction to keep plaintiff separate from the general population at CJTS and the DOC defendants were obliged by the transfer order to incarcerate her at York.  Plaintiff responds that quasi-judicial immunity does not apply to the discretionary administrative decisions made by the defendants to keep plaintiff in isolation at both facilities.  I agree.

Whether an official has quasi-judicial absolute immunity depends on the nature of the official's activities and the relationship of the activities to the judicial process.  See Imbler v. Pachtman, 424 U.S. 409, 430 (1976) (prosecutor has absolute immunity for activities intimately associated with judicial phase of criminal process).  Judges themselves have absolute immunity for decisions they make as adjudicators, but not for decisions they make as administrators.  Forrester v. White, 484 U.S 219, 227 (1988)(we must "draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges.").  An official may be entitled to quasi-judicial immunity for acts performed as an agent of a

court in connection with a case but only to the extent the acts are done with the authorization or approval of the court.  See Gross v. Rell, 695 F.3d 211, 216-17 (2d Cir. 2012)(conservator immune from suit only to the extent she acted with authorization or approval of Probate Court).

The injunction requiring plaintiff to be housed separately from the general population at CJTS is not in the record.  While it is reasonable to presume that the DCF defendants were complying with the terms of the injunction in isolating plaintiff from male peers, I cannot presume that the injunction required them to keep her in the restrictive conditions alleged in the complaint throughout the time she was at CJTS pending the outcome of the transfer litigation.

The order authorizing plaintiff's confinement at York expressly prohibited holding her in isolation for longer than 72 hours and required that she be classified by the DOC defendants in accordance with applicable statutes and regulations.  The 72-hour limit was consistent with the Court's finding that continuing to confine plaintiff in seclusion or near total seclusion was clearly not in her best interest.  Viewed in the context provided by this finding, the Court seems to have expected DOC officials to make a classification decision during the 72-hour period that would enable plaintiff to spend less time in seclusion or near total seclusion.

Accepting plaintiff's allegations as true, she was nonetheless held in seclusion or near total seclusion in the mental health unit for five weeks.

### Qualified Immunity Applies to the Prolonged Isolation Claim

Defendants also move to dismiss these claims on the basis of qualified immunity.  Plaintiff responds that whether qualified immunity applies cannot be resolved on the basis of the present record.  Though it is rarely possible to resolve issues of qualified immunity on a motion to dismiss, I conclude that the allegations of the complaint and the decision in In re Doe provide a sufficient basis for determining that qualified immunity applies.

The Supreme Court recently reversed a decision of the Second Circuit denying qualified immunity.  Zorn v. Linton, 607 U.S. ___, 146 S. Ct. 926 (March 23, 2026)(per curiam).  In doing so, the Court restated the controlling principles:

> Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law. Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curiam). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Ibid.  A right is not clearly established if existing precedent does not place the constitutional question "'beyond debate.'" Ibid.

34

> To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances ... was held to have violated" the Constitution. Escondido v. Emmons, 586 U.S. 38, 43 (2019) (per curiam) (internal quotation marks omitted).  The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal quotation marks omitted).  Principles stated generally, such as that "an officer may not use unreasonable and excessive force," do not suffice. Kisela v. Hughes, 584 U.S. 100, 105 (2018) (*per curiam*).  In short, officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[ n]" that it proscribed their specific conduct. City and County of San Francisco v. Sheehan, 575 U.S. 600, 616, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

Zorn v. Linton, 146 S. Ct. at 930.

The Second Circuit "contravened these principles" because the Circuit case law on which it relied did not "clearly establish that Zorn's specific conduct violated the Fourth Amendment."  Id.  "The Second Circuit concluded otherwise by reading [its precedent] to establish the general principle 'that the gratuitous use of pain compliance techniques – such as a rear-wristlock – on a protestor who is passively resisting arrest constitutes excessive force.'  But that principle . . . lacks the 'high degree of specificity' needed to make it 'clear' to officers which actions

35

violate the law." Id. at 931 (citing Wesby, 583 U.S.at 63). In particular, "[i]t does not 'obviously resolve' whether using a rear wristlock to move a noncompliant protester after repeated warnings violates the Fourth Amendment, as it fails to specify which circumstances make the use of force 'gratuitous.'" Id. "Because the Second Circuit failed to identify a case where an officer taking similar actions in similar circumstances 'was held to have violated' the Constitution, Emmons, 586 U.S., at 43 (internal quotation marks omitted), Zorn was entitled to qualified immunity." Id.

In 2014, no Supreme Court or Second Circuit case, nor any consensus of circuit authority, provided clear guidance to assist the defendants in addressing the issues of safety, security and rehabilitation presented by plaintiff's specific circumstances.[27] Competent officials would know that in the Second Circuit, substantive due process entitled all institutionalized persons to reasonably non-restrictive conditions of confinement. See Soc'y for Good Will to Retarded Children, 737 F.2d at 1246. But that general principle lacked the high degree of specificity to make it clear

---

[27] On the first appeal in Santana, the First Circuit observed that "[t]he Supreme Court ha[d] not addressed the use of isolation in a juvenile detention center." Santana v. Collazo, 714 F.3d 1172, 1179 (1st Cir. 1983). To this day, the practice has yet to be addressed by the Supreme Court or the Second Circuit.

that the restrictive conditions in which plaintiff was held were unreasonably excessive and thus unlawful. Specifically, given the state of the law in this Circuit, it would not have been clear to every reasonable official in the position of the defendants that confining a transgender girl in plaintiff's position in the conditions and for the periods of time alleged in the complaint in the interests of safety, security and rehabilitation was prohibited by the Fourteenth Amendment. Further factual development would not enable plaintiff to show that the law was so clearly established as to defeat qualified immunity.

With regard to plaintiff's initial confinement at CJTS, plaintiff identifies no case clearly establishing that confining a child with her history and characteristics in the housing unit apart from her male peers violated substantive due process. Accepting the complaint's allegations as true, moreover, it is apparent that plaintiff's confinement at CJTS was not obviously unlawful. After plaintiff's unquestionably serious assault on the staff member at Meadowridge, DCF placed her at CJTS and immediately sought judicial authorization to transfer her to DOC custody. The unprecedented nature of the transfer motion underscores the uniqueness of the situation DCF officials faced at the time. Plaintiff obtained an injunction requiring DCF to house her separately because she was "scared to enter the general

population." <u>In re Doe</u>, 2014 WL 2600505, at *2. No controlling authority made it clear that confining her in the housing unit apart from the general population would be so unreasonably restrictive as to violate substantive due process.

Plaintiff opposed DCF's transfer motion and requested placement at the new Pueblo Unit for girls. If the objectives of safety, security and rehabilitation could be equally met by placing plaintiff in significantly less confining conditions with female peers at Pueblo, keeping her at CJTS could violate due process. But it would not have been clear to every reasonable official that failing to place plaintiff at Pueblo pending the outcome of the transfer litigation would violate due process. Indeed, the Superior Court determined that plaintiff was clearly too dangerous at that time to be housed in any DCF facility, including, specifically, the Pueblo Unit.

Similarly, no controlling authority made it clear that confining plaintiff at York in the conditions and for the periods of time alleged in the complaint would violate her right to substantive due process.[28]   The

---

[28] <u>See</u> Ian M. Kysel, <u>Banishing Solitary: Litigating an End to the Solitary Confinement of Children in Jails and Prisons</u>, 40 N.Y.U. Rev. L. & Soc. Change 675, 675-76 (2016)(observing that as of 2016 there was "no case law applying the federal constitution to the solitary confinement of children in adult jails and prisons"); <u>see also</u> Kim Brooks Tandy, <u>Do No Harm: The Enhanced Application of Legal and Professional Standards in Protecting Youth from the Harm</u>

conditions of plaintiff's five-week confinement in the mental health unit, as alleged in the complaint, may be fairly described as approximating solitary confinement, and therefore warrant significant concern under Youngberg. But plaintiff did not want social interaction with adult inmates; the transfer order permitting her incarceration at York necessarily contemplated that she would have little access to other children; and she declined to be transported to CJTS to participate in educational programs with the residents there because she feared being victimized by them. No controlling authority put defendants on notice that in these circumstances isolating plaintiff in the mental health unit as alleged in the complaint would surely violate substantive due process.

The conditions of plaintiff's subsequent six-week confinement at York, although sufficiently restrictive to warrant concern under Youngberg, were materially less restrictive in terms of the elements that define solitary confinement: she lived in a three-room housing unit with

---

of Isolation in Youth Correctional Facilities, 34 Child. Legal Rts. J. 143, 158 (2014)("Importantly, the Supreme Court has not specifically addressed what standard governs the use of isolation for juveniles adjudicated delinquent."); Paul Holland & Wallace J. Mlyniec, Whatever Happened to the Right to Treatment?: The Modern Quest for A Historical Promise, 68 Temp. L. Rev. 1791 (1995)(discussing the need for community-based solutions to the treatment needs of juveniles in confinement in light of the uncertain protection provided by Youngberg and other cases).

access to outdoor space; was in constant contact with staff in the unit; could watch television when she wished; and received educational services. The law did not clearly establish that confining this child in these conditions for six weeks would violate substantive due process.

Plaintiff's subsequent confinement in the housing unit at CJTS differs from her previous confinement in the same unit because it was more prolonged, lasting more than four months. Under Youngberg, if plaintiff's social isolation could be significantly reduced during this period without compromising the interests in safety, security and rehabilitation, defendants were required to make the attempt. The obvious alternative would be to place plaintiff at the Pueblo Unit where she could interact with age-appropriate female peers. However, plaintiff had just been removed from Pueblo for legitimate reasons. Perhaps substantive due process required defendants to give Pueblo another try at some point. But no controlling authority put the matter beyond debate.

Qualified immunity doctrine has been roundly criticized for being overly protective of state officials at the expense of deserving plaintiffs in that it serves to immunize from damages liability all but those who are incompetent or knowingly violate the law. Yet the principles reiterated again by the Supreme Court in Zorn

40

are controlling and must be faithfully applied. I conclude that these principles shield all four of the individual defendants from damages liability on plaintiff's constitutional claims.

B.   JJDPA Claims (Counts Five and Six)

Plaintiff alleges that the defendants violated the JJDPA's prohibition on confining juveniles in adult jails and lockups. See 34 U.S.C. § 11133(a)(13)(to receive federal grants, a state must not detain or confine a juvenile in a jail or lockup for adults except under narrow exceptions). Plaintiff argues that this provision was violated when she was held at York as a juvenile who had not been charged with or convicted of a crime in adult court. Defendants contend that the JJDPA claims must be dismissed because the statute does not create rights privately enforceable through § 1983. Though the issue is not free from doubt, recent Supreme Court decisions support defendants' position.

Legal Framework

Section 1983 authorizes private suits against state actors who violate rights "secured by the Constitution and laws [of the United States]." Federal statutes do not create § 1983-enforceable rights as a matter of course. A statute creates privately enforceable rights only if it "unambiguously confer[s] individual rights upon a class of beneficiaries" through language that is "rights-creating," "individual-centric," and has "an

41

unmistakable focus on the benefited class."  Health & Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166, 183-86 (2023).  This is "a demanding bar cleared only in the atypical case." Medina v. Planned Parenthood S. Atl., 606 U.S. 357, 375 (2025)(internal quotes omitted). Spending-power statutes, which provide for termination of funds as the primary remedy for noncompliance, face heightened scrutiny under this framework.  See Gonzaga University v. Doe, 536 U.S. 273, 280 (2002).

Talevski and Medina clarify the degree of textual specificity required to meet the standard applied in those cases.  In Talevski, two provisions of the Federal Nursing Home Reform Act satisfied the standard: one explicitly guaranteed each resident "the right to be free from" physical or chemical restraints; the other provided that facilities "must not transfer or discharge" a resident absent specified preconditions.  Both provisions used "clear rights-creating language" with "an unmistakable focus on the benefited class."  Talevski, 599 U.S. at 185-86.  In Medina, by contrast, a Medicaid provision requiring states to ensure that eligible individuals "may obtain" assistance from any qualified provider failed to meet the Tavelski standard.  The provision "addresse[d] a State's obligations to the federal government, not the rights of any particular person." Medina, 606 U.S. at 379.

Application to the JJDPA

The JJDPA provision at issue here mandates that a state plan receiving formula grants "shall . . . provide that no juvenile will be detained or confined in any jail or lockup for adults."  34 U.S.C. § 11133(a)(13).  This is a funding condition — it specifies what a state's plan must contain in order to qualify for federal grants — rather than a direct conferral of rights on juveniles confined by the state.

Plaintiff relies primarily on Briggs v. Bremby, 792 F.3d 239 (2d Cir. 2015), where the Court of Appeals held that time limits in the Food Stamp Act are privately enforceable under § 1983.  Briggs applied the framework of Blessing v. Freestone, 520 U.S. 329 (1997), which tests the private enforceabilty of a statute based on whether it uses mandatory language, identifies a defined class of beneficiaries, and establishes a specific prohibition.  The provision of the JJDPA at issue here uses mandatory language, focuses on individual juveniles rather than speaking solely in the abstract language of state obligations, and establishes a specific prohibition.  On this basis, one Circuit Court of Appeals held in 1994 that the JJDPA's adult lockup provision is enforceable under § 1983.  See Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 658 (6th Cir. 1994).[29]

---

[29] Horn has not been followed by any other Circuit.

The controlling authority here, however, is not Briggs alone but Talevski and Medina, which postdate Briggs and establish a higher threshold than Blessing. Under Talevski and Medina, the critical question is not whether mandatory language benefits a defined class, but whether the statute "clearly and unambiguously" confers individual rights.  Medina, 606 U.S. at 376.  Measured against the FNHRA provisions that satisfied this standard in Talevski — which spoke explicitly of individual "rights" and directly prohibited what facilities "must not" do to individual residents — the JJDPA provision falls short.  It specifies what a state plan "shall provide," embedding the prohibition within a conditions-of-funding requirement rather than conferring rights on individual juveniles in the direct, unmistakable manner Talevski requires.  Moreover, the JJDPA, which funds state juvenile justice programs rather than providing direct individual benefits, is if anything a weaker candidate for privately enforceable rights than the Medicaid provision at issue in Medina.

C.   PREA Claim (Count Seven)

Plaintiff alleges that the defendants violated Department of Justice regulations implementing the PREA. See 28 C.F.R. § 115.342.  The regulations provide that residents of juvenile facilities may be isolated "only as a last resort when less restrictive measures are inadequate," require documentation of the basis for

isolation and reasons why no alternative exists, and mandate a thirty-day review of each resident in isolation.  Id.   The complaint alleges that plaintiff was not placed in isolation as a last resort, no thirty-day reviews were conducted, and no documentation was provided.  The defendants argue that this statute does not create rights enforceable through § 1983.  I agree.

Congress enacted the PREA in 2003 because a "high incidence of prison rape" was "undermin[ing] the effectiveness and efficiency of United States Government expenditures through grant programs."  42 U.S.C. § 15601(14). Congress sought to "make the prevention of prison rape a top priority in each prison system"; establish national standards for prison rape prevention and punishment; "protect the Eighth Amendment rights of Federal, State, and local prisoners"; and "increase the efficiency and effectiveness of Federal expenditures through grant programs . . . ."  42 U.S.C. § 15602 (2)-(3), (7)-(8).

Congress mandated that DOJ promulgate national standards governing the detection, prevention, reduction and punishment of prison rape.  34 U.S.C. § 30307.  DOJ promulgated regulations in 2012.  28 C.F.R. §§ 115 et seq.  States are not required to adopt them but a majority have done so, including Connecticut.[30]

---

[30] Connecticut adopted the regulations in 2012.  See Conn. Gen. Stat. § 18-81cc.

The PREA was adopted pursuant to Congress's Fourteenth Amendment enforcement power as well as its spending power, see 42 U.S.C. § 15601, which strengthens the case for private enforceability. And the regulations speak with the specificity and individual focus required by Tavelski: the provision that isolation may be used "only as a last resort" addresses the treatment of individual residents; the thirty-day review requirement confers on each individual a specific procedural entitlement; and the documentation requirement creates an obligation directly tied to the circumstances of each individual.

Nonetheless, a regulation may be privately enforced only if it "invoke[s] a private right of action that Congress through statutory text created," and a right of action "can extend no further than" the personal right conferred by the plain language of the statute. Alexander v. Sandoval, 532 U.S. 275, 291 (2001). In other words, a regulation cannot confer privately enforceable rights beyond those conferred by the statute itself. See Taylor v. Housing Authority of New Haven, 267 F.R.D. 36, 42 (D. Conn. 2010), aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of the City of New Haven, 645 F.3d 152, 154 (2d Cir. 2011)(explicitly adopting Judge Arterton's analysis of the private enforceability of agency regulations under Sandoval).

46

The Second Circuit has not considered whether the PREA creates privately enforceable rights.   But other judges of this court have consistently held that the PREA does not create rights that are independently enforceable through a private suit.  See, e.g., Jones v. Beckert, No. 23-cv-1603 (VDO), 2024 WL 308480, *4 (D. Conn. Jan. 26, 2024); McClendon v. Maldonado, No. 3:16-cv-02136 (SRU), 2017 WL 3821792, at *3 (D. Conn. Aug. 31, 2017); White v. Doe, No. 3:16-cv-01874 (JAM), 2017 WL 2562845, *5 (D. Conn. June 13, 2017); Green v. Martin, 224 F.Supp.3d 154, 171 (D. Conn. 2016)(Haight, J.).  Other district courts are in agreement.  See Walsh v. N.J. Dep't of Corr., No. CV 17-2442 (JBS-AMD), 2017 WL 3835666, at *3 (D.N.J. Aug. 31, 2017).[31]

D. ADA and Rehabilitation Act (Counts Nine and Ten)

Juveniles confined in state facilities are protected against discrimination on the basis of disabilities by Title II of the ADA and Section 504 of the Rehabilitation Act.  The complaint alleges that defendants violated plaintiff's rights under both Title II and section 504. Defendants contend that plaintiff's allegations fail to

---

[31] In count eight, plaintiff claims that defendants violated the Fourteenth Amendment by depriving her of a liberty interest grounded in the JJDPA and PREA regulations.  This claim overlaps with the substantive due process claims in counts one and two. As discussed above, those counts state a plausible claim for relief based in part on the JJDPA and PREA but are dismissed based on qualified immunity.  Count eight is dismissed on this basis as well.

satisfy the elements of a cognizable claim under either statute.  I disagree.

<u>Disability</u>

The ADA and Rehabilitation Act define "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); see <u>Roberts v. Royal Atl. Corp.</u>, 542 F.3d 363, 370 (2d Cir. 2008) (definition is identical under both statutes).  The 2008 ADA Amendments Act ("ADAAA") mandates that the definition "be construed in favor of broad coverage" and that the "substantially limits" standard "not be a demanding standard."  42 U.S.C. § 12102(4)(A)-(B).  Major life activities include "the operation of a major bodily function, including . . . neurological, brain, endocrine, and reproductive functions."  42 U.S.C. § 12102(2)(B).[32]

Defendants argue that plaintiff has failed to adequately allege a qualifying disability, and specifically that gender dysphoria is excluded from the ADA as a "gender identity disorder not resulting from physical impairments."  42 U.S.C. § 12211(b)(1). However, the complaint plausibly alleges ADA disability coverage on three independent grounds.

---

[32] The ADAAA directs that the disability determination "should not demand extensive analysis" and that the primary focus of ADA cases should be whether discrimination occurred, not the threshold disability question.  42 U.S.C. § 12102(4)(B).

First, the complaint alleges that plaintiff suffers from depression, PTSD, anxiety and developmental trauma disorder.  DOJ's implementing regulations identify major depression and PTSD as conditions that will "virtually always" substantially limit major life activities.  28 C.F.R. § 35.108(d)(2)(iii)(K).

Second, the ADA's exclusion of "gender identity disorders" does not encompass "gender dysphoria."  In the only circuit decision to consider the issue, the Fourth Circuit held that the two are categorically distinct. Williams v. Kincaid, 45 F.4th 759 (4th Cir. 2022).  The Court grounded its decision in a comparison of the text of the edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) in effect at the time the ADA was enacted - DSM-3 - and the current edition – DSM-5. At the time of the ADA's enactment in 1990, the diagnosis of "gender identity disorder" in DSM-3 addressed transgender identity itself; "gender dysphoria," as currently defined in DSM-5, addresses the clinically significant distress experienced by some transgender people.  The Court concluded that "the ADA excludes from its protection anything falling within the plain meaning of 'gender identity disorders,' as that term was understood 'at the time of its enactment,' Bostock [v. Clayton County, 140 S.Ct. [1731] at 1738. But nothing in the ADA, then or now, compels the conclusion that gender dysphoria

constitutes a 'gender identity disorder' excluded from ADA protection." Id. at 769. A petition for en banc review in Kincaid narrowly lost by a vote of 8 to 6, and the Supreme Court denied certiorari with a notable dissent. See 143 S. Ct. 2414 (June 30, 2023) (Alito, J., with Thomas, J., dissenting). However, the Fourth Circuit's decision is consistent with the ADAAA's mandate that the definition of "disability" be construed broadly.

Third, even if gender dysphoria were considered a "gender identity disorder," the complaint plausibly alleges that plaintiff's condition results from physical impairments. The complaint alleges a physical basis for gender dysphoria, invokes a growing body of medical research identifying physiological and genetic contributors to the condition, and alleges that plaintiff has received hormone therapy as part of her medically supervised treatment. These allegations are sufficient to raise a plausible inference that her gender dysphoria results from a physical impairment. See Kincaid, 45 F.4th at 770-72.

Animus

Defendants argue that to state a claim for relief plaintiff must allege discriminatory animus based on disability, citing Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98 (2d Cir. 2001). In Garcia, the Second Circuit recognized that Congress, in enacting Title II, intended to abrogate a state's Eleventh Amendment

immunity against suits for money damages and that this abrogation is valid insofar as it is based on Congress's power under Section 5 of the Fourteenth Amendment to enforce by appropriate legislation the constitutional guarantee that no state shall deprive any person of due process or equal protection. Id. at 108. The Court held that Title II validly abrogates a state's sovereign immunity for claims seeking damages for violations of the statute motivated by discriminatory animus on the ground that government action of this nature is proscribed by the Fourteenth Amendment. Id. at 111. Garcia's discriminatory animus requirement does not apply when — as here — the Title II claim is based on conduct that violates the substantive component of the Fourteenth Amendment's due process clause. See Bolmer v. Oliveira, 594 F.3d 134, 137 (2d Cir. 2010)(Garcia is inapplicable when Congress's abrogation is supported by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others). Because plaintiff sufficiently alleges a violation of her Fourteenth Amendment right to substantive due process under Youngberg, the ADA and Rehabilitation Act claims do not require an additional allegation of discriminatory animus.

 <u>Merits</u>

 The complaint alleges that DCF excluded plaintiff from participation in educational and rehabilitative

programs, denied her the integrated setting to which she was entitled, failed to make reasonable modifications, and discriminated against her based on her disabilities by placing her in a boys' facility, denying her gender expression, and isolating her from an appropriate peer group. Accepted as true and construed most favorably to plaintiff, these allegations are sufficient to support an ADA claim. See 28 C.F.R. § 35.130(d)(public entity shall administer services and programs in "the most integrated setting appropriate to the needs of qualified individuals with disabilities").

     E.   Sovereign Immunity

Defendants argue that the claims for money damages against the State and DCF are barred by the Eleventh Amendment. See Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). This argument is well-taken as to the § 1983 claims. As just discussed, however, Title II validly abrogates sovereign immunity for conduct that violates the Fourteenth Amendment, so the ADA damages claims against the State and DCF may proceed. As to the Rehabilitation Act, the State has waived sovereign immunity by accepting federal financial assistance. See 42 U.S.C. § 2000d-7.

IV. Conclusion

Accordingly, the motion to dismiss is hereby granted as to counts one through eight and denied as to counts nine and ten.

A telephone conference will be scheduled to take place within 30 days. Counsel are requested to confer in advance of the conference with regard to steps that should be taken to resolve the remaining claims, including whether a settlement conference would be helpful.

So ordered this 22nd day of April 2026.


_____/s/__RNC_____
          Robert N. Chatigny
       United States District Judge